FILED

2013 NOV 19 PM 4:07

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BY:_____

BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP
BLAIR A. NICHOLAS (Bar No. 178428)
(Blairn@blbglaw.com)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:   (858) 793-0070
Fax:   (858) 793-0323

*Attorneys for Plaintiff Deerfield Beach Police Pension Fund*

(Additional Counsel on signature page)

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEERFIELD BEACH POLICE PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | Civil Action No. SACV13-01818 CJC (JPRx)<br><br>ECF CASE |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| QUALITY SYSTEMS, INC., STEVEN T. PLOCHOCKI, PAUL A. HOLT, and SHELDON RAZIN, | **JURY TRIAL DEMANDED** |
| Defendants. | |

# **TABLE OF CONTENTS**

Page

I. SUMMARY OF THE ACTION ................................................................. 1

II. JURISDICTION AND VENUE ................................................................ 6

III. THE PARTIES ...................................................................................... 7

    A. Plaintiff ......................................................................................... 7

    B. Defendants ..................................................................................... 7

IV. BACKGROUND ..................................................................................... 9

V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ...................................................... 17

VI. DEFENDANTS ACTED WITH SCIENTER ............................................. 26

VII. LOSS CAUSATION ............................................................................... 28

VIII. PRESUMPTION OF RELIANCE ............................................................ 28

IX. NO SAFE HARBOR .............................................................................. 30

X. CLASS ACTION ALLEGATIONS .......................................................... 30

XI. CAUSES OF ACTION ........................................................................... 32

COUNT I Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder (Against All Defendants) .................................................................. 32

COUNT II For Violations Of Section 20(A) Of The Exchange Act (Against Defendants Plochocki, Holt and Razin) ................................................................................. 36

XII. PRAYER FOR RELIEF .......................................................................... 37

XIII. JURY DEMAND ................................................................................... 37

Plaintiff Deerfield Beach Police Pension Fund alleges the following based upon Plaintiff's personal knowledge as to itself and the investigation of Plaintiff's counsel as to all other matters, which included, among other things, a review of Quality Systems, Inc.'s ("QSI" or the "Company") public documents, conference calls and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding QSI, and securities analysts' reports and advisories about the Company.   Many facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody or control.   Plaintiff believes that further substantial evidentiary support for the allegations set forth below will exist after a reasonable opportunity for discovery.

## I.   SUMMARY OF THE ACTION

1.   This is a federal securities fraud class action brought on behalf of all persons or entities, other than Defendants and their affiliates, who purchased or otherwise acquired QSI common stock during the period from May 26, 2011 through July 25, 2012, inclusive (the "Class Period"), and were damaged thereby. This action seeks to recover damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.   As alleged herein, QSI and its senior executives made a series of materially false and misleading statements concerning the Company's purportedly strong growth prospects and favorable earnings guidance for fiscal years 2012 and 2013.   At the time Defendants made these statements, they knew or recklessly disregarded that, contrary to their representations, QSI's business was slowing significantly.

3.   Defendant QSI develops and sells practice management software to medical and dental providers, including software related to scheduling and billing. Prior to and during the Class Period, QSI portrayed itself as a high-growth

CLASS ACTION COMPLAINT

company, repeatedly touting its "record growth" in revenue and earnings, and robust "pipeline" of business that contained hundreds of millions of dollars of software sales that the Company sought to realize within the next six to eight months. QSI also repeatedly issued "bullish" annual guidance to investors, stating that it was "confident" that it would achieve annual growth rates in earnings per share ("EPS") well in excess of 20%. Based on these representations, analysts highlighted QSI's "continued growth opportunities," issued consensus estimates in-line with, or higher than, the Company's own guidance, and repeatedly recommended that investors purchase the stock. In turn, QSI's stock price increased dramatically, rising 45% from the beginning of 2011 to reach an all-time and Class Period high of $50.70 on September 27, 2011.

4. By the time the Class Period began, analysts had started to question whether QSI's growth rates, and the corresponding appreciation in its stock price, were sustainable in light of potential saturation in its principal markets. For example, on May 23, 2011, an analyst issued a report questioning whether investors could "expect revenue and earnings growth to accelerate to a level that can support further share [price] appreciation." In response to these questions, QSI's most senior executives denied that the Company's business was slowing, and assured investors that QSI would meet and even exceed market expectations for growth.

5. For instance, in the fall of 2011, Steven T. Plochocki, the Company's CEO, dismissed concerns of a slowdown in QSI's business as "baseless," stating that "[t]here is nothing drying up and there is nothing slowing down." Plochocki further issued guidance which called for QSI to report EPS growth of as much as 33% for the 2012 fiscal year – a figure that Plochocki underscored was "quite conservative," and which he stated that the Company was "very confident" it would achieve. Indeed, in the Company's SEC filings, it repeatedly assured investors that its guidance was highly reliable because the Company continually

1   updated it based on real-time data from all its operating divisions, stating that QSI
2   engaged in "a continuous reforecasting process, which incorporates inputs from all
3   operating entities to determine short term and long term expectations."
4   Throughout late 2011 and the end of January 2012, QSI repeatedly affirmed its
5   bullish guidance for the 2012 fiscal year.

6         6.       These statements were false. Contrary to the statements that QSI's
7   business was growing, and that the Company was expected to achieve EPS growth
8   of as much as 33%, the Company's business was experiencing a material
9   downturn. Specifically, QSI's new bookings had begun declining in the first
10   quarter of fiscal 2012, which began on April 1, 2011. The Company's new
11   bookings were the contracts it signed with new clients, and were essential to its
12   ability to drive earnings growth because they created new sources of revenue and
13   profit. As QSI's new bookings declined, the Company was forced to rely on
14   contract renewals by existing clients just to maintain its level of earnings (known
15   as "replacement" business), causing its growth to slow. Further, as a result of the
16   decline in new bookings, the Company's financial performance had begun to slow
17   down by late 2011. Moreover, the Company's "pipeline" had begun to decrease
18   during the fourth quarter of fiscal 2012, which began on January 1, 2012.

19         7.       Defendants knew or recklessly disregarded that QSI's growth was
20   materially slowing. Indeed, throughout the Class Period, Defendants were privy to
21   real-time data concerning the revenues and earnings of each of QSI's operating
22   divisions, and QSI's guidance was continuously updated based on that real-time
23   data. Accordingly, Defendants knew or recklessly disregarded that the fiscal 2012
24   guidance calling for earnings growth of as much as 33% was directly contradicted
25   by the reality of QSI's performance.

26         8.       QSI's fiscal 2012 year ended on March 31, 2012 and, as Defendants
27   knew, the Company's actual EPS for fiscal 2012 were far below the purportedly
28   conservative guidance Defendants had assured the market QSI would achieve.

1   Nevertheless, the Company's senior executives did not say a word about QSI's
2   extremely poor performance for more than a month. The market did not receive
3   any inkling that QSI had badly missed its guidance until May 7, 2012, when
4   Plochocki, responding to a question at an industry conference, stated that the
5   Company was experiencing delays in closing sales.

6       9.      This comment raised investor concerns about the Company's fiscal
7   2012 performance. As a result of these concerns, QSI's stock price declined 17%
8   over the next two trading days, falling from a closing price of $36.99 on May 6 to a
9   closing price of $30.99 on May 8, on very high volume. With investors seriously
10  concerned about the Company's fiscal 2012 performance and QSI's stock price
11  rapidly falling, management was forced to pre-announce its poor annual results.

12      10.     Thus, on May 10, 2012, QSI revealed that, contrary to its prior
13  statements touting its continued "record" growth, its ability to generate earnings
14  had materially slowed in fiscal 2012. Specifically, QSI announced that it would
15  report EPS of between $1.27 and $1.30 for fiscal 2012 – or as much as 36% below
16  its guidance. The market reacted with surprise and disappointment to this news,
17  and analysts reported that QSI's "big miss" on its guidance "grossly fall[s] short of
18  our estimates and consensus." QSI's stock price immediately declined 6%, falling
19  from $32.09 to $30.12 on May 10, again on extremely high volume.

20      11.     To limit this decline, and lay to rest any question that these results
21  potentially indicated a longer-term deterioration in QSI's business, the Company's
22  senior executives assured investors that QSI's poor performance was limited to the
23  2012 fiscal fourth quarter, and issued EPS guidance for the 2013 fiscal year that
24  called for significant growth of between 20% to 25%. During an analyst
25  conference call on May 17, 2012 to discuss the fiscal 2012 results, both Plochocki
26  and the Company's CFO, Paul Holt, stated that they were "confident in [their]
27  ability to deliver on this guidance" and described nine separate initiatives that
28  purportedly were underway to enable QSI to meet its guidance.

12.     The assurances were highly material to investors. Following the May 17 call, analysts reported that these remarks "give[] us comfort that the factors responsible for a weaker than expected F4Q are transitory and do not signify a pause in the company's business momentum," expressed confidence in the Company's growth prospects, and continued to recommend that investors purchase QSI stock. QSI continued to affirm its highly favorable fiscal 2013 guidance in a series of statements during the spring and summer of 2012, including in proxy materials filed on June 26, 2012, just four days before the fiscal 2013 first quarter ended.

13.     Again, however, these statements were false. The decline that had occurred in the Company's business in fiscal 2012 had only exacerbated during the first quarter of fiscal 2013. As Defendants knew based on their access to real-time data concerning the Company's revenues and earnings, QSI's EPS for the first quarter of fiscal 2013 had dramatically declined as compared to the year-ago period.

14.     QSI's fiscal 2013 first quarter closed on June 30, 2012, and the Company's results were dismal. Far from achieving at least 20% growth in earnings, the exact opposite had occurred: QSI's net income and EPS had declined by almost 20%. Significantly, while in possession of this material non-public information, QSI continued to falsely affirm its fiscal 2013 guidance weeks after the first quarter closed in proxy materials dated July 13 and July 23, 2012.

15.     On July 26, 2012 – a mere three days after QSI affirmed its guidance – QSI suddenly announced that its EPS had precipitously declined and, as a result, it was retracting its guidance. QSI disclosed that, compared to the year-ago quarter, its net income had declined 18% and its EPS had declined 19%, and thus, it was "not affirming our previous guidance nor providing revised guidance."

16.     The market reacted with shock. Analysts immediately downgraded QSI stock, and QSI's stock price collapsed on its highest trading volume of the

1   year, plummeting from $23.63 per share to $15.95 per share on July 26 – a decline

2   of 33% in a single trading day.   By itself, this single-day decline destroyed

3   approximately $330 million in QSI's market capitalization.

4          17.     Defendant Plochocki profited enormously from the scheme described

5   herein by selling tens of thousands of Company shares at artificially inflated stock

6   prices during the Class Period.   On February 24, 2012, Defendant Plochocki sold

7   88,500 QSI shares, reaping proceeds of nearly $4 million.   This massive stock sale

8   was highly suspicious.   Indeed, this was the first sale of stock that Plochocki had

9   made in nearly three and a half years, and it was executed at a price which was

10  near QSI's all-time high.   Through this sale, Plochocki liquidated nearly all – 92%

11  – of his holdings of QSI common stock just weeks before QSI closed the fiscal

12  2012 fourth quarter, at a time when he knew or recklessly disregarded that QSI

13  would not meet its annual earnings guidance.

14         18.     As summarized above and detailed further herein, the disclosure of

15  the truth about QSI's crippled growth prospects had a devastating impact on the

16  Company's shareholders, wiping out more than $600 million in shareholder value

17  and causing substantial damage to the Class.   This action seeks to recover the

18  damages suffered by those investors as a result of Defendants' fraudulent scheme.

19  II.    JURISDICTION AND VENUE

20         19.     The claims asserted herein arise under Sections 10(b) and 20(a) of the

21  Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated

22  thereunder, 17 C.F.R. § 240.10b-5.   In connection with the acts and conduct

23  alleged in this Complaint, Defendants, directly or indirectly, used the means and

24  instrumentalities of interstate commerce, including but not limited to the mails,

25  interstate wire, interstate telephone communications, and facilities of the national

26  securities markets.

27         20.     This Court has jurisdiction of this action pursuant to 28 U.S.C.

28  § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

1    21.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c)

2  and (d).  QSI maintains offices and conducts business in this District, and many of

3  the events and omissions giving rise to the claims occurred in this District.

4  III.   THE PARTIES

5     A.   Plaintiff

6    22.    Plaintiff Deerfield Beach Police Pension Fund is a closed public

7  retirement system that provides defined benefit monthly pensions to the retired

8  police officers of Deerfield Beach, Florida.  As reflected in the accompanying

9  certification, incorporated by reference herein, Plaintiff purchased QSI common

10  stock during the Class Period and suffered damages as a result of the violations of

11  the federal securities laws alleged herein.

12     B.   Defendants

13    23.    Defendant QSI is a California corporation that develops and markets

14  practice management software to medical and dental providers, including software

15  related to scheduling and billing capabilities.  QSI maintains offices and conducts

16  business in this District at 18111 Von Karman Avenue, Suite 700, Irvine,

17  California.  QSI's securities trade on the NASDAQ under the symbol "QSII."

18    24.    Defendant Steven T. Plochocki was at all relevant times QSI's Chief

19  Executive Officer and a member of the Board of Directors.  He also has served as

20  QSI's President since January 25, 2012.  During the Class Period, Plochocki

21  reviewed, approved, and signed QSI's filings with the SEC that contained false and

22  misleading statements, as detailed herein.  Plochocki also reviewed and approved

23  QSI's press releases which contained false and misleading statements.  Plochocki

24  also participated in conference calls with securities analysts in which QSI's false

25  and misleading filings with the SEC were presented and discussed, and in which

26  Plochocki made additional false and misleading statements.  Plochocki participated

27  in those conference calls from QSI's offices located in this District.  As alleged

28  herein, Plochocki knew or recklessly disregarded at all relevant times that his

1  statements concerning QSI's growth prospects were materially misleading.   In
2  addition, Plochocki had a strong financial incentive to engage in the alleged
3  misconduct.   During the Class Period, Plochocki sold 88,500 shares of his QSI
4  stock for proceeds of approximately $4 million.

5      25.    Defendant Paul A. Holt was at all relevant times QSI's Chief
6  Financial Officer.   During the Class Period, Holt reviewed, approved, and signed
7  QSI's filings with the SEC that contained false and misleading statements, as
8  detailed herein.   Holt also reviewed and approved QSI's press releases which
9  contained false and misleading statements.   Holt also participated in conference
10  calls with securities analysts in which QSI's false and misleading filings with the
11  SEC were presented and discussed, and in which Holt made additional false and
12  misleading statements.   Holt participated in those conference calls from QSI's
13  offices located in this District.     As alleged herein, Holt knew or recklessly
14  disregarded at all relevant times that his statements concerning QSI's growth
15  prospects were materially misleading.

16      26.    Defendant Sheldon Razin was at all relevant times the founder of QSI
17  and the Chairman of its Board.   He also served as QSI's CEO from 1974 until
18  April 2000, and President from 1974 until April 2000, except for the period from
19  August 1990 to August 1991. During the Class Period, Razin played an active role
20  in QSI's business and remained involved in the Company's day-to-day business
21  activities.   Razin reviewed, approved, and signed QSI's filings with the SEC that
22  contained false and misleading statements, as detailed herein.   As alleged herein,
23  Razin knew or recklessly disregarded at all relevant times that his statements
24  concerning QSI's growth prospects were materially misleading.

25      27.    Plochocki, Holt and Razin, because of their high-ranking positions
26  and direct involvement in the everyday business of the Company, directly
27  participated in the management of QSI's operations, including its reporting
28  functions and the development of its guidance, had the ability and did control

QSI's conduct, and were privy to confidential information concerning QSI and its business, operations and financial statements, as alleged herein.  These Defendants were directly involved in controlling the content and in drafting, reviewing, publishing and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, that the false and misleading statements and omissions were being issued, and approved or ratified these misstatements and omissions in violation of the federal securities laws.

IV.   BACKGROUND

28.   As noted above, QSI develops and sells practice management software to medical and dental providers.  The principal driver of the value of its stock was its ability to grow its revenues and earnings by significant amounts each year.  During conference calls and in its SEC filings issued during the Class Period, the Company repeatedly touted its "strong record of growth," underscoring that "[o]ver the past five fiscal years, revenue and earnings per share have grown at a compound annual growth rate of 23% and 18%, respectively."   Indeed, in January 2012, Plochocki emphasized that QSI stock was an attractive investment because the Company had exceeded analysts' consensus earnings expectations for five consecutive quarters.  Analysts, in turn, recommended QSI stock largely due to its "very strong growth profile," "continued growth opportunities," and track record of meeting or exceeding consensus estimates for earnings.  To boost the price of QSI stock, it was essential that Defendants continue to report stellar earnings growth.

29.   However, by the time the Class Period began in May 2011, investors had begun to question whether QSI could continue to report significant earnings growth given potential saturation in QSI's principal markets.  For example, analysts expressed "concern[]" that "new sales are becoming more difficult," noted that the Company's key physician market had achieved "70% [] penetration," and

reported on "anxiety that the [medical] software market might be more saturated than previously thought."   As Oppenheimer summarized, investors had come to wonder whether "peak multiples may be behind us."

30.   To assuage these concerns, Defendants made a series of misstatements in which they falsely represented that QSI's growth prospects continued to be strong, and issued highly favorable EPS guidance for fiscal 2012. Thus, for example, on May 26, 2011, the first day of the Class Period, Plochocki announced QSI's fiscal 2011 results and issued EPS guidance to the market for fiscal 2012 which reflected an extraordinary growth rate.   Specifically, on a conference call, Plochocki stated that QSI was in "agreement" with analysts' consensus estimates for QSI's fiscal 2012 EPS, which called for QSI to report EPS of $2.75 per share, representing a growth rate of approximately 30% year-over-year.   Defendants affirmed this guidance in a conference call on July 28, 2011, when they announced QSI's fiscal 2012 first quarter results, touting the Company's 55% increase in earnings, and assuring investors that "all four of our business units remain on-target performing to plan."

31.   These statements were material to investors.   Following the issuance of this guidance, in May and July 2011, numerous analysts recommended that investors buy QSI stock precisely because of its purported growth prospects.   For example, JPMorgan rated the stock "overweight" and reported that "we feel the company is now on solid footing to benefit from accelerated growth," and "we continue to like the company's growth prospects."   Similarly, Morgan Stanley rated QSI stock "overweight" because the "growth story remains solid."   In turn, the Company's stock price rose significantly.   Between the start of the Class Period and the end of September 2011, QSI's stock price increased approximately 13%, reaching an all-time high of $50.70 on September 27.

32.   On October 27, 2011, QSI held an analyst conference call to discuss its results for the fiscal 2012 second quarter.   Plochocki continued to underscore

the Company's "extraordinary growth," and <u>increased</u> the range of the Company's guidance.  Specifically, Plochocki announced that QSI's business was performing so well that it would now "up" its guidance to call for EPS growth of approximately 29% to 33%.  He further emphasized that "our confidence going into this quarter and our fiscal year fourth quarter is very strong," and the guidance was actually "quite conservative" in light of the Company's business opportunities.  Soon thereafter, on November 7, 2011, Plochocki stated in an interview with *Investor's Business Daily* that any "concerns that the federally-funded boom in digital health care may be slowing" were "baseless," assuring investors that "[t]here is nothing drying up and there is nothing slowing down."

33.    Analysts again reacted positively to these statements.  For example, after the October 27 call, Deutsche Bank reported that QSI was experiencing "strong growth" and that management "remains optimistic on the state of end market demand and its ability to continue to drive significant growth."  Similarly, William Blair reiterated its "outperform" rating on QSI stock, and reported that QSI "shares have the potential to benefit from strong earnings growth."

34.    On January 26, 2012, the Company announced its results for the third quarter of fiscal 2012.  On a conference call that day, Plochocki again touted QSI's "continued record growth" and assured investors that "[o]ur pipeline continues to build to record levels."  QSI not only affirmed the bullish fiscal year 2012 guidance, but Plochocki again represented that it was extremely conservative and, if anything, too low.  Specifically, on the January 26, 2012 call, he stated that QSI had recently upgraded its EPS guidance to as much as 33% growth, and added: "And actually, quite honestly, we probably have a pretty good shot at 35%."

35.    The statements summarized above were false.  At the time that Defendants made these statements touting the Company's purported growth, and issued "bullish" guidance calling for an increase of as much as 33% in the Company's EPS, the Company was experiencing a significant slowdown in its

business.  As noted above, QSI's new bookings had begun declining in the first quarter of fiscal 2012, which began on April 1, 2011, and the Company's financial performance had begun to slow down by late 2011.  Moreover, the Company's "pipeline" had begun to decrease in the fourth quarter of fiscal 2012, which began on January 1, 2012.

36.    QSI's senior executives were aware of or recklessly disregarded this slow-down in the Company's business.  Indeed, as noted above, Defendants were privy to real-time information concerning QSI's revenues and income, and QSI engaged in a continuous reforecasting process based on this data.  Thus, the true facts concerning QSI's performance were known to, or recklessly disregarded by, Defendants.

37.    On March 31, 2012, QSI's 2012 fiscal year ended, and the Company had experienced EPS growth that was significantly below what Defendants had assured the market it would achieve.  Although Defendants knew that QSI had fallen far short of its supposedly reliable and conservative guidance, Defendants made no disclosure of this fact for weeks.  It was not until May 7, 2012, that the market received its first indication that the Company's representations concerning QSI's fiscal 2012 performance may not have been accurate.  On that day, Plochocki attended the Deutsche Bank Health Care Conference.  In response to a question concerning increased competition in the marketplace, Plochocki stated that, "So yeah, it's very competitive. The deals are taking a little bit longer to get done. It's one of the trends that we're starting to see a little bit more of."

38.    This statement raised questions in the market about QSI's fiscal 2012 performance.  As a result of these concerns, QSI's stock declined 8% on May 7, declining from $36.99 to $33.98 on very high volume.  Further, based on this statement, certain analysts cut their own forecasts for QSI's performance on May 8, 2012. JPMorgan, for example, issued a report on May 8, 2012, titled "Trimming Estimates After Mgmt Commentary," in which it noted that the surprisingly

"downbeat management commentary" had sparked "investor concerns" about the Company's ability to close deals quickly, and the impact of this fact on QSI's performance. In response to this development, QSI stock declined another 9% on May 8, falling from $33.98 to $30.99, again on extraordinarily high volume.

39.   Given the investor concerns about the Company's performance and the resulting severe negative impact on QSI stock, Defendants were forced to pre-announce QSI's disappointing fiscal 2012 results. Thus, on May 10, 2012, the Company issued a press release announcing that it expected to report EPS between $1.27 and $1.30 – results which translated to growth rates that were 28% below the bottom of QSI's guidance and 36% below the top of the guidance.

40.   Analysts widely reported that these results were "disappointing" and much worse than expected even considering Plochocki's "downbeat" remarks on May 7. For example, Piper Jaffray reported that QSI's "big miss" on its guidance "grossly fall[s] short of our estimates and consensus." Credit Suisse reported that, "[c]oming on the heels of … QSII's management presentations at competitor conferences, we would suggest weaker results had begun to be discounted in [the] shares, however these preannounced results were below even revised expectations." As a direct result of this disclosure, QSI's stock price immediately declined another 6% on May 10, falling from $32.09 to $30.12 on extremely high volume.

41.   In an effort to assure investors that QSI's poor fiscal 2012 results were a one-time event and did not indicate a more lasting downturn in its business, Defendants represented that QSI's "big miss" was due to two facts unique to the fourth quarter of fiscal 2012, and that "none of the fundamentals [of QSI's business] have changed." First, in the May 10 press release, and in an analyst conference call on May 17 to discuss the 2012 fiscal year results, Plochocki and QSI stated that the poor results were caused by delays in closing certain deals prior to the end of the fourth quarter. Notably, Plochocki assured analysts on the May

17 call that closing these deals would have a positive impact on the Company's 2013 revenues, stating that "[s]everal of the deals that we should have gotten done in the March-end quarter, we have since signed and have since announced to the marketplace. ... I think the best way to characterize that is that they were seven-figure deals, and they would have had a significant impact on the quarter. And we will get the benefit of that in [the] June quarter." Second, in the May 10 press release and during the May 17 analyst conference call, Plochocki and Holt represented that QSI's fiscal 2012 performance was due to a delay in "recognition of revenue related to a large customer implementation," which would not have a negative impact on the Company's business going forward.

42.     Moreover, Plochocki and Holt assured the market that the Company's pipeline of new business had grown, and issued bullish guidance for fiscal year 2013 calling for EPS growth of between 20% and 25%. During the May 17 analyst call, Plochocki stated that "we remain confident about the growth opportunities, as evidenced by our [] guidance in the 2013 fiscal year," and detailed nine separate initiatives that supposedly would enable the Company to deliver on its fiscal 2013 guidance. Similarly, Holt underscored that "[w]e are confident in our ability to deliver on this guidance," and that the guidance was calculated using "conservative" assumptions. Plochocki and Holt stated that a key factor "supporting" their guidance was QSI's pipeline of business, which they stated "keeps growing" and was "very deep and vibrant." Indeed, Plochocki stated that the pipeline was $189 million, which represented an increase of approximately 13% year-over-year and 3% over the prior quarter.

43.     Following the May 17 call, analysts reported that, while the fiscal 2012 results were disappointing, the Company's growth prospects remained strong, and continued to recommend that investors buy QSI stock. For example, on May 17, JPMorgan reported that QSI "shares provide compelling value" because "management commentary on the call indicated the 4Q miss was part of the lumpy

nature of the business rather than a fundamental change in the end market," and "[w]e continue to believe there is ample runway ahead [for growth], and expect results over the next few quarters to prove this." Similarly, Sterne Agee issued a "buy" recommendation and reported that "[m]anagement's commentary on the earnings call gives us comfort that the factors responsible for a weaker than expected F4Q are transitory and do not signify a pause in the company's business momentum. We foresee QSII recovering into the mid-30s (up ~20% from today) over the next several months as near-term concerns recede and investors regain confidence in the company's FY13 outlook."

44. In a series of statements during the spring and summer of 2012, QSI and Plochocki affirmed the favorable fiscal year 2013 guidance, and further stated that this guidance was a key reason why the Company was superior to its competitors. For example, at a June 4, 2012 analyst industry conference, Plochocki represented that the Company's strong guidance differentiated it from its competitors, stating that "we are the only company in our sector that has finished the year and given guidance on the upcoming year for revenue and earnings growth with a 2 in front of it in those two categories." On June 26, 2012, just four days before the first quarter of fiscal 2013 ended, the Company again reaffirmed its guidance in preliminary proxy materials filed with the SEC, which included an open letter to shareholders signed by Plochocki and Razin. In this letter and in other SEC filings during this period, the Company assured investors that its guidance was reliable because the guidance was continuously updated based on real-time data, stating that QSI engaged in "a continuous reforecasting process, which incorporates inputs from all operating entities to determine short term and long term expectations."

45. Again, however, the statements concerning QSI's growth prospects were false. The slow-down in QSI's business had not only continued, but had become even more pronounced during the first quarter of fiscal 2013. Indeed, far

CLASS ACTION COMPLAINT

from growing during the first quarter of fiscal 2013, QSI's EPS were sharply declining from the year-ago quarter. Similarly, contrary to Plochocki's representation on the May 17 call that QSI's pipeline had grown during the fourth quarter of fiscal 2012, the pipeline had shrunk in that quarter.

46. On July 3, 2012, the SEC sent QSI a comment letter, which was not made public until after the Class Period, stating that the Company's disclosures concerning its guidance were inadequate. In particular, the SEC comment letter noted that the proxy materials "contain[ed] very specific projections about the future performance of Quality Systems" without providing any support, and instructed QSI to "provide support for these very specific projected figures by describing the assumptions underlying them, including any limitations on those assumptions or other factors that may cause them not to be realized." The SEC warned QSI's management that, "[s]ince the company and its management are in possession of all facts relating to a company's disclosure, they are responsible for the accuracy and adequacy of the disclosures they have made." In a subsequent letter dated July 9, 2012, which also was not made public until the Class Period ended, the SEC stated that QSI's proposed revised disclosure offered merely "generic support and discussion" and was "confusing."

47. QSI's fiscal 2013 first quarter closed on June 30, 2012. As Defendants knew, contrary to their statements that QSI would achieve 20%-25% growth in earnings, the opposite had occurred: QSI's net income and EPS had declined by almost 20%. Significantly, notwithstanding their knowledge of QSI's dismal performance – and despite the fact that the SEC had put Defendants on notice of the inadequacy of their public disclosures – Defendants continued to falsely affirm the Company's fiscal 2013 guidance weeks after the first quarter closed, in proxy materials dated July 13 and July 23, 2012.

48. Then, just three days after affirming its guidance, on July 26, 2012, QSI stunned the market by announcing its poor first quarter results and

CLASS ACTION COMPLAINT

withdrawing its purportedly reliable and conservative guidance. Specifically, on that day, QSI announced that its net income had declined 18% and its EPS had declined 19% as compared to the year-ago quarter. Due to these results, Plochocki stated that "we are not affirming our previous guidance nor providing revised guidance." Neither Plochocki nor any QSI representative provided any explanation as to how the Company could have reaffirmed its guidance as recently as three days ago, when they had known QSI's first quarter results for several weeks. QSI also announced that its pipeline had declined significantly.

49. The market reacted with astonishment. Analysts immediately downgraded QSI stock, and QSI's stock price collapsed on its highest trading volume of the year, falling from $23.63 per share to $15.95 per share on July 26 – an enormous decline of 33% in a single trading day. This single-day decline destroyed approximately $330 million in investor value.

V. DEFENDANTS' FALSE AND
MISLEADING STATEMENTS AND OMISSIONS

50. During the Class Period, Defendants represented to investors that QSI's growth prospects were strong and its pipeline of expected software sales was increasing, and issued very favorable EPS guidance for fiscal years 2012 and 2013. Defendants' statements were materially false and misleading because, in truth, the Company's business was slowing significantly. Accordingly, the guidance for fiscal years 2012 and 2013 lacked any reasonable basis and/or Defendants were aware of facts that tended to seriously undermine the accuracy of their statements. The paragraphs set forth below: (i) identify Defendants' Class Period statements and omissions alleged to be materially false and misleading, (ii) set forth when, where, and by whom they were made, and (iii) summarize why those statements and omissions were materially false and misleading.

51. The May 26, 2011 and July 28, 2011 Conference Calls. On May 26, 2011, the first day of the Class Period, QSI held an analyst conference call to

report its fiscal 2011 fourth quarter and year-end results (the "May 26 Conference Call"). During this call, Defendant Plochocki stated that QSI was in "agreement with the consensus view of the analysts in terms of their projections for revenue and [] EPS for fiscal year 2012." Analysts' consensus estimates at that time were for QSI to report EPS for fiscal 2012 of $2.75 per share, reflecting a growth rate of approximately 30% from the prior year. On July 28, 2011, QSI held an analyst conference call to report its fiscal 2012 first quarter results (the "July 28 Conference Call"). On the July 28 Conference Call, Plochocki again stated that QSI was in "agreement with the consensus view of the analysts for revenue and earnings per share."

52.     October 27, 2011 Conference Call: On October 27, 2011, QSI held an analyst conference call to discuss its results for the fiscal 2012 second quarter. During the conference call, Plochocki praised the "extraordinary growth" that QSI had experienced in that quarter, and stated that:

> As a result of our strong first-half performance and <u>our confidence in the second half of this year, we are now prepared to up our general views for the year.</u> More in line with consensus views, we are now in general agreement with a revenue range of growth of 21% to 24% for the year and <u>an EPS range of growth of 29% to 33% for the year.</u> This is an <u>upgrade</u> from our previous views of 20% to 23% revenue growth and … 28% to 32% EPS growth. <u>Our confidence is strong, we're bullish on our second half</u>[.]

53.     During the October 27, 2011 call, an analyst asked whether the Company's raised guidance was "conservative," and Plochocki stated that the guidance was "quite conservative" given that the Company's pipeline of future business was so "large:"

> And so our confidence going into this quarter and our fiscal year fourth quarter is very strong. So it gave us the opportunity to take a

1       second look at the ranges we had provided historically and <u>gave us</u>
2       <u>the confidence to up them</u> slightly. And as you know, we're
3       typically <u>quite conservative</u>.

4       54.    <u>The November 7, 2011 Interview</u>: On November 7, 2011, *Investors'*
5   *Business Daily* published an interview with Plochocki titled "Quality Systems
6   Chief Says Boom Just Getting Started." In that interview, Plochocki denied that
7   the Company's business was slowing. Specifically, that article stated as follows:
8   "Plochocki said worries about flattening and saturation were baseless. 'There is
9   nothing drying up and there is nothing slowing down,' he said."

10       55.    <u>January 9, 2012 Conference</u>: On January 9, 2012, Plochocki attended
11   a JPMorgan Global Healthcare Conference (the "January 9, 2012 Conference").
12   At the January 9, 2012 Conference, Plochocki again affirmed the upwardly revised
13   fiscal 2012 guidance as follows:

14       We are earmarked for a very strong year. Our fiscal year ends
15       March 31, and we have given analysts prognostications for …
16       earnings per share growth [in the] 29% to 34% range.

17       56.    <u>The January 26, 2012 Conference Call</u>: On January 26, 2012, QSI
18   held an analyst call to discuss its fiscal 2012 third-quarter results. On that call,
19   Plochocki touted the Company's "continued record growth," and stated that

20       <u>Our pipeline continues to build to record levels</u>. As leads, RFPs,
21       online demos, web hits continue to accelerate throughout all of our
22       business units, <u>we're setting a very strong foundation for what we</u>
23       <u>believe is going to be a powerfully robust period here in the second</u>
24       <u>year of the stimulus movement</u>.

25       57.    On the call, an analyst noted that, "over the last couple of quarters,
26   you have been providing us some higher-level guidance in terms of growth," and
27   asked for "an update [] on where you stand with respect to this current fiscal year."
28   In response, Plochocki stated that:

I think the guidance that we provided last quarter was 21% to 24% revenue growth for the year. That's the year that will be ending in two months. And then our EPS, I think we upgraded to 29% to 34%. And actually, quite honestly, we probably have a pretty good shot at 35% on that bottom one. And then, of course, we'll be announcing guidance on our next call for our fiscal year 2013.

58.     At the end of the January 26, 2012 conference call, Plochocki again underscored QSI's purported favorable growth prospects, as follows:

I think what you see here is a company that's now five straight quarters where we have exceeded analysts' expectations for revenue growth and earnings per share. We have $183 million pipeline, which is growing. We have categories three and four in your pipeline, which are building, as well, so I think along the lines of the CMS report that came out late October, excuse me, late November, we truly are embarking upon probably a four to eight quarter period of the most robust growth in EHR adoption, and we're well prepared for it with product and service offerings that we think will serve the shareholder quite well.

59.     The February 7, 2012 Conference: On February 7, 2012, Plochocki attended the UBS Global Health Care Services Conference (the "February 7, 2012 Conference"). At the February 7, 2012 Conference, Plochocki again stated that the Company's pipeline of new business was "continually growing," as follows:

Our sales pipeline; we have $183 million worth of pipeline, the business we intend to close within the next six to eight months. That sales pipeline has grown every quarter since the announcement of the stimulus bill back in February of 2009 and we view it as continually growing as a result of the fact that the leads that continue to come into our system, the RFPs, are building

<u>a strong base along those areas</u>.

60.     The statements set forth above in ¶¶51-59 were materially false and misleading.  At the time that Defendants made these statements, QSI's business had already experienced a material slow-down.  As noted above, QSI's new bookings had begun declining in the first quarter of 2012, which began on April 1, 2011, thereby causing the Company's earnings growth to slow.  Further, the Company's financial performance had begun to materially slow down by late 2011.  Moreover, contrary to the statements concerning the purported growth in QSI's pipeline, QSI's pipeline had begun to decline in the fourth quarter of fiscal 2012, which began on January 1, 2012.

61.     <u>May 10, 2012 Press Release and Form 8-K</u>:  On May 10, 2012, QSI issued a press release, which was filed with the SEC on Form 8-K that same day (the "May 10 Press Release and Form 8-K").  Defendant Holt signed the Form 8-K.  In the press release, QSI preliminarily announced its results for the 2012 fiscal year, including the fact that it expected to miss its guidance by material amounts, as described above.  QSI also issued highly favorable guidance for fiscal year 2013.  Specifically, the May 10 Press Release and Form 8-K stated that: "Quality Systems' management also announced annual revenue and earnings per share guidance for the upcoming 2013 fiscal year.  … [E]arnings per share are expected to grow between 20 and 25 percent versus the 2012 fiscal year."

62.     <u>The May 17, 2012 Conference Call</u>:  On May 17, 2012, QSI held a conference call to discuss its 2012 fiscal year results.  On that call, Defendants affirmed the guidance set forth in the May 10 Press Release and Form 8-K.  Defendants also made numerous false statements designed to convince investors that QSI's poor 2012 fiscal year results were a one-time event, and that the Company's growth prospects remained strong.  For example, Defendant Plochocki stated:

<u>Our performance for fiscal 2012 fourth quarter was impacted due</u>

1  to delays in both the closing of several fourth-quarter
2  opportunities, as well as recognition of revenue related to a large
3  customer implementation. Looking ahead, we remain confident
4  about the growth opportunities, as evidenced by our recent
5  guidance in the 2013 fiscal year. We have stated that we expect
6  revenues to increase 20% to 24%, earnings per share to grow 20%
7  to 25%.

8  Some of the key dial-movers for our upcoming year include, one,
9  to continue to expand offshore capabilities for software
10  development and back office functions; two, expand our
11  international distribution channel; three, continue to maximize
12  cross-selling opportunities; four, sell more multiple product deals,
13  like the Norton deal that we recently announced; five, expand
14  RCM capabilities to dental and hospital markets; six, move
15  upstream in the hospital sector; seven, be at the forefront of ACO
16  modeling. At HIMSS in February, we introduced five new
17  products to aid physicians in that effort. Eight, continue to
18  compete and win in the 50% of the market that has yet to adopt
19  electronic medical records. Nine, continue to acquire product and
20  service offerings that supplement or complement our core offerings
21  domestically and internationally.

22  63.   Later in the call, in response to an analyst question concerning the
23  Company's ability to meet its guidance, Defendant Plochocki assured investors
24  that QSI was "very confident" in its ability to deliver on its guidance in light of the
25  nine initiatives described above:

26  We have been historically a 20/20 or better company for at least
27  the last 12 years. We are earmarking this year to be the same. We
28  anticipate that the expansion in those nine areas I addressed twice

-22-                        CLASS ACTION COMPLAINT

1    already on this call, I think, are going to give us opportunities to

2    continue to keep that pace. <u>We are very -- we are very confident in</u>

3    <u>that.</u>

4    64.    Similarly, Defendant Holt stated that the Company was confident in

5    its ability to deliver on its guidance, in significant part because of the purportedly

6    strong pipeline:

7    Moving on to our fiscal 2013 guidance, our guidance range of 20%

8    to 24% revenue growth includes expected growth in all of our

9    business segments and revenue categories. We are expecting a

10   slight increase in recurring revenue share of total revenue next

11   year, primarily on the heels of faster growth in RCM and other

12   recurring revenue streams. <u>We are confident in our ability to</u>

13   <u>deliver on this guidance</u>, which is very consistent with our five-

14   year compound annual growth rate of 23%.

15   <u>Supporting our confidence in this guidance range are a number of</u>

16   <u>factors, including our current sales pipeline</u>, growing momentum in

17   RCM, which Monty will discuss further, increased interest we are

18   seeing from payor groups and large enterprise customers in

19   enterprise Ambulatory solutions, as rapid growth in demand for

20   consulting and other services, additional products and service

21   capabilities as a result of acquisitions and new international market

22   opportunities.

23   Our earnings per share guidance of 20% to 25% growth represents

24   a slight increase compared to our five-year average compound

25   annual growth rate of approximately 18%, and is consistent with

26   what we've achieved on average over the last two years.

27   65.    In response to an analyst question, Plochocki again attributed the

28   poor fiscal 2012 results to delays in closing a few deals, and stated that the

-23-                              CLASS ACTION COMPLAINT

1 | Company's business remained sound, its pipeline continued to be strong, and the
2 | Company's first quarter of fiscal 2013 was off to a strong start:

3 |     [E]very four to six quarters, we have a quarter like this where the
4 |     deals don't line up the way we would like them to, and we just
5 |     don't get them done. Several of the deals that we should have
6 |     gotten done in the March-end quarter, we have since signed and
7 |     have since announced to the marketplace. It happens periodically.
8 |     <u>None of the fundamentals [of QSI's business] have changed,</u>
9 |     <u>though. Our pipeline is deep.</u> Our categories one and two are
10 |     strong. We have a very strong bevy of six- and seven-figure deals
11 |     in that pipeline. None of the fundamentals gave us any indications
12 |     that we weren't going to be able to pull some of these deals
13 |     through. <u>But the bottom line is that we did close many of them</u>
14 |     <u>heading into this June quarter, and we are really off to a pretty</u>
15 |     <u>good start for June.</u>

16 | 66.    Similarly, later in the call, Plochocki stated:

17 |     The takeaway from this is that if the fundamentals have changed,
18 |     that would be a different story. <u>But our fundamentals haven't</u>
19 |     <u>changed. Our pipeline keeps growing,</u> categories one and two are
20 |     very deep and vibrant for us this quarter. We haven't seen any
21 |     fundamental change to any of the dynamics that have been feeding
22 |     into our system for the last two to three years.

23 | 67.    In response to another analyst question as to whether the delay in
24 | closing deals during the fiscal year 2012 fourth quarter would "get worse" and
25 | negatively impact QSI's business in fiscal year 2013, Plochocki flatly denied that
26 | the Company anticipated any deterioration in its performance for fiscal 2013,
27 | stating:

28 |     The several deals that took longer than we anticipated in our fourth

1    quarter that have entered into closure cycles for our first quarter is

2    one issue.  <u>Whether I am anticipating this to be an impact on our</u>

3    <u>fiscal 2013, I would say no. It is two different issues</u>.  Fiscal 2013,

4    as we have it earmarked in our four divisions, with the nine points

5    that we are going to drive, with the deals that we've closed, with

6    the acquisitions we've already done, with our international

7    distribution, channel distribution program now underway, <u>we</u>

8    <u>believe that we are going to be able to continue to grow at 20/20</u>.

9    68.    <u>The June 26, 2012 Letter to Shareholders</u>: As the first quarter of

10   fiscal 2013 progressed, Defendants repeatedly affirmed their bullish guidance

11   calling for EPS growth of between 20% and 25%.  For example, on June 26, 2012,

12   just four days before the fiscal 2013 first quarter closed, QSI filed proxy materials

13   with the SEC on Schedule 14A.  These proxy materials consisted of an Open Letter

14   to Shareholders signed by Defendants Plochocki and Razin, among others (the

15   "June 26, 2012 Letter to Shareholders").   In that letter, Defendants stated as

16   follows:

17          We are proud of our strong record of delivering earnings growth

18          and generating superior returns for our shareholders.  <u>We are also</u>

19          <u>confident about our growth prospects. For fiscal 2013, we expect</u>

20          <u>that revenues will increase in the 20-24% range and we expect</u>

21          <u>earnings per share to grow by 20-25%</u>.

22          <u>Led by our Board nominees and management team, we have a</u>

23          <u>robust strategy in place</u> to enhance our position as a leader in the

24          healthcare information technology (HCIT) sector and <u>capture</u>

25          <u>growth</u> potential arising out of demographic, industry and

26          regulatory developments.

27   69.    The statements set forth above in ¶¶61-68 concerning QSI's

28   purported growth prospects were materially false and misleading, and the guidance

-25-                                          CLASS ACTION COMPLAINT

1   for fiscal year 2013 was without any objective basis.  At the time that Defendants
2   made these statements and issued the fiscal year 2013 guidance, QSI's business
3   was already experiencing a pronounced downturn.  Indeed, far from growing,
4   QSI's earnings for the first quarter of 2013 were declining far below the earnings it
5   had recorded for the prior fiscal year.  Moreover, at the time that Defendants made
6   the statements summarized above touting the purported continued growth in QSI's
7   pipeline, QSI's pipeline was declining.

8       70.   The July 13 and July 23, 2012 Proxy Materials: QSI's fiscal 2013
9   first quarter ended on June 30, 2012.  As noted above, while Defendants had
10  falsely assured investors that QSI would report EPS growth of between 20% and
11  25% for fiscal year 2013, in reality, QSI's EPS had declined by 19%.
12  Nevertheless, weeks after the quarter ended, Defendants continued to affirm the
13  materially false and misleading 2013 fiscal year guidance.   Specifically, on
14  July 13, 2012, Defendants filed QSI's Definitive Proxy Statement with the SEC on
15  Schedule 14A, and on July 23, 2012, Defendants filed Additional Definitive Proxy
16  Materials with the SEC on Schedule 14A (collectively, the "July 13 and July 23,
17  2012 Proxy Materials").  The July 13 and July 23, 2012 Proxy Materials were
18  signed by Defendants Plochocki and Razin.  In the July 13 and July 23, 2012 Proxy
19  Materials, Defendants stated, "For fiscal 2013, … we expect earnings per share to
20  grow by 20-25%."

21      71.   The statements set forth in ¶70 were materially false and misleading.
22  As noted above, at the time Defendants made these statements asserting that QSI's
23  EPS for fiscal 2013 would grow by between 20%-25%, they knew that QSI's EPS
24  for the first quarter of 2013 had dramatically declined.

25  VI.   DEFENDANTS ACTED WITH SCIENTER

26      72.   The facts alleged herein establish that Defendants' misstatements
27  were intentional and/or reckless.  At all times, Defendants Plochocki, Holt, and
28  Razin were well aware of or recklessly disregarded the slow-down in QSI's

business.   Specifically, these Defendants were personally involved with, and exercised control over, the determination of what EPS guidance the Company publicly issued.  These Defendants were also privy to real-time data reflecting the true revenues and earnings of every QSI operating division.  Moreover, as noted above, QSI stated that it employed a "continuous reforecasting process" pursuant to which its guidance was continually recalculated based on that data, and these Defendants were privy to these calculations.  Accordingly, during the Class Period, these Defendants knew or recklessly disregarded that QSI's guidance calling for significant growth was completely at odds with the reality of its business, which was slowing down in fiscal year 2012 and, for fiscal year 2013, was sharply contracting.

73.   Indeed, Defendants repeatedly affirmed QSI's bullish fiscal 2013 guidance weeks after the first quarter had ended, when they knew that QSI's EPS had declined by 19%.  Such misconduct is highly indicative of an intent to deceive and, at a minimum, is severely reckless.

74.   In addition, Defendant Plochocki profited enormously from the scheme to misrepresent the true quality of QSI's growth prospects.   While in possession of material, nonpublic information regarding the pronounced slow-down in QSI's business, Defendant Plochocki sold substantial amounts of QSI common stock from his holdings at artificially inflated prices. The price at which Defendant Plochocki sold his stock far exceeded the closing price of QSI stock after the Company announced that its EPS had significantly declined (*i.e.,* $15.95 on July 26, 2012).

75.   On February 24, 2012, Defendant Plochocki sold 88,500 QSI shares at $43.99 per share, reaping proceeds of $3,893,115.   This stock sale was suspicious in timing and amount because: (i) Defendant Plochocki made this sale when he was aware that he was misrepresenting QSI's growth prospects; (ii) prior to making this massive stock sale, he had made no stock sales for approximately

1  three and a half years; (iii) through this sale, he liquidated nearly all, *i.e.*, 92%, of

2  his holdings of QSI stock; and (iv) he made these sales at a time when QSI's stock

3  price was near its all-time high. As such, Defendant Plochocki's significant insider

4  stock sales while in possession of material nonpublic information regarding QSI's

5  true growth prospects and financial performance further support a strong inference

6  of his scienter.

7  VII.  LOSS CAUSATION

8      76.  Defendants' wrongful conduct directly caused the economic loss

9  suffered by Plaintiff and the other members of the Class. The materially false and

10  misleading statements set forth above were widely disseminated to the securities

11  markets, investment analysts and the investing public. As a result, Plaintiff and the

12  other members of the Class purchased QSI securities at artificially inflated prices

13  and were damaged when the artificial inflation dissipated as a result of partial

14  corrective disclosures entering the market that revealed QSI's true growth

15  prospects and financial performance, as set forth above at ¶¶37-40, 48-49.

16      77.  The decline in QSI's stock price was a direct and proximate result of

17  the Defendants' scheme being revealed to investors and to the market. The timing

18  and magnitude of QSI's stock price decline negates any inference that the losses

19  suffered by Plaintiff and the other members of the Class were caused by changed

20  market conditions, macroeconomic factors, or even Company-specific facts

21  unrelated to Defendants' fraudulent conduct.

22  VIII.  PRESUMPTION OF RELIANCE

23      78.  Plaintiff is entitled to a presumption of reliance under *Affiliated Ute*

24  *Citizens of Utah v. U.S.*, 406 U.S. 128 (1972) because the claims asserted herein

25  against Defendants are predicated in part upon material omissions of fact that

26  Defendants had a duty to disclose.

27      79.  Plaintiff is also entitled to a presumption of reliance on Defendants'

28  material misrepresentations and omissions pursuant to the fraud-on-the-market

doctrine because, at all relevant times, the market for QSI securities was open, efficient, and well-developed for the following reasons, among others:

    (a) QSI's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient market for securities;

    (b) As a public company, QSI filed periodic reports with the SEC;

    (c) QSI regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services;

    (d) QSI was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales forces and certain customers; and

    (e) The price of QSI securities promptly reacted to the dissemination of new information regarding the Company, as set forth above. QSI securities were actively traded throughout the Class Period with substantial trading volume.

80.    As a result of the foregoing, the market for QSI stock promptly digested current information regarding QSI from all publicly available sources and reflected such information in QSI's stock price. Under these circumstances, all purchasers of QSI common stock during the Class Period suffered similar injury through their purchase of QSI common stock at artificially inflated prices, and a presumption of reliance applies.

81.    Accordingly, Plaintiff and the other members of the Class did rely and are entitled to have relied on the integrity of the market price for QSI securities, and a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period applies.

IX.   NO SAFE HARBOR

82.   The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements and omissions pleaded in this Complaint.  Many of the alleged false statements herein are not forward-looking, but concern then-existing facts about QSI's financial performance.  In addition, any forward-looking statements alleged to be false herein were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Furthermore, to the extent that the statutory safe harbor would otherwise apply to any statement found by the Court to be forward-looking, Defendants are liable for those false or misleading forward-looking statements because at the time each of those statements was made, the speaker knew that the statement was false or misleading, or the statement was authorized and/or approved by an executive officer of QSI who knew that the statement was false or misleading when made.

X.   CLASS ACTION ALLEGATIONS

83.   Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons or entities, other than Defendants and their affiliates, who purchased or otherwise acquired QSI common stock during the period from May 26, 2011 through July 25, 2012, inclusive (defined above as the "Class Period"), and were damaged thereby.  Excluded from the Class are Defendants; QSI's affiliates and subsidiaries; the officers and Directors of QSI and its subsidiaries and affiliates at all relevant times; members of the immediate family of any excluded person; heirs, successors, and assigns of any excluded person or entity; and any entity in which any excluded person has or had a controlling interest.

84.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, QSI common shares were

actively traded on the NASDAQ. As of May 21, 2012, QSI had approximately 59,294,619 shares of common stock issued and outstanding. Although the exact number of Class members is unknown to Plaintiff at this time, Plaintiff believes that there are at least thousands of members of the proposed Class. Members of the Class can be identified from records maintained by QSI or its transfer agent(s), and may be notified of the pendency of this action by publication using a form of notice similar to that customarily used in securities class actions.

85.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class were similarly damaged by Defendants' conduct as complained of herein.

86.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of fact and law common to the Class are:

(a) whether Defendants' misrepresentations and omissions as alleged herein violated the federal securities laws;

(b) whether Defendants' misrepresentations and omissions as alleged herein were material;

(c) whether Defendants Plochocki, Holt and Razin are personally liable for the alleged misrepresentations and omissions described herein;

(d) whether Defendants' misrepresentations and omissions as alleged herein caused the Class members to suffer a compensable loss; and

(e) whether the members of the Class have sustained damages, and the proper measure of damages.

87.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation. Plaintiff has no interest that conflicts with the interests of the Class.

88.     A class action is superior to all other available methods for the fair

1  and efficient adjudication of this action. Joinder of all Class members is

2  impracticable. Additionally, the damage suffered by some individual Class

3  members may be small relative to the burden and expense of individual litigation,

4  making it practically impossible for such members to redress individually the

5  wrongs done to them. There will be no difficulty in the management of this action

6  as a class action.

7  XI.   CAUSES OF ACTION

8                                COUNT I

9

10              Violations Of Section 10(b) Of The Exchange Act
                And Rule 10b-5 Promulgated Thereunder

11                        (Against All Defendants)

12      89.    Plaintiff repeats and re-alleges each and every allegation set forth

13  above as if fully set forth herein.

14      90.    During the Class Period, Defendants QSI, Plochocki, Holt and Razin

15  carried out a plan, scheme and course of conduct which was intended to, and

16  throughout the Class Period, did: (i) deceive the investing public regarding QSI's

17  business, operations, growth prospects and the intrinsic value of QSI securities;

18  (ii) enable Defendants to artificially inflate the price of QSI securities;

19  (iii) enable Defendant Plochocki to sell almost $4 million of his privately-held QSI

20  shares during the Class Period and while in possession of material adverse non-

21  public information about the Company; and (iv) cause Plaintiff and other members

22  of the Class to purchase QSI securities at artificially inflated prices. In furtherance

23  of this unlawful scheme, plan and course of conduct, Defendants jointly and

24  individually (and each of them) took the actions set forth herein.

25      91.    Defendants (i) employed devices, schemes, and artifices to defraud;

26  (ii) made untrue statements of material facts or omitted to state material facts

27  necessary in order to make the statements made, in light of the circumstances

28  under which they were made, not misleading; and (iii) engaged in acts, practices,

1  and a course of business that operated as a fraud or deceit upon the purchasers of
2  the Company's securities during the Class Period in an effort to maintain
3  artificially high market prices for QSI securities in violation of Section 10(b) of the
4  Exchange Act and Rule 10b-5. Defendants are sued as primary participants in the
5  wrongful and illegal conduct charged herein. Defendants Plochocki, Holt and
6  Razin are also sued as controlling persons as alleged below.

7      92.   Defendants, individually and in concert, directly and indirectly, by
8  the use, means or instrumentalities of interstate commerce and/or of the mails,
9  engaged and participated in a continuous course of conduct to conceal adverse
10 material information about the business, operations and future prospects of QSI as
11 specified herein.

12     93.   Defendants employed devices, schemes and artifices to defraud, while
13 in possession of material adverse non-public information and engaged in acts,
14 practices, and a course of conduct as alleged herein in an effort to assure investors
15 of QSI's value and performance and continued substantial growth, which included
16 the making of, and the participation in the making of, untrue statements of material
17 facts and omitting to state material facts necessary in order to make the statements
18 made about QSI and its business operations and future prospects in light of the
19 circumstances in which they were made, not misleading, as set forth more
20 particularly herein, and engaged in transactions, practices and a course of business
21 which operated as a fraud and deceit upon the purchasers of QSI securities during
22 the Class Period.

23     94.   Defendant QSI is liable for all materially false and misleading
24 statements made during the Class Period, as alleged above at ¶¶50-71.

25     95.   QSI is liable for the false and misleading statements made by QSI
26 officers during conference calls with investors and analysts as the maker of such
27 statements and under the principle of respondeat superior.

28     96.   Defendants Plochocki and Holt, as the most senior officers of the

1   Company, and Defendant Razin, as the Company's Chairman, are liable as direct
2   participants in the wrongs complained of herein.   Through their high-ranking
3   positions of control and authority as the most senior executive officers and
4   Chairman of the Company, each of these Defendants was able to control, and did
5   directly control, the content of the public statements disseminated by QSI.  These
6   Defendants had direct involvement in the daily business of the Company and
7   participated in the preparation and dissemination of QSI's materially false and
8   misleading statements set forth above.

9        97.    In addition, Defendants Plochocki, Holt and Razin are liable for,
10   among other material omissions and false and misleading statements, the false and
11   misleading statements and omissions they made as follows:

12   Defendant Plochocki:

13       a. Defendant Plochocki authorized the May 10, 2012 Press Release.
14       b. Defendant Plochocki signed the June 26, 2012 Letter to Shareholders,
15          and the July 13 and 23, 2012 Proxy Materials.
16       c. Defendant Plochocki made statements during numerous conference
17          calls and other public conferences as alleged herein, including calls
18          and conferences on May 26, 2011, July 28, 2011, October 27, 2011,
19          January 9, 2012, January 26, 2012, and May 17, 2012.

20   Defendant Holt

21       a. Defendant Holt signed the May 10, 2012 Form 8-K.
22       b. Defendant Holt made statements during conference calls and other
23          public conferences as alleged herein, including the call on May 17,
24          2012.

25   Defendant Razin

26       a. Defendant Razin signed the June 26, 2012 Letter to Shareholders, and
27          the July 13 and 23, 2012 Proxy Materials.

28

98.     The allegations in this Complaint establish a strong inference that Defendants acted with scienter throughout the Class Period in that they had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts. Defendants' misrepresentations and omissions were done knowingly or with recklessness for the purpose and effect of concealing QSI's operating condition and future business prospects from the investing public and supporting the artificially inflated price of QSI's securities. As demonstrated by Defendants' material misstatements and omissions throughout the Class Period, if Defendants did not have actual knowledge of the misrepresentations and omissions alleged herein, they were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether their statements were false or misleading, even though such facts were available to them. Specifically, Defendants knew or recklessly disregarded that QSI's business was materially slowing during the Class Period, as described more fully above.

99.     Plaintiff and the other members of the Class have suffered damages in that, in direct reliance on the integrity of the market in which the securities trade and/or the materially false and misleading statements and omissions made by Defendants, they paid artificially inflated prices for QSI common stock, which inflation was removed from the stock when the true facts became known. Plaintiff and the other members of the Class would not have purchased QSI common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

100.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

101.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of QSI securities during the Class Period.

## COUNT II

### For Violations Of Section 20(A) Of The Exchange Act
(Against Defendants Plochocki, Holt and Razin)

102.   Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

103.   Defendants Plochocki, Holt and Razin acted as controlling persons of QSI within the meaning of Section 20(a) of the Exchange Act, as alleged herein. By reason of their high-level positions of control and authority as the Company's most senior officers and, in the case of Razin, as QSI's Chairman, these Defendants had the power and authority to influence and control, and did influence and control, the decision-making and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. These Defendants were able to and did influence and control, directly and indirectly, the content and dissemination of the public statements made by QSI during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein. Defendants were provided with or had unlimited access to copies of the Company's press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

104.   In their capacities as QSI's most senior corporate officers and Chairman, and as more fully described above, Defendants Plochocki, Holt and Razin had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities law violations as alleged herein. These Defendants signed QSI's SEC filings, and were directly involved in providing false information and certifying and/or approving the false

1  statements disseminated by QSI during the Class Period.

2      105.   By virtue of their positions as controlling persons of QSI and as a

3  result of their own aforementioned conduct, Defendants Plochocki, Holt and Razin,

4  together and individually, are liable pursuant to Section 20(a) of the Exchange Act,

5  jointly and severally with, and to the same extent as the Company is liable under

6  Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

7  Moreover, as detailed above, during the time that Defendants Plochocki, Holt and

8  Razin exercised control over QSI, each of these Defendants was culpable for the

9  material misstatements and omissions made by QSI, including such misstatements

10 as to QSI's growth prospects, as set forth above.

11     106.   As a direct and proximate result of these Defendants' misconduct,

12 Plaintiff and the other members of the Class suffered damages in connection with

13 their purchases or acquisitions of QSI securities during the Class Period.

14 XII.   PRAYER FOR RELIEF

15     WHEREFORE, Plaintiff prays for relief and judgment as follows:

16     (a) Declaring that this action is a proper class action and certifying Plaintiff

17 as class representative under Rule 23 of the Federal Rules of Civil Procedure;

18     (b) Awarding compensatory damages in favor of Plaintiff and the other Class

19 members against all Defendants, jointly and severally, for all damages sustained as

20 a result of Defendants' wrongdoing, in an amount to be proven at trial, including

21 interest thereon;

22     (c) Awarding Plaintiff and the other members of the Class their reasonable

23 costs and expenses incurred in this action, including attorneys' fees and expert

24 fees; and

25     (d) Awarding such other and further relief as the Court may deem just and

26 proper.

27 XIII.  JURY DEMAND

28     Plaintiff hereby demands a trial by jury of all issues so triable.

-37-                          CLASS ACTION COMPLAINT

1   Dated:  November 19, 2013

2                                          Respectfully submitted,

3                                          BERNSTEIN LITOWITZ BERGER
                                             & GROSSMANN LLP

4                                          By: _____

5
                                           Blair A. Nicholas (Bar No. 178428)
6                                          (Blairn@blbglaw.com)
                                           12481 High Bluff Drive, Suite 300
7                                          San Diego, CA 92130
                                           Tel:   (858) 793-0700
8                                          Fax:   (858) 793-0323

9
                                           *Attorneys for Plaintiff Deerfield Beach*
10                                         *Police Pension Fund and Proposed Lead*
                                           *Counsel for the Class*
11

12

13  KLAUSNER, KAUFMAN, JENSEN              BERNSTEIN LITOWITZ BERGER
       & LEVINSON                             & GROSSMANN LLP
14  Robert D. Klausner                     Gerald H. Silk
15  (Bob@robertdklausner.com)              (Jerry@blbglaw.com)
    10059 Northwest 1st Court              John J. Rizio-Hamilton
16  Plantation, FL 33324                   (Johnr@blbglaw.com)
    Tel:   (954) 916-1202                  1285 Avenue of the Americas
17  Fax:   (954) 916-1232                  New York, NY 10019
                                           Tel:   (212) 554-1400
18  *Additional Counsel for Plaintiff*     Fax:   (212) 554-1444
19  *Deerfield Beach Police Pension Fund*
                                           *Attorneys for Plaintiff Deerfield Beach*
20                                         *Police Pension Fund and Proposed Lead*
                                           *Counsel for the Class*
21

22

23

24

25

26

27

28

-38-                          CLASS ACTION COMPLAINT

### CERTIFICATION PURSUANT TO
### THE FEDERAL SECURITIES LAWS

I, Richard A. Giuffreda, on behalf of Deerfield Beach Police Pension Fund ("Deerfield Beach"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Chairman of Deerfield Beach. I have reviewed the complaint and authorize its filing.

2. Deerfield Beach did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Deerfield Beach is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Deerfield Beach's transactions in the Quality Systems, Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5. Deerfield Beach has not sought to serve as a lead plaintiff or representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification.

6. Deerfield Beach will not accept any payment for serving as a representative party on behalf of the Class beyond Deerfield Beach's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___ day of November, 2013.

Richard A. Giuffreda
Chairman
*Deerfield Beach Police Pension Fund*

**Deerfield Beach Police Pension Fund**
Transactions in Quality Systems, Inc.

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 2/1/2012 | 630 | $39.2250 |
| Sale | 5/14/2012 | (630) | $31.7336 |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge _____ Cormac J. Carney _____ and the assigned Magistrate Judge is _____ Jean P. Rosenbluth _____ .

The case number on all documents filed with the Court should read as follows:

## SACV13-01818 CJC (JPRx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge.

Clerk, U. S. District Court

November 19, 2013
_____
Date

By ___ Dwayne Roberts _____
Deputy Clerk

---

## NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

**Subsequent documents must be filed at the following location:**

| ☐ Western Division | ☒ Southern Division | ☐ Eastern Division |
|---|---|---|
| 312 N. Spring Street, G-8 | 411 West Fourth St., Ste 1053 | 3470 Twelfth Street, Room 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701 | Riverside, CA 92501 |

**Failure to file at the proper location will result in your documents being returned to you.**

---

CV-18 (08/13)                    NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| I. (a) PLAINTIFFS ( Check box if you are representing yourself ☐ ) | DEFENDANTS ( Check box if you are representing yourself ☐ ) |
|---|---|
| DEERFIELD BEACH POLICE PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | Quality Systems, Inc., Steven T. Plochocki, Paul A. Holt, and Sheldon Razin |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same information.) Blair A. Nicholas, Esq. (Bar # 178428) Bernstein Litowitz Berger & Grossmann LLP 12481 High Bluff Drive, Suite 300, San Diego, CA 92130 Tel: 858-793-0070    Fax: 858-793-0323 | (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same information.) |
|---|---|

### II. BASIS OF JURISDICTION (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☒ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. ORIGIN (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

### V. REQUESTED IN COMPLAINT: JURY DEMAND: ☒ Yes ☐ No (Check "Yes" only if demanded in complaint.)

CLASS ACTION under F.R.Cv.P. 23: ☒ Yes ☐ No    ☐ MONEY DEMANDED IN COMPLAINT: $ _____

### VI. CAUSE OF ACTION (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
The claims asserted in this complaint arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. Sections 78j(b) and 78t(a). Plaintiff asserts that Defendants violated the securities laws by making materially false and misleading statements and omissions.

### VII. NATURE OF SUIT (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL PROPERTY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☒ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | ☐ 196 Franchise | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| | **REAL PROPERTY** | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/Accomodations | ☐ 740 Railway Labor Act | |
| | ☐ 220 Foreclosure | | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

FOR OFFICE USE ONLY: Case Number: SACV13-01818 CJC (JPRx)

| CV-71 (09/13) | CIVIL COVER SHEET | Page 1 of 3 |
|---|---|---|

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A: Was this case removed from state court?<br><br>☐ Yes ☒ No<br><br>If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| Question B: Is the United States, or one of its agencies or employees, a party to this action?<br><br>☐ Yes ☒ No<br><br>If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS |
|---|---|---|---|
| | **A PLAINTIFF?**<br>Then check the box below for the county in which the majority of DEFENDANTS reside. | **A DEFENDANT?**<br>Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| | ☐ Los Angeles | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | ☐ Riverside or San Bernardino | Eastern |
| | ☐ Other | ☐ Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? | A.<br>Los Angeles County | B.<br>Ventura, Santa Barbara, or San Luis Obispo Counties | C.<br>Orange County | D.<br>Riverside or San Bernardino Counties | E.<br>Outside the Central District of California | F.<br>Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |
| Indicate the location in which a majority of defendants reside: | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of claims arose: | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ |

**C.1. Is either of the following true? If so, check the one that applies:**

☒ 2 or more answers in Column C

☐ only 1 answer in Column C and no answers in Column D

Your case will initially be assigned to the
SOUTHERN DIVISION.
Enter "Southern" in response to Question D, below.

If none applies, answer question C2 to the right. ➡

**C.2. Is either of the following true? If so, check the one that applies:**

☐ 2 or more answers in Column D

☐ only 1 answer in Column D and no answers in Column C

Your case will initially be assigned to the
EASTERN DIVISION.
Enter "Eastern" in response to Question D, below.

If none applies, go to the box below. ⬇

Your case will initially be assigned to the
WESTERN DIVISION.
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above: ➡ | Southern |

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**IX(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?   ☒ NO   ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?   ☒ NO   ☐ YES

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

| X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT): _____ | DATE: November 19, 2013 |

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |