1   ROBBINS GELLER RUDMAN
      & DOWD LLP
2   DARREN J. ROBBINS (168593)
    ROBERT R. HENSSLER JR. (216165)
3   CHRISTOPHER D. STEWART (270448)
    655 West Broadway, Suite 1900
4   San Diego, CA  92101
    Telephone:  619/231-1058
5   619/231-7423 (fax)
    darrenr@rgrdlaw.com
6   bhenssler@rgrdlaw.com
    cstewart@rgrdlaw.com
7
    BERNSTEIN LITOWITZ BERGER &
8      GROSSMANN LLP
    BLAIR A. NICHOLAS (178428)
9   BENJAMIN GALDSTON (211114)
    12481 High Bluff Drive, Suite 300
10  San Diego, CA  92130
    Telephone:  858/793-0070
11  858/793-0323 (fax)
    blairn@blbglaw.com
12  beng@blbglaw.com

13  Lead Counsel for Lead Plaintiffs

14  [Additional counsel appear on signature page.]

15                UNITED STATES DISTRICT COURT

16               CENTRAL DISTRICT OF CALIFORNIA

17                      SOUTHERN DIVISION

18  In re QUALITY SYSTEMS, INC.      )   No. 8:13-cv-01818-CJC-JPR
19  SECURITIES LITIGATION            )
                                     )   CLASS ACTION
20  ─────────────────────────────   )
                                     )   AMENDED COMPLAINT FOR
21  This Document Relates To:        )   VIOLATIONS OF THE FEDERAL
                                     )   SECURITIES LAWS
22        ALL ACTIONS.               )
                                     )   DEMAND FOR JURY TRIAL
23  ─────────────────────────────   )

24

25

26

27

28

930247_1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION AND VENUE PER L.R. 8-1 ......................... 1

I.      INTRODUCTION ................................................................................ 2

II.     CLAIMS ASSERTED AND SOURCES OF ALLEGATIONS .................... 8

III.    THE PARTIES ................................................................................. 10

        A.     Plaintiffs .......................................................................... 10

        B.     Defendants ....................................................................... 10

IV.     OVERVIEW OF THE FRAUD ........................................................... 12

        A.     QSI's Business .................................................................. 12

        B.     Defendants Promote QSI to Investors as a Growth Stock ................. 13

V.      DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND
        OMISSIONS ................................................................................... 18

        A.     Summary of Why Defendants Class Period Statements Were
               False and Misleading and Made with Scienter ................................ 18

        B.     The May 26, 2011, June 9, 2011 and July 28, 2011 Conference
               Calls .................................................................................... 24

        C.     October 27, 2011 Conference Call, November 7, 2011
               Interview, and December 14, 2011 Conference ................................ 26

        D.     January 9, 2012 Healthcare Conference, January 26, 2012
               Earnings Call, and February 7, 2012 Healthcare Conference ........... 28

        E.     May 9, 2012 Robert W. Baird & Co. Growth Stock Conference ....... 32

        F.     May 10, 2012 Press Release and Form 8-K ................................ 33

        G.     The May 14, 2012 JMP Securities Research Conference .................. 35

        H.     The May 17, 2012 Conference Call ............................................ 36

        I.     The June 26, 2012 Shareholder Letter and July 2012 Proxy
               Materials ............................................................................. 42

VI.     DEFENDANTS WITHDRAW QSI'S FY2013 GUIDANCE .................... 44

VII.    DEFENDANTS' KNOWLEDGE ABOUT QSI'S TRUE BUSINESS
        CONDITIONS ................................................................................ 47

VIII.   ADDITIONAL SCIENTER ALLEGATIONS ........................................ 53

930247_1

1
2                                                                                    **Page**
3
4       A.     Defendant Plochocki Sold 87% of His QSI Stock While in
               Possession of Material Non-Public Information .................................. 53

5       B.     The SEC Challenged the Adequacy of Defendants' Disclosures
               Regarding QSI's Projections Calling Them "Generic" and
6              "Confusing" .................................................................................... 55

7       C.     Defendants' False Statements and Omissions Concerned QSI's
               Core Operations Which Defendants Closely Monitored ................... 57
8
        D.     Defendants Affirm QSI's FY2013 Guidance but Withdraw It
9              Just Three Days Later .......................................................... 58

10      E.     Defendant Razin's Control Over QSI's Operations and Board ......... 58

11  IX.   LOSS CAUSATION ......................................................................... 61

12  X.    PRESUMPTION OF RELIANCE ................................................... 64

13  XI.   NO SAFE HARBOR ......................................................................... 67

14  XII.  CLASS ACTION ALLEGATIONS ................................................. 68

15  XIII. CLAIMS FOR RELIEF .................................................................... 69

16  COUNT I ....................................................................................................... 69

17  COUNT II ..................................................................................................... 73

18  COUNT III .................................................................................................... 75

19  XIV. PRAYER FOR RELIEF ................................................................... 76

20  XV.  JURY DEMAND ............................................................................... 77
21
22
23
24
25
26
27
28

- ii -

1

**STATEMENT OF JURISDICTION AND VENUE PER L.R. 8-1**

2      The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act

3  of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5

4  promulgated thereunder, 17 C.F.R. §240.10b-5.  In connection with the acts and

5  conduct alleged in this Amended Complaint, Defendants, directly or indirectly, used

6  the means and instrumentalities of interstate commerce, including, but not limited to,

7  the mails, interstate wire, interstate telephone communications, and facilities of the

8  national securities markets.

9      This Court has jurisdiction of this action pursuant to 28 U.S.C. §1331 and §27

10  of the Exchange Act, 15 U.S.C. §78aa.

11      Venue is proper in this District pursuant to 28 U.S.C. §1391(b), (c) and (d).

12  Defendant Quality Systems, Inc. maintains offices and conducts business in this

13  District, and many of the events and omissions giving rise to the claims occurred in

14  this District.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

930247_1

## I.      INTRODUCTION

1.      This is an extraordinary case in which one of Quality Systems Inc.'s ("QSI" or the "Company") longest tenured and most experienced directors – ***who served as a director*** during the period from May 26, 2011 through July 25, 2012, inclusive (the "Class Period) – has accused the Company, Sheldon Razin ("Razin"), QSI's founder and a fellow member of the Board of Directors ("Board"), and Steven T. Plochocki ("Plochocki"), QSI's Chief Executive Officer ("CEO"), of ***fraud***.  In his sworn complaint, Ahmed Hussein ("Hussein"),[1] who also is the Company's second largest shareholder for more than 20 years, asserts based on his personal knowledge as a Company insider for many years that Razin and Plochocki "***orchestrated a course of wrongful and fraudulent conduct*** . . . that culminated in the dissemination" of earnings projections that were "***factually baseless when they were made***."  Indeed, as here, Hussein alleges that the same Class Period statements at issue in this action concerning the Company's sales, sales growth, and revenue and earnings projections were "completely baseless" and contradicted by the true facts known to the Defendants.   According to Hussein, and based on his review of internal QSI documents available to him in his capacity as a director, contrary to Defendants' Class Period statements promising revenue growth of 20-24% and earnings growth of 20-25% for fiscal year 2013 ("FY2013"), QSI's revenues and net income were, in fact, decreasing because the Company's new bookings had begun to decline in the first quarter of fiscal year 2012 ("FY2012") (*i.e.*, April 2011) and the sales pipeline had begun to decline in the fourth quarter of fiscal 2012 (*i.e.*, January 2012).  Moreover, the Company's senior officers knew that their statements were false because they were privy to "real-time information concerning QSI's revenue and income" but nevertheless "made projections that lacked any objective basis."

---

[1]   QSI, Razin, Plochocki and Hussein are collectively referred to as Defendants and Razin, Plochocki and Hussein are referred to as the Individual Defendants.

930247_1

1    2.    Indeed, prior to and throughout the Class Period, Defendants
2    aggressively promoted QSI's "extraordinary" and "strong record of growth" while
3    repeatedly claiming that their earnings and revenue guidance – with projected
4    increases as high as 35% – were "conservative" given QSI's "large" and "robust"
5    pipeline of business driven by "unprecedented demand." Defendants further assured
6    investors that they were "***confident***" in their projections because of their "continuous
7    reforecasting process" and access to real-time sales data in the Company's Salesforce
8    sales tracking and forecasting database. Based on these representations, analysts also
9    highlighted QSI's "continued growth opportunities," issued consensus estimates in
10   line with, or higher than, the Company's own guidance, and repeatedly recommended
11   that investors purchase the stock based on QSI's track record of meeting or exceeding
12   consensus estimates for earnings. In turn, the Company's stock price increased
13   dramatically, rising 45% from the beginning of 2011 to reach an all-time and Class
14   Period high of $50.04 on September 27, 2011.[2]

15   3.    In truth and unknown to investors, beginning in early 2011 and
16   continuing throughout the Class Period, QSI's sales and sales prospects were severely
17   declining. Contrary to Defendants' representations, the Salesforce data and reports
18   received by the Company's top executives, including the Individual Defendants (as
19   defined herein), showed that as early as April 2011, QSI was not meeting sales targets
20   and that the Company's "pipeline" of sales prospects was drying up. The first-hand
21   accounts of numerous former QSI employees interviewed in connection with Robbins
22   Geller Rudman & Dowd LLP and Bernstein Litowitz Berger & Grossman LLP ("Lead
23   Counsel") investigation confirm that, throughout the Class Period, the Company was
24   missing it sales projections – by as much as 50% – and, consequently, the Company's
25   internal sales targets were increasing quarter-over-quarter in an effort to make up for
26   the mounting deficits.

27   ───────────────────
     [2]   All share amounts and per-share prices have been adjusted to reflect the two-for-
28   one stock split on October 26, 2011.

930247_1

4.     The declining sales and demand for QSI's products was well-known throughout the Company, including by the Individual Defendants.

5.     The Company's former Chair of its Audit Committee also confirmed that QSI's senior executives continually monitored the Company's revenues and earnings, and that QSI management knew internally what the Company was doing on a monthly basis with respect to revenues and earnings.  Other former QSI employees confirm that the Individual Defendants regularly and automatically received detailed reports via email on a weekly basis that showed actual sales performance to forecasted targets and were specific enough that senior management would have a good idea of what was closing in any given month.  These reports – called, for example, pipeline by stage current fiscal year, opportunities to close in the next fiscal quarter, closed opportunities this fiscal year, closed opportunities previous fiscal year – clearly showed that sales and sales prospects at QSI were dropping beginning in April 2011. According to one internal QSI analyst that was responsible for preparing the reports, the analyst did not know how QSI management could not know that revenues were trending downward because it was clearly reflected in the reports the analyst saw and prepared, and which were distributed and available to the Defendants.

6.     Despite their knowledge of declining sales and sales prospects, Defendants continued to hype QSI's sales pipeline to dispel any doubt that the market for the Company's health practice management and electronic records software products was flagging.  In particular, at the start of the Class Period in May 2011, when analysts questioned whether QSI's growth rates, and the corresponding appreciation in its stock price, were sustainable in light of potential saturation in its principal markets, the Company's most senior executives denied that the Company's business was slowing, and assured investors that QSI would meet and even exceed market expectations for growth.

7.     Similarly, in the fall of 2011, Plochocki, the Company's CEO, dismissed concerns of a slowdown in QSI's business as "baseless," stating that "*[t]here is*

- 4 -

*nothing drying up and there is nothing slowing down*."  Plochocki further issued guidance which called for QSI to report earnings per share ("EPS") growth of as much as 33% for the FY2012 – a figure that Plochocki underscored was "*quite conservative*," and which he stated the Company was "*very confident*" it would achieve.[3]  Indeed, in the Company's SEC filings, it repeatedly assured investors that its guidance was highly reliable because the Company continually updated it based on real-time data from all its operating divisions, stating that QSI engaged in "a continuous reforecasting process, which incorporates inputs from all operating entities to determine short term and long term expectations."  Throughout late 2011 and the end of January 2012, QSI repeatedly affirmed its bullish guidance for the FY2012.  In response to these materially false and misleading statements, the share price for QSI common stock steadily increased from a closing price of $33.90 per share on November 25, 2011 to a closing price of $44.60 per share on February 23, 2012.

8.    Cashing in on the dramatic share price increases, Defendant Plochocki sold 88,500 shares of QSI stock – *nearly 90% of his holdings* – on February 24, 2012, for proceeds of nearly $4 million.  This massive stock sale was highly suspicious.  Indeed, this was the first sale of stock that Plochocki had made in nearly three and a half years, and it was executed at a price that was near QSI's all-time high and just weeks before the Company closed its FY2012 results.

9.    QSI's FY2012 year ended on March 31, 2012.  As Defendants knew, however, the Company's actual EPS for FY2012 were far below the purportedly conservative guidance Defendants had assured the market QSI would achieve.  Nevertheless, the Company's senior executives did not say a word about QSI's extremely poor performance for more than a month.  The market did not receive any inkling that QSI had badly missed its guidance until May 7, 2012, when Plochocki,

---

[3]   QSI's FY2012 began on April 1, 2011 and ended on March 31, 2012.  Similarly, QSI's FY2013 began on April 1, 2012 and ended on March 31, 2013.

1  responding to a question at an industry conference, stated that the Company was
2  experiencing delays in closing sales.

3       10.    This comment raised investor concerns about the Company's
4  performance.  As a result of these concerns, QSI's stock price declined 17% over the
5  next two trading days, falling from a closing price of $36.99 on Friday, May 4, 2012
6  to a closing price of $30.99 on May 8, 2012 on very high volume.  With investors
7  seriously concerned about the Company's performance, and QSI's stock price rapidly
8  falling, management was forced to pre-announce its poor annual results.

9       11.    On May 10, 2012, QSI revealed that, contrary to Defendants' prior
10  statements touting continued "record" growth, the Company's ability to generate
11  earnings had materially slowed in FY2012.  Specifically, QSI announced that it would
12  report EPS of between $1.27 and $1.30 for FY2012 – or as much as 36% below its
13  guidance.  The market reacted with surprise and disappointment to this news, as
14  analysts reported that QSI's "big miss" on its guidance "grossly fall[s] short of our
15  estimates and consensus."  QSI's stock price immediately declined 6%, falling from
16  $32.09 on May 9, 2012 to $30.12 on May 10, 2012 again on extremely high volume.

17       12.    To limit this decline, and lay to rest any question that these results
18  potentially indicated a longer term deterioration in QSI's business, the Company's
19  senior executives assured investors that QSI's poor performance was limited to the
20  FY2012 fourth quarter, and issued EPS guidance for the FY2013 that called for
21  significant growth of between 20% to 25%.  During an analyst conference call on May
22  17, 2012 to discuss the FY2012 results, both Plochocki and the Company's Chief
23  Financial Officer ("CFO"), Paul Holt ("Holt"), stated that they were "confident in
24  [their] ability to deliver on this guidance" and described nine separate initiatives that
25  purportedly were underway to enable QSI to meet its guidance.

26       13.    The assurances were highly material to investors.  Following the May 17,
27  2012 call, analysts reported that these remarks "give[] us comfort that the factors
28  responsible for a weaker than expected F4Q are transitory and do not signify a pause

- 6 -

in the company's business momentum," expressed confidence in the Company's growth prospects, and continued to recommend that investors purchase QSI stock. QSI continued to affirm its highly favorable FY2013 guidance in a series of statements during the spring and summer of 2012, including in proxy materials filed on June 26, 2012, just four days before the FY2013 first quarter ended.

14.     Again, however, these statements were false.  The decline that had occurred in the Company's business in FY2012 had only been exacerbated during the first quarter of FY2013.  As Defendants knew based on their access to real-time data concerning the Company's revenues and earnings, QSI's EPS for the first quarter of FY2013 had dramatically declined as compared to the year-ago period.  According to QSI's former Chief Operating Officer ("COO"), the Company affirmed its FY2013 guidance when it already knew that its earnings for the first quarter had significantly declined was shocking because QSI management would know at the end of the first quarter what deals closed.  According to the former COO, you know what deals you need to make your number.

15.     QSI's FY2013 first quarter closed on June 30, 2012, and the Company's results were dismal.  Far from achieving at least 20% growth in earnings, the exact opposite had occurred – QSI's net income and EPS had declined by almost 20%.  Significantly, while in possession of this material non-public information, QSI continued to falsely affirm its FY2013 guidance for weeks ***after*** the first quarter closed in proxy materials dated July 9, 10, 13 and 23, 2012.

16.     On July 26, 2012 – a mere three days after QSI affirmed its guidance – QSI suddenly announced that its EPS had precipitously declined and, as a result, it was retracting its guidance.  QSI disclosed that, compared to the year-ago quarter, its net income had declined 18% and its EPS had declined 19%, and thus, it was "not affirming [its] previous guidance nor providing revised guidance."

17.     The market reacted with shock.  Analysts immediately downgraded QSI stock, and QSI's stock price collapsed on its highest trading volume of the year,

- 7 -

1   plummeting from $23.63 per share on July 25, 2012 to $15.95 per share on July 26,

2   2012 – a decline of 33% in a single trading day.  By itself, this single-day decline

3   destroyed approximately $330 million in QSI's market capitalization.



19        18.    As summarized above and detailed further herein, the disclosure of the

20  truth about QSI's financial condition had a devastating impact on the Company's

21  shareholders, wiping out more than $600 million in shareholder value and causing

22  substantial damage to the Class.  This action seeks to recover the damages suffered by

23  those investors as a result of Defendants' fraudulent scheme.

24  **II.    CLAIMS ASSERTED AND SOURCES OF ALLEGATIONS**

25        19.    Lead Plaintiffs, Arkansas Teacher Retirement System ("Arkansas

26  Teachers") and the City of Miami Fire Fighters' and Police Officers' Retirement Trust

27  ("Retirement Trust") (collectively, "Lead Plaintiffs"), by their undersigned counsel,

28  bring this action individually and on behalf of all persons or entities who purchased or

930247_1

1   otherwise acquired the common stock of QSI during the Class Period, and were

2   damaged thereby (the "Class").  Excluded from the Class are Defendants (as defined

3   herein), present or former executive officers of QSI, and their immediate family

4   members (as defined in 17 C.F.R. §229.404 Instructions (1)(a)(iii) and (1)(b)(ii)).

5   This action seeks to recover damages caused by Defendants' violations of §§10(b) and

6   20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

7          20.    Lead Plaintiffs allege the following based upon personal knowledge as to

8   themselves and their own acts and upon information and belief as to all other matters.

9   Lead Plaintiffs' information and belief is based on, *inter alia*, the independent

10  investigation of Lead Counsel.  Lead Counsel's investigation includes, but is not

11  limited to, a review and analysis of: (i) QSI's public filings with the United States

12  Securities and Exchange Commission ("SEC"); (ii) documents and information

13  disclosed in other litigation naming QSI and/or its directors as Defendants or Nominal

14  Defendants, including currently pending litigation initiated by a former longtime

15  director and the second largest shareholder of QSI captioned *Ahmed D. Hussein v.*

16  *Quality Systems, Inc., et al.*, pending in California Superior Court for Orange County

17  and alleging fraud and other causes of action arising from the same statements and

18  circumstances as this action; (iii) research reports by securities and financial analysts

19  regarding QSI; (iv) transcripts of QSI investor conference calls; (v) QSI press releases

20  and media reports; (vi) economic analyses of the historical movement, pricing and

21  trading data for publicly traded QSI common stock; (vii) consultation with relevant

22  experts; (viii) interviews with former QSI employees (identified herein as Confidential

23  Witnesses ("CW")); and (ix) other publicly available material and data identified

24  herein.  Lead Counsel's investigation into the factual allegations contained herein is

25  ongoing, and many of the relevant facts are known only by the Defendants named

26  herein, or are exclusively within their custody or control.  Lead Plaintiffs believe that

27  substantial additional evidentiary support will exist for the allegations set forth herein

28  after a reasonable opportunity for discovery.

III.   **THE PARTIES**

    A.    **Plaintiffs**

    21.    On February 4, 2014, the Court appointed the Retirement Trust and the Arkansas Teachers as Lead Plaintiffs.  The Retirement Trust is a public retirement system that provides defined benefit pension payments to the retired fire fighters and police officers of Miami, Florida.  Arkansas Teachers is a public retirement system that provides, among other benefits, defined benefit pension payments to the retired public school teachers and education employees of the state of Arkansas.

    22.    As reflected in the certifications already on file with the Court and attached hereto as Exhibits A and B, Lead Plaintiffs purchased QSI common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

    B.    **Defendants**

    23.    Defendant QSI is a California corporation that develops and markets practice management and electronic health records ("EHR") software to medical and dental care providers, including software related to scheduling and billing capabilities. QSI is headquartered and conducts business in this District at 18111 Von Karman Avenue, Suite 700, Irvine, California.  The Company's common stock trades on the NASDAQ under the symbol "QSII."

    24.    Defendant Plochocki is and was at all relevant times QSI's CEO and a member of the Board.  He also has served as the Company's President since January 25, 2012.  During the Class Period, Plochocki reviewed, approved, and signed QSI filings with the SEC that contained false and misleading statements, as detailed herein. Plochocki also reviewed and approved QSI press releases that contained false and misleading statements.  Plochocki also participated in conference calls with securities analysts in which Plochocki made additional false and misleading statements. Plochocki participated in those conference calls from QSI's offices located in this District.

- 10 -

930247_1

25.    Defendant Holt is and was at all relevant times QSI's CFO.  During the Class Period, Holt reviewed, approved, and signed QSI filings with the SEC that contained false and misleading statements, as detailed herein.  Holt also reviewed and approved QSI press releases that contained false and misleading statements.  Holt also participated in conference calls with securities analysts in which Holt made additional false and misleading statements.  Holt participated in those conference calls from QSI's offices located in this District.

26.    Defendant Razin is and was at all relevant times the founder of QSI and the Chairman of its Board.  He also served as the Company's CEO from 1974 until April 2000, and President from 1974 until April 2000, except for the period from August 1990 to August 1991.  During the Class Period, Razin played an active role in QSI's business and remained involved in the Company's day-to-day business activities.  Razin reviewed, approved, and signed QSI's filings with the SEC that contained false and misleading statements, as detailed herein.

27.    As the Company's CEO, CFO and Chairman, respectively, the Individual Defendants were directly involved in the day-to-day operations of QSI, including its reporting functions and the development of its guidance, and had the ability to and did control QSI's conduct.  Because of their high-ranking positions and direct involvement in the everyday business of the Company, the Individual Defendants had access to the adverse undisclosed information about QSI's business and sales conditions via their access to internal corporate documents, the Company's Saleforce sales database and forecasting system, conversations and contact with other corporate officers and employees, attendance at meetings, and via reports and other information provided to them.  Their positions of control and authority as officers or directors enabled the Individual Defendants to control the content of the SEC filings, press releases, and other public statements of QSI during the Class Period.  Accordingly, each of the Individual Defendants bears responsibility for the accuracy of the public reports and press releases detailed herein and is therefore primarily liable for the

- 11 -

misrepresentations and omissions contained therein.  These Individual Defendants were directly involved in controlling the content and in drafting, reviewing, publishing and/or disseminating the false and misleading statements and information alleged herein, were aware of and recklessly disregarded that the false and misleading statements and omissions were being issued, and approved or ratified these misstatements and omissions in violation of the federal securities laws.

## IV.    OVERVIEW OF THE FRAUD

### A.    QSI's Business

28.    QSI was founded by Razin in 1974 and became a publicly traded company in 1982.  The Company and its wholly owned subsidiaries operate as four business divisions: (1) NextGen Division ("NextGen"), which consists of NextGen Healthcare Information Systems, LLC; (2) RCM Services Division (formerly known as Practice Solutions), which consists of NextGen Practice Solutions, LLC; (3) Hospital Solutions Division (formerly known as Inpatient Solutions); and (4) QSI Dental Division.  QSI's four divisions share the resources of QSI's corporate office but maintain their own product lines, product platforms, development, implementation and support teams.

29.    NextGen was by far the Company's most significant source of revenue and most profitable division consistently throughout the Class Period, contributing 75.7% of QSI's FY2012 consolidated revenue.  NextGen develops and markets practice management ("PM") software that is used in automating medical office functions including scheduling and billing, and also develops and markets EHR software that is mainly used for automating patient records.

30.    The main market driver in the healthcare information technology ("HCIT") industry is the $787 billion American Recovery and Reinvestment Act ("ARRA" or the "Act") signed in 2009.  The ARRA included $60 billion in government funds dedicated to incentivizing healthcare providers to transform their practices from paper to electronically based and operated.  QSI has described the

- 12 -

system as "five years of carrot, five years of stick" – meaning, that for the first five years between 2009 and 2015, healthcare providers that adopt certified electronic management and health record systems would be eligible for government subsidies, and for the five years thereafter, beginning in 2015, healthcare providers who have not adopted certified systems will receive a reduction in government reimbursement for healthcare service provided.

31.     QSI also has referred to the ARRA as the "number one market driver" in the HCIT sector and often referenced the Act's positive effect on QSI's business.  For example, Plochocki stated on a December 14, 2011 call that the industry had "a five-year period of these incentives" and that "2012, '13, and '14 are going to be very robust periods for our sector" due to the availability of government funds for healthcare systems spending.  Plochocki added that the industry was in the "very early stages" of the incentives program and was seeing "a building growing momentum in terms of adoption for electronic health records."  On February 7, 2012, Plochocki again stated that as a result of the ARRA, "the 2012, 2013 and 2014 periods are going to be very robust."

32.     Customers in the HCIT market in which QSI competes range from sole practitioners to large hospitals.  A customer's size is generally determined by the number of physicians affiliated with that customer, and customers of different sizes comprise different market segments.  QSI's larger customers were the most profitable.

**B.     Defendants Promote QSI to Investors as a Growth Stock**

33.     Prior to and throughout the Class Period, the principal driver of the value of QSI's stock was the Company's ability to grow its revenues and earnings by significant amounts each year.  During conference calls and in its SEC filings issued during the Class Period, Defendants repeatedly touted QSI's "strong record of growth," underscoring that "[o]ver the past five fiscal years, revenue and earnings per share have grown at a compound annual growth rate of 23% and 18%, respectively."  Indeed, in January 2012, Plochocki emphasized that QSI stock was an attractive

- 13 -

investment because the Company had exceeded analysts' consensus earnings expectations for five consecutive quarters.  Analysts, in turn, recommended QSI stock largely due to its "very strong growth profile," "continued growth opportunities," and track record of meeting or exceeding consensus estimates for earnings.

34.   QSI's ability to continuously book new system sales and add to its installed base on which it earned maintenance revenue was extremely important to QSI and was integral to its ability to grow revenue and earnings.  Specifically, system sales and maintenance revenue together constituted *over 66%* of QSI's total revenue for FY2012.  Specifically, of QSI's $429.8 million in FY2012 consolidated revenue, 34% ($148.8 million) came from system sales and 32.3% ($138.8 million) came from maintenance.

35.   QSI's NextGen division was particularly important to consolidated revenue.  Indeed, 83% ($124.06 million) of QSI's total system sales revenue for FY2012 came from NextGen.  Moreover, nearly 84% of QSI's FY2012 maintenance revenue of $138.8 million came from NextGen.  The table below breaks down QSI's revenue from system sales and maintenance from its four divisions for FY2012:

| | **FY2012** | | | |
|---|---|---|---|---|
| | **System Sales** | | **Maintenance** | |
| | Revenue (in thousands) | Percent of QSI system sales | Revenue (in thousands) | Percent of QSI maintenance |
| NextGen | $124,064 | 83.37% | $116,544 | 83.94% |
| QSI Dental | 5,631 | 3.78% | 7,639 | 5.50% |
| Hospital Solutions | 17,752 | 11.9% | 14,553 | 10.48% |
| RCM Division | 1,351 | 0.9% | 96 | 0.069% |
| **Total** | 148,798 | 100% | 138,832 | 100% |

- 14 -

36.     Sales and maintenance of new PM and EHR systems also yielded very high gross margins.  In the second quarter of FY2012, for example, gross margins on revenue from system sales and maintenance were 75.7% and 61.6%, respectively.

37.     New system sales (which included software, hardware, third-party software, supplies and implementation and training services components) were also very important to revenue growth because they were the most profitable sales and inextricably included the promise of future, high-margin maintenance revenue (which includes revenue from post-contract services and software license renewals). Defendant Holt acknowledged that new software sales were QSI's highest margin items on the Company's October 27, 2011 earnings call.  Similarly, Plochocki stressed the importance of QSI's maintenance revenue on a December 14, 2011 call, stating "64% of [QSI's] revenue [is] recurring, which is largely tied into maintenance." Accordingly, any slowdown in new system sales would negatively impact both short-term revenue from system sales, but also expected future revenue from maintenance on new systems – thus devastating QSI's growth.

38.     In addition to QSI's heavy reliance on system sales and maintenance revenue, QSI's projections were also dependent on continuing to make "greenfield" sales, which were system sales made to a customer who previously had no EHR system at all.  According to QSI's FY2012 Form 10-K, the PM systems market was substantially a "replacement market," and because the vast majority of physician practices already had a PM system in place, companies mainly competed to replace existing PM systems.   By contrast, with respect to EHR systems, QSI often represented that this market was largely greenfield, and that QSI typically competed to replace paper-based patient record alternatives, as opposed to replacing existing EHR systems.

39.     Throughout the Class Period, Defendants sought to distinguish QSI's greenfield opportunities as superior to those of its competitors and/or the overall HCIT industry.   Defendants repeatedly represented that QSI's greenfield market was

930247_1

1    significant and would continue to grow.  For instance, during a June 9, 2011 call, Holt

2    described the Company's EHR systems market as "greenfield for the most part . . .

3    and I think it's going to be that way for a while."  On October 27, 2011, Plochocki

4    represented during an earnings call that with respect to QSI, "the greenfield

5    opportunities are plentiful."  On December 14, 2011, Plochocki denied QSI's business

6    was slowing, stating that its greenfield opportunities "are going to continue to grow."

7         40.    QSI did not disclose greenfield sales statistics during 2011, however in

8    response to repeated analyst inquiries on the subject, in 2012 QSI began to publicly

9    report the percentage of its system sales that were greenfield.  In fact, the percentage

10    of QSI's system sales that were "greenfield" sharply dropped beginning in 2012.

11    According to disclosures by QSI, only 70% and 73% of QSI's system sales for the

12    quarters ending March and June 2012, respectively, were greenfield.  These numbers

13    were significantly lower than the greenfield figure for the quarter ending December

14    2011 (*i.e.*, 90%).  QSI later disclosed that its "greenfield" metric dropped even further,

15    to about 67%, for the quarter ending September 2012.

16         41.    In addition to QSI's greenfield metric, QSI's publicly reported sales

17    pipeline figure was also important to investors.[4]  Defendant Plochocki explained

18    during a December 14, 2011 call, QSI's calculation of its publicly reported pipeline

19    figure.  According to Plochocki, QSI's sales pipeline is divided into four "categories."

20    The publicly reported pipeline figure consists of the deals assigned to categories 1 and

21    2, with deals in category 1 (50% of the pipeline number) expected to close in three to

22    four months with 70% certainty, and deals in category 2 (the remaining 50% of the

23    pipeline figure) expected to close in six to eight months with 70% certainty.

24    

---

25    [4]   During QSI's July 26, 2012 conference call, a financial analyst specifically asked

26    Scott Decker ("Decker"), NextGen's President, for QSI's definition of "pipeline" and
Decker agreed that it represents the value of deals that the Company believes it will
close within six months.  During a December 14, 2011 call, Plochocki stated that the

27    pipeline represents deals QSI expects to close with "about a 70% certainty."  During
QSI's May 17, 2012 call, the Company stated that it had been "measuring pipeline on

28    a consistent methodology" for two years.

930247_1

Categories 3 and 4, which contain deals that are not expected to close within eight months, "haven't reached what [QSI] call[s] our closure cycle," and are therefore not included in the publicly reported pipeline number.[5]

42.    QSI's publicly reported pipeline number was not transparent to the public when it came to QSI's actual business performance.  For example, the publicly reported pipeline figure did not include deals assigned to categories 3 and 4. Therefore, any slowdown in adding deals to categories 3 and 4 would not be apparent to the market.  Moreover, any difficulty in moving category 3 and 4 deals toward categories 1 and 2, and thus into the pipeline number that was publicly reported, would also not be apparent to the market.  However, by the time the Class Period began in May 2011, investors had begun to question whether QSI could continue to report significant earnings growth given potential saturation in QSI's principal markets.  For example, analysts expressed "concern[]" that "new sales are becoming more difficult," noted that the Company's key physician market had achieved "70% . . . penetration," and reported on "anxiety that the [medical] software market might be more saturated than previously thought."  As Oppenheimer summarized, investors had come to wonder whether "peak multiples may be behind us."

43.    To assuage these concerns, Defendants made a series of misstatements in which they falsely represented that QSI's growth prospects continued to be strong, and issued highly favorable EPS guidance for FY2012 and FY2013.

---

[5]  *See* December 14, 2011, Oppenheimer & Co. Inc. Healthcare Conference transcript: Q: "And if you could give us a sense how long it typically takes to move from categories three and four up into one and two.  Because one and two covers, I believe, it's ex-120 days, is that correct? [A: Plochocki:] Categories one and two are deals, the front end – 50% of our pipeline in category one are deals that we intend to close in three to four months with about a 70% certainty.  Category two, which is the other 50% of our pipeline, the one that we announced, is deals we intend to close within six to eight months.  Categories three and four are deals that are probably beyond that; they haven't reached what we call our closure cycle."

930247_1

1

## V.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

2

3

### A.   Summary of Why Defendants Class Period Statements Were False and Misleading and Made with Scienter

4

44.   During the Class Period, Defendants represented to investors that QSI's

5 sales and sales prospects were strong and its pipeline of expected software sales was

6 increasing, and issued highly favorable EPS guidance for FY2012 and FY2013.

7 Defendants' statements were false.  In truth, the Company's business was slowing

8 significantly.  Accordingly, and as confirmed by QSI's own longtime director,

9 Hussein, and based on his experience as a Company insider and documents made

10 available to him in his capacity as a director, Defendants' guidance for FY2012 and

11 FY2013 "lacked any objective basis and, in fact, were totally inconsistent with QSI's

12 actual business performance at and before the times the projections were disclosed."

13

45.   Hussein served as an independent director of QSI for approximately 14

14 years, from 1999 until May 2013.  Hussein currently owns approximately $5.6 million

15 shares of QSI and has been the second largest shareholder of QSI for over 20 years.

16 During his tenure at the Company, Hussein was a member of various committees,

17 including the transactions committee, and had access to internal Company documents

18 in his capacity as director.  On May 14, 2013, Hussein submitted to the QSI Board his

19 letter of resignation ("May 2013 Resignation Letter"), in which Hussein described in

20 detail securities law violations committed by Defendants QSI, Plochocki, and Razin.

21 On October 10, 2013, Hussein filed a verified complaint in California state court,

22 which provided even further detail regarding the securities fraud claims Hussein

23 alleges against QSI, Plochocki, and Razin.  Hussein's claims are in large part

24 predicated on the same false and misleading public statements alleged in this action.

25

46.   According to Hussein, Defendants' revenue and earnings projections

26 during the Class Period "lacked any objective basis, and in fact were totally

27 inconsistent with QSI's actual business performance at and before the times the

28 projections were disclosed."  "Razin and Plochocki orchestrated a course of wrongful

- 18 -

1   and fraudulent conduct" by publicly issuing "projections [that] were factually baseless

2   when they were made."  "Razin and his management team knew, QSI's financial

3   performance had begun slowing down in late 2011," and "[c]ontrary to the growth

4   projections provided to Hussein and the marketplace, QSI's new bookings had, in fact,

5   begun declining a year earlier, in the first quarter of fiscal 2012 [quarter beginning

6   April 1, 2011], and QSI's sales pipeline had begun declining in the fourth quarter of

7   fiscal 2012 [quarter beginning January 1, 2012]."  Moreover, "QSI's revenues and net

8   income in fact were decreasing, not increasing, and the growth projections it had

9   repeatedly trumpeted were in fact completely baseless."

10          47.     According to Hussein, Defendants knew that their statements were false

11  because they were aware of real time data that contradicted their public statements.

12  Hussein stated in his May 2013 Resignation Letter that "Company management have

13  real-time access to the company's financial information, and cannot possibly have

14  believed that there was any basis for the fiscal 2013 projections that had been

15  provided to the marketplace."  Those persons with such access included Defendant

16  Plochocki who, as stated in Hussein's May 2013 Registration Letter, "was privy to the

17  company's true financial condition [and] cashed out 94,000 stock options on February

18  24, 2012, when the company's stock price was near its peak."  According to Hussein,

19  QSI engaged in a "'continuous reforecasting process' based on real-time information

20  concerning QSI revenues and income," "business performance, financial performance

21  [and] sales pipeline."

22          48.     The accounts of other former QSI personnel – including former directors,

23  the Company's COO, and sales executives – confirm that QSI experienced a dramatic

24  sales slowdown beginning in at least April 2011 that continued into 2012, which

25  Defendants were well aware through their receipt of and access to real-time sales

26  information.

27          49.     For example, *CW1* noticed a slowdown in QSI's business beginning in

28  April 2011 and stated that, by that point in time, new sales opportunities had gone

- 19 -

away.[6]  According to CW1, market penetration had greatly increased between 2005-2009, and QSI communicated to employees during town hall-style meetings or otherwise that the Company was entering a replacement market whereby QSI sought to replace competitors' systems.  According to CW1, CW1 joined QSI at the end of the entire upswing in terms of growth, when the company began to take a "dive."  Around 15% of CW1's compensation was based on NextGen sales figures.  According to CW1, between November 2010 and November 2011, the Company began to cutback and eventually stopped paying the bonus portion of CW1's compensation because the Company was failing to hit its sales targets.

50.     Similarly, according to CW2, NextGen experienced a slowdown in business by April 2011.[7]  According to CW2, Plochocki explained on internal

---

[6]     CW1 worked as a product manager at NextGen's Horsham, Pennsylvania location from approximately November 2010 to September 2013.  CW1 reported to Kate Kervin ("Kervin"), Vice President of Product Management at NextGen.  CW1's job responsibilities included working on developing product strategy and working with sales personnel on release plans for NextGen's software products, including for example, software releases for purchased EHR systems.  CW1's duties also included reviewing Salesforce reports and assessing market trends and opportunities for NextGen's products.  CW1's duties also included attending executive meetings during which participants discussed matters including sales results and opportunities, revenue, and overall business performance at QSI.  Executive meeting attendees included Kervin, Tim Eggena (Executive Vice President of Research and Development, QSI), Steve Puckett ("Puckett") (Chief Technology Officer, QSI), and Jerry Shultz  ("Shultz") (Senior Vice President of Sales).

[7]     CW2 was the Chief Information Officer ("CIO") of Practice Management Partners ("PMP"), which QSI acquired in late 2008 and became part of QSI's revenue cycle management ("RCM") division.  CW2 stayed on as the CIO and Vice President of Information Technology of the RCM division until September 2012.  CW2 was a member of the RCM division's leadership team for around two years.  CW2 was based in the Hunt Valley, Maryland location.  CW2 reported to Don Good, who was President of PMP and remained president of the RCM business unit following the 2008 acquisition.  CW2's job responsibilities including overseeing all aspects of information technology in the RCM division.  CW2 was also involved in creating projections on the profitability of new clients, as well as with the Company's implementation of enterprise resource planning ("ERP") software.  Additionally, CW2's duties included attending meetings with personnel in the RCM division, as well as monthly meetings with Monte Sandler ("Sandler") (Executive Vice President, RCM division), during which attendees discussed sales projections and other matters.  CW2 also attended senior management meetings during which management discussed sales levels, trends, market competition and saturation, revenue, profits, and other issues.  Senior management meeting attendees included Defendant Plochocki, Sandler (Executive Vice President, RCM division), Charles Kaplan (General Manager, RCM

conference calls around March 2011 that the market had become saturated, that any sales QSI was making were largely to replace existing EHR systems, and that market saturation was forcing QSI to compete for deals at a lower cost.  Management also discussed on these calls how government subsidies had prompted a lot of companies to get involved in the HCIT market and that there was a "bubble" in the industry.

51.     According to **CW2**, QSI fully knew and planned for the decline in sales and stated RCM would help offset the decline.  According to CW2, management consistently said in internal meetings that RCM was the wave of the future because it provided steady revenue, and QSI was depending on the revenue from RCM.  According to CW2, QSI was acquiring other RCM companies to offset the decline in revenue from QSI's software sales.  In addition to acquiring PMP, QSI acquired RCM companies Healthcare Strategic Initiatives ("HSI") and Matrix.  CW2 was told in meeting after meeting that the RCM division was integral to QSI because QSI knew there was a "bubble" in healthcare information technology software that was going to end soon.  According to CW2, the revenue cycle team met on a weekly and biweekly basis, during which they would discuss projections and sales.  According to CW2, it was clear from these meetings that there was no way that they would meet the projections that were put out there for them.

52.     **CW3**, a NextGen Sales Executive, also corroborates the sales decline at QSI beginning in early 2011 and continuing throughout 2012.[8]  Prior to joining QSI,

---

division), Kristin Closson (Vice President of Operations, NextGen), Axel Perez (Vice President of Operations, RCM division), and Judy Schneeberger (Vice President of Billing Operations, NextGen).

[8]   CW3 worked as a NextGen Sales Executive from September 2011 to September 2012.  CW3's duties included selling NextGen's PM and EHR systems and other products to practice with ten or fewer physicians.  CW3's sales region was in California and included Bakersfield.  CW3 reported to regional Vice President Jamie Christianson ("Christianson"), who reported to Kelly (last name unknown) ("Kelly") who CW3 believed was the national sales director.  In addition to product sales, CW3's job responsibilities also included attending weekly conference calls with Christianson and other sales reps in CW3's region, during which they discussed sales metrics and Salesforce reports and data.  In addition to CW3's weekly calls, CW3 and other regional sales representatives attended quarterly conference calls with Kelly to

930247_1

1   CW3 had heard QSI's business was blossoming, QSI had a great product and sales

2   opportunities, and QSI was well positioned for growth.  After joining QSI, CW3

3   discovered none of this was true and that QSI had fallen on hard times.

4        53.    QSI used Salesforce, a CRM program with data that was updated daily.

5   CW3 held weekly calls with Christianson and other sales reps in the region, during

6   which they discussed Salesforce reports.  In addition to these weekly calls, CW3 and

7   Christianson's regional sales reps held quarterly calls with Kelly a few weeks before

8   the end of each quarter.  Kelly pulled his own Salesforce reports in advance of these

9   quarterly calls.  According to CW3, Kelly pulled data from Salesforce to create

10  PowerPoint presentations which were used to illustrate where sales were falling short.

11  According to CW3, they were very aware that they were falling short because they

12  would present their numbers to them and show them their deficit.  During these

13  quarterly calls, they discussed the sales numbers, the sales pipeline, what deals were

14  expected to close, how the sales numbers compared against targets, why targets were

15  being missed, and whether any deals needed to be moved to the next quarter for

16  forecasting purposes.

17       54.    According to CW3, the focus on the calls was almost always the fact that

18  they were missing their targets and needed to make significantly more sales.

19  According to CW3, everyone was falling short in CW3's region, often by more than

20  50%.  CW3 believed other regions were similarly missing their targets by about 50%.

21  Despite constantly missing targets by wide margins, management never adjusted the

22  sales targets downward to reflect the deficits, and instead ***raised*** the sales targets to

23  compensate for their past poor performance.  Kelly stressed during the calls that the

24  sales reps needed to sell more in order to make their targets and said if any deals could

25  be pushed into the current quarter, the sales team needed to make it happen.

26

27  discuss matters including sales metrics, NextGen's pipeline, the status of various

28  deals, sales targets, and other matters.

- 22 -

55.     Kelly discussed the sales targets during these calls, which CW3 understood were coming from upper management in Irvine.  Kelly and Christianson told the sales reps that the numbers discussed during the quarterly calls were being reported to upper management in Irvine.  CW3 and other reps were told to keep the information in Salesforce up to date so that management could pull the latest, most accurate reports, including in advance of earnings conference calls.

56.     According to CW3, management could pull any report they wanted from Salesforce, and from these reports, management knew at all times where they stood with respect to sales and knew they were falling short.  Management could view in Salesforce the daily sales activities, sales forecasts, and the projected value of accounts, as well as see how far off regional and Company-wide sales were from its targets.  According to CW3, management knew that goals were not being met and were always disappointed in the numbers.

57.     In sum, the first-hand accounts of Hussein, a longtime QSI director with intimate knowledge of the Company's inner workings, as well as numerous former QSI directors, officers and sales personnel – each of which corroborates the others – confirm that: (i) QSI's most profitable segment (new system sales) was in decline by April 2011 and grew more pronounced during the Class Period; (ii) QSI's pipeline of new business was drying up as of January 2012; and (iii) Defendants knew about the deteriorating sales conditions through their regular receipt of reports and access to real-time sales information through the Company's Saleforce sales database.

58.     The paragraphs set forth below: (i) identify Defendants' Class Period statements and omissions alleged to be materially false and misleading, (ii) set forth when, where, and by whom they were made, and (iii) summarize why those statements and omissions were materially false and misleading.

**B.     The May 26, 2011, June 9, 2011 and July 28, 2011
        Conference Calls**

59.     On May 26, 2011, the first day of the Class Period, QSI held an analyst conference call to report its fiscal year 2011 ("FY2011") fourth quarter and year-end results.   During the call, Defendant Plochocki issued EPS guidance for FY2012, stating that QSI was in "agreement with" the consensus view of analysts' revenue and EPS projections for FY2012, which called for QSI to report FY2012 EPS of $2.75 per share, reflecting a growth rate of approximately 30% from the prior year.

60.     Less than one month later, on June 9, 2011, Defendant Holt commented about the ambulatory market at a Goldman Sachs Global Healthcare Conference.   In response to a direct and specific question about what proportion of the ambulatory business was made up of the highly profitable new business contracts ("greenfield") versus the less profitable replacement market (also referred to as "competitive displacements"), Holt said "it's greenfield for the most part . . . and I think it's going to be that way for a while."

61.     On July 28, 2011, QSI held an analyst conference call to report its FY2012 first quarter results.   On the July 28, 2011 Conference Call, Plochocki *raised* the FY2012 EPS guidance of that previously issued on May 26, 2011, stating that QSI was in "agreement with the consensus view of the analysts for revenue and earnings per share."   In response to a specific question about what precise "consensus view" QSI was in agreement with, Plochocki stated that it was the new and increased consensus view of EPS at $2.79 per share.

62.     The May 26, 2011, June 9, 2011, and July 28, 2011 statements were material to investors.   In response to QSI's EPS guidance, numerous analysts recommended that investors buy QSI stock precisely because of the Company purported growth prospects.  For example, J.P. Morgan rated the stock "[o]verweight" and reported that "we feel the company is now on solid footing to benefit from accelerated growth," and "[w]e continue to like QSII's growth prospects."  Similarly,

- 24 -

Morgan Stanley rated QSI stock "[o]verweight" because the "[g]rowth [s]tory [r]emains [s]olid." In turn, the Company's stock price rose significantly. Between the start of the Class Period and the end of September 2011, QSI's stock price increased approximately 13%, reaching an all-time high of $50.04 on September 27, 2011.

63. Defendants' statements and omissions about the Company's projected revenue and EPS for FY2012 and its prospects for further growth were materially false and misleading in at least the following respects:

(a) Numerous former QSI employees, including the Company's longtime Director and second largest shareholder, Hussein, confirm that by April 2011, shortly before the Class Period began, QSI began experiencing a marked slowdown in new client bookings and "adds" to its sales pipeline. According to the verified complaint of longtime QSI director Hussein, "[c]ontrary to the growth projections" that Defendants publicly issued to the market, "QSI's new bookings had, in fact, begun declining a year earlier, in the first quarter of fiscal 2012 [quarter beginning April 1, 2011], and QSI's sales pipeline had begun declining in the fourth quarter of fiscal 2012 [quarter beginning January 1, 2012]." As a result, according to Hussein, "QSI's financial performance had begun slowing down in late 2011." According to Hussein, *the slowdown resulted in QSI "ma[king] projections that lacked any objective basis"* and which were "*totally inconsistent with QSI's actual business performance at and before the times the projections were disclosed*."

(b) Former QSI employees that were employed by QSI during the Class Period also confirm that QSI was experiencing a slowdown in its business beginning in early 2011 if not earlier. For example, CW1 noticed a slowdown in QSI's new sales beginning around April 2011. According to CW1, by April 2012, new sales opportunities had dried up altogether, and the Company had stopped paying bonuses tied to corporate performance because QSI was not hitting any of its numbers. Similarly, CW2 and CW3 also noticed a slowdown in QSI's business while with the

- 25 -

Company.  And CW4 indicated the reason CW4 left QSI in 2011 was because sales were drying up.[9]

(c)    At the time the statements were made, real-time internal forecasting data and sales reports that were circulated and available to the Individual Defendants and the Company's executives and management contradicted and were inconsistent with Defendants' public statements.  *See* §§I., V.A, VII., VIII.C.

## C.    October 27, 2011 Conference Call, November 7, 2011 Interview, and December 14, 2011 Conference

64.    On October 27, 2011, QSI held an analyst conference call to discuss its results for the FY2012 second quarter.  During the conference call, Plochocki praised the "extraordinary growth" that QSI had experienced in that quarter, and increased the range of the Company's EPS guidance:

As a result of our strong first-half performance and our confidence in the second half of this year, we are now prepared to up our general views for the year.  More in line with consensus views, *we are now in general agreement with a revenue range of growth of 21% to 24% for the year and an EPS range of growth of 29% to 33% for the year.  This is an upgrade from our previous views of 20% to 23% revenue growth and . . . 28% to 32% EPS growth.  Our confidence is strong, we're bullish on our second half* . . . .

65.    During the October 27, 2011 call, an analyst asked whether the Company's raised guidance was "conservative," and Plochocki stated that the guidance was "*quite conservative*" given that the Company's pipeline of future business was so "large:"

And so our confidence going into this quarter and our fiscal year fourth quarter is very strong.  So it gave us the opportunity to take a second look at the ranges we had provided historically and gave us the

---

[9]    *See infra* n.12.

confidence to up them slightly.  And as you know, we're typically quite conservative.

66.   In response to a specific question about QSI's pipeline and whether it was flattening out, Decker also emphasized that current demand was strong.  "But I would say if you look out 12 – 12 months and further, ***it's unprecedented with the amount of demand we see coming*** for our clients for rollout levels to extents they've never talked to us about in the past, so it is flat but I wouldn't read too much into that."

67.   Plochocki was asked about whether the EHR market had topped out and whether most of QSI's business was no longer greenfield.  Plochocki "set the record straight," and stated that "the greenfield opportunities are plentiful.  As I said, more than half of the large practice market, more than 75% of the midsize practice market is still fair game for new system sales."

68.   Analysts again reacted positively to these statements.  For example, after the October 27, 2011 call, Deutsche Bank emphasized that QSI was reporting "strong growth" and that management "remains optimistic on the state of end market demand and its ability to continue to drive significant growth."  Similarly, William Blair reiterated its "outperform" rating on QSI stock, and urged that QSI "shares have the potential to benefit from strong earnings growth."

69.   On November 7, 2011, *Investors' Business Daily* published an interview with Plochocki titled "Quality Systems Chief Says Boom Just Getting Started," in which Plochocki denied that the Company's business was slowing, "Plochocki said ***worries about flattening and saturation were baseless.  'There is nothing drying up and there is nothing slowing down***,' he said."

70.   On December 14, 2011, Defendant Plochocki participated in the Oppenheimer & Co. Inc. Healthcare Conference.  During the conference, Plochocki again denied that QSI's business was slowing.  To the contrary, according to Plochocki, "greenfield opportunities" "are going to continue to grow."  Plochocki also

1  emphasized the strength of the Company's current pipeline: "So the bottom line is that
2  our pipeline current and our pipeline future are very robust."

3      71.    Responding to analyst commentary that the large-practice market and
4  mid-size practice market may be totally penetrated, Plochocki was adamant that this
5  was not the case.  "And lot of people will say, well, the market – the first groups that
6  will be totally penetrated will be large and mid practices.  You wouldn't know that by
7  our pipeline and you certainly wouldn't know that by our categories three and four in
8  our pipeline."

9      72.    Defendants' statements and omissions in the October 27, 2011 call,
10  November 7, 2011 interview, and December 14, 2011 conference calls concerning
11  QSI's earnings projections, demand for its products, and present and future sales
12  conditions were false and misleading in at least the following respects:

13      (a)    As set forth above, QSI's most profitable segment, and the most
14  important driver of growth, new system sales, was in decline by April 2011 – and
15  suffered further deterioration throughout 2011.  *See* §§I., V.A., V.B.

16      (b)    Defendants' projections lacked any objective basis, and in fact
17  were inconsistent with QSI's actual business performance at and before the times the
18  projections were disclosed.  *See* §§V.A., V.B., VII.; *see also* ¶117.

19      (c)    At the time the statements were made, real-time internal
20  forecasting data and sales reports that were circulated and available to the Individual
21  Defendants and the Company's executives and management contradicted and were
22  inconsistent with Defendants' public statements.  *See* §§I., V.A., VII., VIII.C.

23  **D.    January 9, 2012 Healthcare Conference, January 26, 2012
         Earnings Call, and February 7, 2012 Healthcare Conference**
24
25      73.    On January 9, 2012, Plochocki attended a J.P. Morgan Global Healthcare
26  Conference.  At the January 9, 2012 conference, Plochocki again affirmed the
    upwardly-revised FY2012 guidance as follows:
27

28

- 28 -

930247_1

1    We are earmarked for a very strong year.  Our fiscal year ends March 31,

2    and we have given analysts prognostications for . . . earnings per share

3    growth [in the], 29% to 34% range.

4    74.    On January 26, 2012, QSI held an analyst call to discuss its FY2012

5    third-quarter results.  On that call, Plochocki touted the Company's "continued record

6    growth," and stated:

7    ***Our pipeline continues to build to record levels***.  As leads, RFPs,

8    online demos, web hits continue to accelerate throughout all of our

9    business units, we're setting a very strong foundation for what we

10    believe is going to be a powerfully robust period here in the second year

11    of the stimulus movement.

12    75.    On the call, an analyst noted that, "over the last couple of quarters, you

13    have been providing us some higher-level guidance in terms of growth," and asked for

14    an "update . . . on where you stand with respect to this current fiscal year."   In

15    response, Plochocki stated: "I think the guidance that we provided last quarter was

16    21% to 24% revenue growth for the year.  That's the year that will be ending in two

17    months.  And then our EPS, I think we upgraded to 29% to 34%.  And actually, quite

18    honestly, we probably have a pretty good shot at 35% on that bottom one.  And then,

19    of course, we'll be announcing guidance on our next call for our fiscal year 2013."

20    76.    Decker was asked about the pipeline and whether the current "margin

21    profile" was shifting.  Decker, admitting that he had actual access to current internal

22    data, denied that the current pipeline margin profile was deteriorating:

23    Brian Delaney – Interest Capital (Analyst): Hey, guys, thanks for

24    taking the call.  As it relates to the pipeline, can you guys just comment

25    on the margin profile, what's been getting put in the pipeline, is it

26    consistent with the type of margin profile that we have seen in the

27    pipeline over the last few quarters in terms of what we have added?

28

- 29 -

Scott Decker – Quality Systems, Inc. – President-NextGen Healthcare Information Systems: Yeah, we haven't changed any of the model in our reporting pipeline, so it's very consistent, and there's nothing out of character in the pipeline that we're reporting today versus what we have seen there the past couple of years.

77.   At the end of the January 26, 2012 conference, Plochocki again underscored QSI's purported favorable growth prospects, as follows:

*I think what you see here is a company that's now five straight quarters where we have exceeded analysts expectations for revenue growth and earnings per share*.  We have $183 million pipeline, which is growing.  We have categories three and four in your pipeline, which are building, as well, so I think along the lines of the CMS report that came out late October, excuse me, late November, we truly are embarking upon probably a four to eight quarter period of the most robust growth in EHR adoption, and we're well prepared for it with product and service offerings that we think will serve the shareholder quite well.

78.   Analyst again praised the Company's growth prospects.  That same day, on January 26, 2012, William Blair issued a report highlighting that "management referr[ed] to the market outlook as 'powerfully robust' several times during the call," and recommended that investors buy QSI stock.

79.   On February 7, 2012, Plochocki attended the UBS Global Healthcare Services Conference.  At the February 7, 2012 conference, Plochocki again stated that the Company's pipeline of new business was "continually growing," as follows:

Our sales pipeline; we have $183 million worth of pipeline, the business we intend to close within the next six to eight months.  That sales pipeline has grown every quarter since the announcement of the stimulus bill back in February of 2009 and we view it as continually growing as a

- 30 -

1     result of the fact that the leads that continue to come into our system, the

2     RFPs, are building a strong base along those areas.

3         80.    Just two weeks before he cashed in, dumping 87% of his QSI holdings,

4 Plochocki acknowledged the concern that the highly profitable new EHR business had

5 peaked stating that: "one of the things that is continually asked is when is this going to

6 peak? Where is the peaking out of this electronic medical record system going to take

7 place?" Plochocki was adamant that there was no peak in sight. Plochocki concluded

8 his comments by stating that the current EHR market "is truly a unique opportunity

9 and we intend to cash in on it."

10         81.    Defendants' statements and omissions in the January 9, 2012 conference,

11 January 26, 2012 call, and February 7, 2012 conference concerning QSI's "record"

12 and "continually growing" sales pipeline, earnings projections for FY2013 and growth

13 prospects were materially false and misleading in at least the following respects:

14         (a)    QSI's most profitable segment, and the most important driver of

15 growth, new system sales, was in decline by April 2011 – and suffered further

16 deterioration throughout 2011. *See* §§I., V.A., V.B

17         (b)    Defendants' projections lacked any objective basis, and in fact

18 were inconsistent with QSI's actual business performance at and before the times the

19 projections were disclosed. *See* §§V.A., V.B., VII; *see also* ¶117.

20         (c)    QSI's sales pipeline was in decline by the fourth quarter of

21 FY2012 (the quarter beginning January 1, 2012), and QSI's financial performance had

22 begun slowing down in late 2011. *See* §§I., V.A., V.B.

23         (d)    At the time the statements were made, real-time internal

24 forecasting data and sales reports that were circulated and available to the Individual

25 Defendants and the Company's executives and management contradicted and were

26 inconsistent with Defendants' public statements. *See* §§I., V.A., VII, VIII.C.

27

28

930247_1

**E.    May 9, 2012 Robert W. Baird & Co. Growth Stock Conference**

82.    On May 7, 2012, Defendant Plochocki participated in the Deutsche Bank Healthcare Conference.   After delivering prepared comments regarding QSI's business, Plochocki answered questions from financial analysts.   One analyst specifically asked Plochocki whether increased competition was affecting QSI's profitability.  In response, Plochocki – admitting that he had actual access to up-to-the-minute internal Company information regarding sales – disclosed that "[t]he deals are elongated." And, for the first time, Plochocki admitted that "[t]he deals are taking a little bit longer to get done.  It's one of the trends that we're starting to see a little bit more of." On May 8, 2012, prior to the market's open, J.P. Morgan – after speaking with QSI's management "this morning" – published an analyst report.  In its May 8, 2012 report, J.P. Morgan disclosed that during the May 8, 2012 discussion, QSI management delivered "downbeat" commentary.  Based on this new information regarding "concerns around deal closure cycles getting elongated," J.P. Morgan cut its fiscal fourth quarter 2012 estimates for both revenue and EPS.

83.    To counteract the effect of the previous days' disclosures, on May 9, 2012, Decker delivered prepared remarks to investors at a Robert W. Baird & Co. Growth Stock Conference.  Decker began his presentation by emphasizing that QSI remained "very bullish on the healthcare market."  "And I'll just start in, *because of all the volatility, and say we really are very bullish on the healthcare market, where it's going, and how we're positioned in it*."  Decker added that, "from the macro standpoint, we feel really good about the trends in the industry, where the industry's going, and how we're positioned to take advantage of that."

84.    In response to a question regarding Plochocki's May 7, 2012 disclosure that sales were taking longer to close, Decker admitted that he had actual access to real-time internal data regarding current sales information, and was emphatic that this was not the case:

930247_1

1    Yeah, the question is some comments earlier this week at another

2    conference were made on the sales cycle and that it may be lengthening.

3    And you're on the right point, which is, is that a macro trend we're

4    seeing, ***and it absolutely is not a macro trend we're seeing. In fact, I***

5    ***went back through the data over the last few days and objectively***

6    ***looked at it. Sales cycle has not lengthened for us across the board,***

7    ***and in fact, over the last year, you've seen a compression of it.***" Where

8    Steve [Plochocki] got – his comments were reflecting on, as the CEO, he

9    deals with some bigger deals, and as always, there were some deals that

10   took longer than expected to close.

11        Why did they take longer to close? Well, there is a little bit more

12   uncertainty right now in the market than maybe there was a quarter or

13   two ago. It just goes in cycles, right? And so with the Supreme Court

14   stuff and everything going on, you kind of try to vector maybe why did a

15   couple deals extend out, that might have contributed to it. But as I said, ***I***

16   ***can safely say to you, looking at the objective data, there's nothing***

17   ***major trend-wise going on in our installed base and our closed cycle.***

18   ***If anything, it's compressing, and that's kind of what I would have***

19   ***expected, with meaningful use having been an accelerator over the last***

20   ***year***.

21   **F.    May 10, 2012 Press Release and Form 8-K**

22        85.    On May 10, 2012, QSI issued a press release, which was filed with the

23   SEC on Form 8-K that same day (the "May 10 Press Release and Form 8-K").

24   Defendant Holt signed the Form 8-K. In the press release, QSI preliminarily

25   announced its results for FY2012, including the fact that it expected to miss its

26   guidance by material amounts, as described above. Specifically, QSI disclosed that it

27   expected to report FY2012 EPS of between $1.27 and $1.30 – results which translate

28   to growth rates that were 28% below the bottom of QSI's guidance and 36% below

- 33 -

1   the top of the guidance.  QSI also disclosed that delays in closing deals were a cause

2   of the declining sales.

3        86.   QSI also issued highly favorable guidance for FY2013.  Specifically, the

4   May 10 Press Release and Form 8-K stated: "Quality Systems management also

5   announced annual revenue and earnings per share guidance for the upcoming 2013

6   fiscal year. . . .  [E]arnings per share are expected to grow between 20 and 25 percent

7   versus the 2012 fiscal year."

8        87.   And Plochocki emphasized that QSI's current business was strong and

9   stated, "We are well positioned to help our clients address the necessary requirements

10  for successfully participating in the future delivery of healthcare."

11       88.   Analysts were quick to react to Defendants' disclosure.  For example,

12  UBS published a report that day, titled "Where There's Smoke, There's Usually Fire,"

13  which noted that QSI's recent stock drops were caused by the disclosures "regarding

14  deal closure times."  In response to QSI's "pre-announced" "slower growth outlook"

15  and "F4Q12 miss," UBS reduced its "price target" for QSI stock.  "Importantly,"

16  according to UBS, "no commentary in today's release was made regarding the

17  NextGen pipeline. . . .  Pipeline growth has been slowing and we believe pipeline

18  results/commentary will be critical to stock performance."  That same day Cowen and

19  Company issued a report that highlighted QSI's FY2013 guidance being "significantly

20  below current consensus."  In Cowen's view, QSI's challenge is that its "main

21  customer target has been the mid-to-large physician group market, which we think is

22  largely penetrated at this point."  Likewise, Oppenheimer, commenting on QSI's May

23  10, 2012 disclosures, stated that "we believe the mid-to high-end of the physician

24  market is saturated."

25       89.   That same day, Credit Suisse also decreased its "target price" for QSI.

26  According to Credit Suisse, QSI's May 10, 2012 disclosures "raise concerns about the

27  sustainability of elevated bookings growth."  Commenting on QSI's FY2013

28  guidance, Credit Suisse bluntly questioned whether Defendants were capable of being

- 34 -

1  believed and asked, "Is it credible?"  Moreover, Credit Suisse said it had "little

2  conviction in the company's guidance."  Similarly, JPM Securities reduced its

3  estimates for QSI's FY2013 highlighting the fact that QSI "missed 4Q EPS

4  expectations after communicating 4Q guidance fairly recently."

5      90.   Also on May 10, 2012, William Blair issued a report noting that QSI

6  shares had declined "nearly 10%" following Plochocki's May 7, 2012 disclosures.  In

7  addition, William Blair analysts specifically questioned QSI's repeated claims

8  regarding greenfield opportunities, noting that QSI "typically targets the largest

9  physician groups," which "[a]s we have discussed several times in the past . . . are the

10  most penetrated accounts, and thus perhaps offer fewer greenfield opportunities than

11  other segments (although management has consistently indicated the greenfield

12  market is still plentiful)."

13      91.   On May 11, 2012, Caris & Company published an analyst report

14  regarding QSI, lowering its price target in light of the May 10, 2012 disclosures.

15  Caris & Company highlighted the importance of the NextGen sales pipeline and stated

16  that it was "surprising[]" that QSI "did not disclose . . . sales pipeline activity" in the

17  May 10, 2012 disclosure.  According to Caris & Company, the NextGen sales pipeline

18  raises "questions over future system sales growth rate."

19  **G.    The May 14, 2012 JMP Securities Research Conference**

20      92.   On May 14, 2012, Holt participated in the JMP Securities Research

21  Conference.  During the May 14, 2012 conference, Holt reiterated the FY2013

22  guidance that the Company gave on May 10, 2012.  In addition, Holt discussed how

23  Defendants had arrived at the FY2013 guidance and stated, "I think that the guidance

24  that we've put out in terms of revenue growth next year was something that we

25  certainly spent a fair amount of time talking about internally before we would put that

26  out.  And we tried to be very thoughtful about it and I think it's certainly – we're

27  confident I think in the guidance that we gave."

28

- 35 -

**H.      The May 17, 2012 Conference Call**

93.     On May 17, 2012, QSI held a conference call to discuss its FY2012 results.  On that call, Defendants affirmed the guidance set forth in the May 10 Press Release and Form 8-K.  Defendants also made numerous false statements designed to convince investors that QSI's poor FY2012 results were a one-time event, and that the Company's growth prospects remained strong.  For example, Defendant Plochocki stated:

> Our performance for fiscal 2012 fourth quarter was impacted due to delays in both the closing of several fourth-quarter opportunities, as well as recognition of revenue related to a large customer implementation.
>
> Looking ahead, we remain confident about the growth opportunities, as evidenced by our recent guidance in the 2013 fiscal year.  We have stated that we expect revenues to increase 20% to 24% earnings per share to grow 20% to 25%.
>
> Some of the key dial-movers for our upcoming year include, one, to continue to expand offshore capabilities for software development and back office functions; two, expand our international distribution channel; three, continue to maximize cross-selling opportunities; four, sell more multiple product deals, like the Norton deal that we recently announced; five, expand RCM capabilities to dental and hospital markets; six, move upstream in the hospital sector; seven, be at the forefront of ACO modeling.  At HIMSS in February, we introduced five new products to aid physicians in that effort.
>
> Eight, continue to compete and win in the 50% of the market that has yet to adopt electronic medical records.  Nine, continue to acquire product and service offerings that supplement or complement our core offerings domestically and internationally.

- 36 -

930247_1

94.     Later in the call, in response to an analyst question concerning the Company's ability to meet its guidance, Defendant Plochocki assured investors that QSI was "very confident" in its ability to deliver on its guidance in light of the nine initiatives described above:

We have been historically a 20/20 or better company for at least the last 12 years.  We are earmarking this year to be the same.  We anticipate that the expansion in those nine areas I addressed twice already on this call, I think, are going to give us opportunities to continue to keep that pace.

*We are very – we are very confident in that*.

95.     Similarly, Defendant Holt stated that the Company was confident in its ability to deliver on its guidance, in significant part because of the purportedly strong pipeline:

Moving on to our fiscal 2013 guidance, our guidance range of 20% to 24% revenue growth includes expected growth in all of our business segments and revenue categories.  We are expecting a slight increase in recurring revenue share of total revenue next year, primarily on the heels of faster growth in RCM and other recurring revenue streams.  *We are confident in our ability to deliver on this guidance*, which is very consistent with our five-year compound annual growth rate of 23%.

*Supporting our confidence in this guidance range are a number of factors, including our current sales pipeline*, growing momentum in RCM, which Monty will discuss further, increased interest we are seeing from payor groups and large enterprise customers in enterprise Ambulatory solutions, as rapid growth in demand for consulting and other services, additional products and service capabilities as a result of acquisitions and new international market opportunities.

- 37 -

*Our earnings per share guidance of 20% to 25% growth represents a slight increase compared to our five-year average compound annual growth rate of approximately 18%, and is consistent with what we've achieved on average over the last two years*.

Likewise, Decker emphasized that current demand in the critical high-margin ambulatory market was strong: "[w]e continue to see a robust Ambulatory market."

96.     In response to an analyst question, Plochocki again attributed the poor fiscal 2012 results to delays in closing a few deals, and stated that the Company's business remained sound, its pipeline continued to be strong, and the Company's first quarter of FY2013 was off to a strong start:

[E]very four to six quarters, we have a quarter like this where the deals don't line up the way we would like them to, and we just don't get them done.

Several of the deals that we should have gotten done in the March-end quarter, we have since signed and have since announced to the marketplace.

It happens periodically.  ***None of the fundamentals [of QSI's business] have changed, though.  Our pipeline is deep.***  Our categories one and two are strong.  We have a very strong bevy of six- and seven-figure deals in that pipeline.  None of the fundamentals gave us any indications that we weren't going to be able to pull some of these deals through.  But the bottom line is that we did close many of them heading into this June quarter, and we are really off to a pretty good start for June.

97.     Similarly, later in the call, Plochocki stated:

The takeaway from this is that if the fundamentals have changed, that would be a different story.  But our fundamentals haven't changed.  Our pipeline keeps growing, categories one and two are very deep and

- 38 -

1   vibrant for us this quarter.  We haven't seen any fundamental change to
2   any of the dynamics that have been feeding into our system for the last
3   two to three years.

4   98.     In response to another analyst question as to whether the delay in closing
5   deals during the FY2012 fourth quarter would "get worse" and negatively impact
6   QSI's business in FY2013, Plochocki flatly denied that the Company anticipated any
7   deterioration in its performance for FY2013, stating:

8   The several deals that took longer than we anticipated in our
9   fourth quarter that have entered into closure cycles for our first quarter is
10   one issue.  Whether I am anticipating this to be an impact on our fiscal
11   2013, I would say no.  It is two different issues.

12   Fiscal 2013, as we have it earmarked in our four divisions, with
13   the nine points that we are going to drive, with the deals that we've
14   closed, with the acquisitions we've already done, with our international
15   distribution, channel distribution program now underway, we believe
16   that we are going to be able to continue to grow at 20/20.

17   99.     Following the May 17, 2012 call, analysts reported that, while the fiscal
18   2012 results were disappointing, the Company's growth prospects remained strong,
19   and continued to recommend that investors buy QSI stock.  For example, on May 17,
20   2012 J.P. Morgan reported that QSI "[s]hares [p]rovide [c]ompelling [v]alue" because
21   "management commentary on the call indicated the 4Q miss was part of the lumpy
22   nature of the business rather than a fundamental change in the end market," and "[w]e
23   continue to believe there is ample runway ahead [for growth], and expect results over
24   the next few quarters to prove this."   Similarly, Sterne Agee issued a "buy"
25   recommendation and reported that "[m]anagement's commentary on the earnings call
26   gives us comfort that the factors responsible for a weaker than expected F4Q are
27   transitory and do not signify a pause in the company's business momentum.  We
28   foresee QSII recovering into the mid-30s (up -20% from today) over the next several

- 39 -

1    months as near-term concerns recede and investors regain confidence in the

2    company's FY13 outlook."

3        100.   Defendants' statements on the May 17, 2012 call had their desired effect

4    and financial analysts quickly reported that QSI's disappointing 2012 results were a

5    one-time event and did not represent any decline in QSI's business.  For example,

6    UBS published a report on May 17, 2012 titled: "Apparently F4Q12 Was Just a

7    Stubbed Toe."   Similarly, Oppenheimer published a report on May 17, 2012, and

8    noted that "the company spent the majority of the [May 17] conference call reassuring

9    investors that demand remains strong."

10       101.   That same day, Sterne Agee issued a report and concluded that

11   "[m]anagement's commentary on the earnings call gives us comfort that the factors

12   responsible for a weaker than expected F4Q are transitory and do not signify a pause

13   in the company's business momentum."   Because of the contracts that QSI claimed

14   had slipped from its FY2012 fourth quarter into its FY2013 first quarter, Sterne Agee

15   "expect[ed] the June quarter to be sequentially stronger than the March quarter."

16   Sterne Agee also emphasized the importance of the pipeline and that QSI reported

17   stating that it "reinforc[es] the underlying strength of the business."   In addition,

18   Sterne Agee highlighted the FY2013 guidance for NextGen Ambulatory and stated

19   that the "revenue growth forecast," was a reason it was maintaining a "[b]uy"

20   recommendation.   Sterne Agee also noted the importance of NextGen Ambulatory

21   noting that it "accounts for 75% of consolidated revenues and 87% of operating

22   income."

23       102.   Also on May 17, 2012, William Blair published a report about QSI and

24   noted that the reported EPS was "down 20% year-over-year."   The report also

25   emphasized that, "[d]espite the . . . weaker-than-anticipated fiscal fourth-quarter

26   results, management's commentary on the call was positive, with an emphasis on the

27   fact that the fundamentals of the business have not changed."  J.P. Morgan also issued

28

- 40 -

1  a report regarding QSI on May 17, 2012 and, given Defendants' claims regarding
2  expected growth, recommended that investors buy QSI stock.

3      103.  On May 18, 2012 following Defendants' bullish comments during the
4  May 17, 2012 call, Credit Suisse maintained its "[n]eutral" rating of QSI.  While
5  Credit Suisse's "price target" for QSI remained unchanged, Credit Suisse questioned
6  the "[c]redibility" of QSI's FY2013 guidance, stating that it remained "skeptical that
7  weak 4Q results are merely a one-quarter issue."  Caris & Company issued a report on
8  May 18, 2012 that noted the recent "investor fear[s]" following Plochocki's comments
9  that the "deal sales cycle had elongated," and concluded that "'[i]nvestors interpreted
10 this as a sign that HCIT demand may have peaked."  Caris & Company noted that
11 during the May 17, 2012 call, Defendants "[r]efut[ed] this interpretation," and
12 "provided data points that show rising HCIT demand."  Similarly, Maxim Group and
13 Auriga both published reports on May 18, 2012 and – given the repeated positive
14 comments about QSI's current demand during the May 17, 2012 call – both reiterated
15 a "buy" recommendation.

16     104.  Defendants' May 9-17, 2012 statements and omissions about the
17 Company's "deep pipeline" of sales, projected revenue and EPS for FY2013, along
18 with its prospects for driving further growth, were materially false and misleading in
19 at least the following respects:

20     (a)  QSI's most profitable segment, and the most important driver of
21 growth, new system sales, was in decline by April 2011 – and suffered further
22 deterioration throughout 2011.  See §§I., V.A, V.B.

23     (b)  Defendants' projections lacked any objective basis, and in fact
24 were totally inconsistent with QSI's actual business performance at and before the
25 times the projections were disclosed.  See §§V.A., V.B., VII; see also ¶117.

26     (c)  QSI's sales pipeline was in decline by the fourth quarter of
27 FY2012 (the quarter beginning January 1, 2012), and QSI's financial performance had
28 begun slowing down in late 2011.  See §§I., V.A., V.B.

930247_1

(d)   At the time the statements were made, real-time internal forecasting data and sales reports that were circulated and available to the Individual Defendants and the Company's executives and management contradicted and were inconsistent with Defendants' public statements.  *See* §§I., V.A, VII, VIII.C.

**I.   The June 26, 2012 Shareholder Letter and July 2012 Proxy Materials**

105.  As the first quarter of FY2013 progressed, Defendants repeatedly affirmed their bullish guidance calling for EPS growth of between 20% and 25%.  In a series of statements during the spring and summer of 2012, QSI and Plochocki affirmed the favorable FY2013 guidance, and further stated that this guidance was a key reason why the Company was superior to its competitors.  For example, at a June 4, 2012 analyst industry conference, Plochocki represented that the Company's strong guidance differentiated it from its competitors, stating that "we are the only company in our sector that has finished the year and given guidance on the upcoming year for revenue and earnings growth with a 2 in front of it in those two categories."

106.  On June 7, 2012, analysts at Sterne Agee reported on their "[c]all with [the] Quality Systems CEO."  According to Sterne Agee, Plochocki told them that QSI was expecting "40% revenue growth in FY13."  Sterne Agee commented that this forecast "might appear optimistic."  But, based on Plochocki's claim that "***a majority of the business included in FY13 guidance represents commitments from existing customers***," Sterne Agee recommended a "[b]uy," and stated that they had "little reason to believe QSII will miss current FY13 guidance."  Similarly, on June 18, 2012, J.P. Morgan stated that it had met with QSI management on June 15, 2012 (just two weeks before the first quarter of FY2013 ended), and based on "feedback from management," J.P. Morgan concluded that "the EPS miss last quarter will be a blip on the radar – it's time to buy QSII shares."  And, on June 22, 2012, UBS, looking back to QSI's claims regarding its FY2012 fourth quarter, stated that "F1Q13 should benefit from March quarter delays."

107.   On June 26, 2012, just four days before the FY2013 first quarter closed, QSI filed proxy materials with the SEC on Schedule 14A.  These proxy materials consisted of an Open Letter to Shareholders signed by Defendants Plochocki and Razin, among others (the "June 26, 2012 Shareholders Letter").   In that letter, Defendants stated as follows:

> We are proud of our strong record of delivering earnings growth and generating superior returns for our shareholders.  We are also confident about our growth prospects.  For fiscal 2013, we expect that revenues will increase in the 20-24% range and we expect earnings per share to grow by 20-25%.
>
> Led by our Board nominees and management team, we have a robust strategy in place to enhance our position as a leader in the healthcare information technology (HCIT) sector and capture growth potential arising out of demographic, industry and regulatory developments.

108.   QSI's FY2013 first quarter ended on June 30, 2012.  As noted above, while Defendants had falsely assured investors that QSI would report EPS growth of between 20% and 25% for FY2013, in reality, QSI's EPS had declined by 19%. Nevertheless, *for weeks after the quarter ended*, Defendants continued to affirm the materially false and misleading FY2013 guidance.  On July 9, 2012 and again on July 10, 2012, QSI filed preliminary proxy materials stating QSI had "plans to grow revenues by 20-24% and earnings by 20-25% in FY2013."  Furthermore, on July 13, 2012, Defendants filed QSI's Definitive Proxy Statement with the SEC on Schedule 14A, and on July 23, 2012, nearly a month after the quarter ended, Defendants filed Additional Definitive Proxy Materials with the SEC on Schedule 14A (collectively, the "July 2012 Proxy Materials").  The July 2012 Proxy Materials were signed by Defendants Plochocki and Razin.  In the July 2012 Proxy Materials, Defendants stated: "For fiscal 2013 . . . we expect earnings per share to grow by 20-25%."

1    109.    Defendants' statements and omissions in the June 26, 2012 Shareholders
2    Letter and July 2012 Proxy Materials concerning QSI's current and future sales and
3    earnings forecasts for FY2013 were materially false and misleading in at least the
4    following respects:

5        (a)    QSI's most profitable segment, and the most important driver of
6    growth, new system sales, was in decline by April 2011 – and suffered further
7    deterioration throughout 2011.  *See* §§I., V.A., V.B.

8        (b)    Defendants' projections lacked any objective basis, and in fact
9    were totally inconsistent with QSI's actual business performance at and before the
10   times the projections were disclosed.  *See* §§V.A., V.B., VII; *see also* ¶117.

11       (c)    QSI's sales pipeline was in decline by the fourth quarter of
12   FY2012 (the quarter beginning January 1, 2012), and QSI's financial performance had
13   begun slowing down in late 2011.  *See* §§I., V.A., V.B.

14       (d)    At the time the statements were made, real-time internal
15   forecasting data and sales reports that were circulated and available to the Individual
16   Defendants and the Company's executives and management contradicted and were
17   inconsistent with Defendants' public statements.  *See* §§I, V.A, VII, VIII.C.

18   **VI.    DEFENDANTS WITHDRAW QSI'S FY 2013 GUIDANCE**

19       110.    On July 26, 2012, QSI issued a press release that shocked investors and
20   revealed that contrary to Defendants' repeated claims – the last of which came just
21   three days prior – the Company's business was in severe decline and retracted its
22   "reliable" and "conservative" guidance.    Specifically, on July 26, 2012, QSI
23   announced that its net income had declined 18% and its EPS had declined 19% as
24   compared to the year-ago quarter.  Due to these results, Plochocki stated that "we are
25   not affirming our previous guidance nor providing revised guidance."    Neither
26   Plochocki nor any QSI representative provided any explanation as to how the
27   Company could have reaffirmed its guidance as recently as three days ago, when they

28

- 44 -

1   had known QSI's first quarter results for nearly a month.  QSI also disclosed that its

2   pipeline had declined significantly.

3        111.   Following the issuance of the press release, QSI held a conference call to

4   discuss the announcement.  During the conference call, Defendant Holt admitted the

5   Company's gross profit margin was materially declining (down to 59.1% "from

6   65.2% a year ago").  Holt also admitted that the decline in QSI's gross margin was

7   "primarily due to comparatively lower amount of high margin software revenue and

8   the change in revenue mix towards a larger portion of lower margin implementation

9   and other service revenue."  During the same call, Decker admitted that the steep

10  decline in high margin software sales was ***not*** a new development: "[W]e continue to

11  experience softness in system software sales that began last quarter."  Decker went on

12  to disclose that NextGen's market "is quite choppy right now," and "[t]here is

13  definitely a pause in activity."  Decker also admitted that the pipeline had dropped

14  materially ("$153 million, versus $168 million a year ago").

15       112.   During the same July 26, 2012 call, which was just three days after QSI

16  had affirmed guidance, and nearly a month after the close of the quarter, numerous

17  financial analysts directly asked the obvious question: why retract rather than lower

18  guidance?  For example, Sean Wieland, an analyst with Piper Jaffray asked:

19       So I guess my question is, pulling guidance conveys a level of

20       uncertainty that certainly the market is uncomfortable with.   You

21       touched on it a little bit, but I just want to come back to it again?  Why

22       pull guidance as opposed to just lowering it given maybe even a worst

23       case set of circumstances out there?

24  On the call, Defendants again admitted that they get up-to-the minute updates on sales

25  – with Decker even stating during the call that he "just [got] a note" that QSI had just

26  signed a large customer "this morning" – but, could not explain the discrepancy

27  between their very recent affirming of guidance and the July 26, 2012 repeal.

28

930247_1

113.   Like QSI's investors, analysts covering the Company were surprised by the disclosure of QSI's true financial condition.  On July 26, 2012, in response to QSI's disclosure, financial analysts from Piper Jaffray put it bluntly: "The Fat Lady Sings."  Piper Jaffray went on to question management's "various" explanations for the "poor quarter results," and stated that they believed the cause was "the saturated high-medium end physician market."  That same day, Leerink Swann analysts noted with astonishment that FY2013 guidance was "[a]bandoned with [n]o [v]isibility [p]rovided."  Leerink Swann added that the miss should not have come as a surprise to Defendants: "We believe the miss this quarter is due to the large practice market being nearly fully penetrated, and we do not expect a large re-acceleration of sales in the back half of the year."  In a second report published on July 26, 2012, after the QSI conference call, Leerink Swann even questioned Defendants' honesty in their statements regarding the loss of a large customer (HMA): "We are not convinced that management's commentary around HMA is valid."

114.   Similarly, analysts at Cowen and Company disputed Defendants' claim of a "pause" in new business and stated that they believed that "the market for EHRs, notably at the larger-end, is already peaking."  Cowen and Company also noted that they were "surprised by these results," given that QSI had claimed "during its last quarterly call that a few deals that slipped in F4Q12 [had] been recognized in F1Q13."  Likewise, analysts at Jefferies highlighted Defendants' "slippage" claim and noted that "[t]his is the second consecutive quarter management has attributed the poor revenue performance to slippage."  And Jefferies raised concern that the "Recall on FY13 Guidance" came just "[o]ne quarter after issuing."  Also on July 26, 2012, William Blair noted that the revelation regarding QSI's true financial condition was "surprising – as the company commented it was off to a solid start in the first fiscal quarter (after reporting disappointing fourth-quarter results, where several deals slipped into the first quarter).  We believed the deal slippage would benefit fiscal first-quarter results . . . ."

- 46 -

930247_1

115.   Like many other analysts, on July 26, 2012, J.P. Morgan seized on the inconsistency between Defendants' recent claims that its first quarter FY2013 was off to a solid start and the revelation that "the company is withdrawing prior FY13 guidance." J.P. Morgan immediately downgraded the stock.

116.   Also on July 26, 2012, financial analysts at Oppenheimer were critical of the fact that Defendants "did not specify what industry changes caused the removal of guidance." In a report published the following day, Oppenheimer suggested that Defendants were aware of the fact that the market was deteriorating: "We have been expecting a decline in ambulatory sales for some time." That same day, July 27, 2012, analysts from Wells Fargo Securities were even more pointed in questioning Defendants' prior guidance and stated that "[t]he large physician practice market that QSII primarily targets may have peaked around the second half of calendar 2011."

117.   Following the July 26, 2012 disclosures by QSI, Hussein – then a current QSI director – confronted Plochocki and Holt and asked them how QSI could issue FY2013 projections only to retract them days later. Plochocki told Hussein that the projections were based on Razin's demands. In other words, Plochocki admitted that the projections were *not* based on QSI's actual business performance. Holt told Hussein that he did not remember signing off on the FY2013 projections.

## VII.   DEFENDANTS' KNOWLEDGE ABOUT QSI'S TRUE BUSINESS CONDITIONS

118.   The facts alleged herein establish that Defendants' false and misleading statements and omissions were made intentionally and with reckless disregard for the truth. At all times, the Individual Defendants, Plochocki, Holt and Razin, were well aware of and recklessly disregarded the slowdown in QSI's business. Specifically, the Individual Defendants were personally involved with, and exercised control over, the determination of what EPS guidance the Company publicly issued.

119.   Defendants were also privy to real-time data reflecting the true revenues and earnings of every QSI operating division. Defendants knew that their public

930247_1

statements and projections were inconsistent with QSI's actual business performance because Defendants were provided with and could readily access continuously updated, comprehensive information regarding QSI's revenue, sales pipeline, internal forecasts and other performance metrics.  Indeed, Defendants repeatedly assured investors that its guidance was reliable because it was continuously updated and based on real-time internal data.  QSI stated that it engaged in "a continuous reforecasting process, which incorporates inputs from all operating entities to determine short term and long term expectations."  Moreover, QSI represented on analyst calls that it maintained and reviewed data on sales and other information concerning its business operations.  For example, on May 9, 2012, Decker, NextGen's President, assured investors that QSI had real-time internal data regarding current sales status, that Decker had "gone back through the data over the last few days and objectively looked at it," and had concluded the "[s]ales cycle has not lengthened."

120.   Hussein, a QSI director for approximately 14 years, as well as various former QSI employees, confirmed that QSI maintains real-time, continuously updated data that must have been known to Defendants.  Hussein routinely attended meetings of the QSI Board and personally interacted with Plochocki, Holt and Razin and other top QSI executives regarding non-public matters, including QSI's actual and projected financial performance.  According to Hussein, QSI engaged in a "'continuous reforecasting process' based on real-time information concerning QSI revenues and income," "business performance, financial performance [and] sales pipeline."

121.   The Individual Defendants also repeatedly admitted throughout the Class Period that they had actual access to real-time internal data regarding sales.  For example, during the May 26, 2011 call, Plochocki explained: "All of our leads and the progress that we are making and the status and the forecasts are maintained within salesforce.com and it's a pretty objective set of criteria that we use to report the pipeline."  Accordingly, during the Class Period, the Individual Defendants knew that QSI's guidance calling for significant growth was inconsistent with the true state of

- 48 -

1  QSI's sales and business conditions, which were slowing down in FY2012 and, for

2  FY2013, were sharply contracting.

3       122.   Additionally, various former QSI employees who worked at QSI during

4  the Class Period confirmed the Company maintained and regularly updated real-time

5  pipeline and forecasting information.  For instance, CW1 indicated QSI executives

6  had access to real-time data and reports on sales figures and other metrics, and stated

7  the executives would absolutely see opportunities slowing down.  According to

8  CW5,[10] NextGen automatically sent QSI and its management – including the CFO,

9  Defendant Holt – reports, via email on a weekly or monthly basis, showing NextGen's

10  booked business as well as forecasted business.  CW2 stated QSI should have had

11  real-time data on a daily basis as far as what the sales cycle was, who was purchasing,

12  who was not purchasing, what they were spending, what was in the pipeline, and what

13  was not in the pipeline.  Numerous former employees confirmed that QSI used

14  Salesforce as a tool for sales performance monitoring, forecasting and analyzing QSI's

15  pipeline.

16       123.   *CW6* served as a director at QSI from June 2008 through September

17  2009, including as Chair of the Board's Nominating Committee, and was the

18  Company's COO from September 2009 through May 2010.  According to CW6, CW6

19  could see in early 2010 that the market was going to a recurring revenue model, and

20  that the big license sales that had fueled QSI's growth were no longer going to work

21  and the Company would hit the wall.  CW6 could see that there was saturation in the

22  market.  CW6 warned Razin that certain changes needed to be made in the business

23  model and stressed that the Company needed to plan for when the license sales dried

24  up or it would hit the wall, which is what finally happened.  CW6 stated it was

25  shocking that QSI management would reaffirm its guidance for FY2013 only to

26  withdraw it days later.  You would know at the end of the quarter what deals closed

27  _____

28  [10]  *See infra* n.11.

- 49 -

1    and management would have known what deals they needed and what deals they

2    closed to meet earnings.  CW6 also confirmed that Salesforce reports were available at

3    the push of a button and the forecast was recalculated more often towards the end of

4    the quarter.  By the end of the quarter, QSI management, including specifically

5    Plochocki, and financial personnel, were discussing the forecasts multiple times a day.

6    The eye was never long off that ball, according to CW6.

7         124.  **CW7** served as a QSI director from 2004 to September 2009, including a

8    period which CW7 served as Chair of the Audit Committee.  CW7 confirmed that

9    QSI's senior executives continually monitored the Company's revenues and earnings.

10   Accordingly, QSI management knew internally what they were doing on a monthly

11   basis and had a good idea what they were making during the quarter.  Based on

12   CW7's experience with the Company, CW7 believes that QSI management should

13   have known when they reaffirmed guidance that it was unreasonable given how the

14   quarter went.

15        125.  CW1 had access to QSI's Salesforce program "funnel reports." CW1

16   reviewed funnel reports approximately once per quarter.  The "funnel reports"

17   provided CW1 with a snapshot of sales opportunities, which CW1 equated to where

18   the market was going, and CW1 used the reports to assist in guiding product strategy.

19   CW1 says the funnel reports were available to all of the executives.  Further,

20   according to CW1, specific "dashboards" were set up for different executives, which

21   allowed executives to view QSI's information by specific criteria including by region,

22   clinical specialty, sales representative, and other criteria.  CW1 recalled a specific

23   instance in which the Vice President of Product Management and Marketing, Kervin,

24   Senior Vice President of Product Management and Marketing at NextGen, sent CW1

25   a screenshot of a dashboard reflecting the rollup of NextGen's sales opportunities;

26   CW1 believes the screenshot was of Senior Vice President of Sales at NextGen

27   Shultz's dashboard.  According to CW1, while Shultz may have had multiple

28

930247_1

1   dashboards set up for his review, CW1 knew Shultz would have looked at this
2   information on NextGen's sales opportunities on a daily basis.

3        126.   As part of CW1's job responsibilities, CW1 attended executive meetings
4   whose attendees included Puckett, Executive Vice President of QSI's Hospital
5   Solutions Division, and Shultz.  According to CW1, they (the executives) would
6   absolutely see opportunities slowing down.  CW1 expected QSI executives were
7   aware of sales opportunities drying up since they had access to and reviewed QSI's
8   funnel reports and measured individual sales performance against sales goals on a
9   regular basis.  Whenever CW1 heard or read the projections the Company publicly
10  issued, in CW1's experience, CW1 wondered where management was getting its
11  numbers.  According to CW1, you would roll your eyes when you heard the targets
12  QSI publicly issued during the Class Period because you were trying to add it up on
13  the inside and trying to figure out where they derived the numbers.

14       127.   CW2 also confirmed that sales information was known or readily
15  available to the Individual Defendants and QSI executive management.  CW2's
16  division created monthly reports which included the division's basic profits and losses
17  and expenses.  The RCM division also provided weekly pipeline reports to Sandler,
18  Executive Vice President of QSI's RCM division, concerning new sales, annual
19  anticipated revenue information, and which new clients were in the pipeline and the
20  estimated value of those clients.  According to CW2, at the end of the month, the
21  RCM division knew exactly what its profits or losses and expenses were for that
22  reporting period, and there should never have been any doubt on where they were,
23  including losing sales, or closing sales, or losing business, or gaining new business.

24       128.   CW2 said QSI held management conference calls approximately once
25  every month or two; call attendees included CW2, Defendant Plochocki, division
26  heads, and other QSI management.  CW2 believed Defendant Holt was likely on these
27  calls as well.

28

930247_1

129.   According to CW2, NextGen and the rest of QSI were using an ERP system and should have had real-time data on a daily basis as far as what the sales cycle was, who was purchasing, who was not purchasing, what they were spending, what was in the pipeline, and what was not in the pipeline.  According to CW2, Razin was the leader, and nothing happened at QSI that Razin did not know about.

130.   According to CW5, a NextGen Sales Analyst from July 2010 to October 2012, the NextGen division sent QSI reports showing NextGen's booked business as well as forecasted business.[11]  NextGen's reporting was all automated because CW5 built the reports.  CW5 arranged for sales reports to be automatically delivered to the management team, including the CFO's office, either on a weekly or monthly basis. The Company could easily run reports on when deals had been approved and were closed.  CW5 said that QSI should have absolutely known where it stood for the quarter three weeks after the quarter closed.  According to CW5, NextGen provided the vast majority of QSI's consolidated revenue, so QSI monitored NextGen closely.

131.   According to CW4, a NextGen Sales Executive from 2008 to December 2011, sales forecasts at NextGen were created using Salesforce and all of the executives at NextGen and QSI had access to Salesforce.[12]  The data in Salesforce was

---

[11]   **CW5** worked as a CRM (customer relationship management) Sales Analyst at NextGen from July 2010 to October 2012.  CW5 was based in NextGen's Horsham, Pennsylvania location and reported to Mike Lovett, Vice President of Sales Solutions at NextGen.  CW5's responsibilities included managing Salesforce, which NextGen used for forecasting purposes, building forecasting reports and automating NextGen's reporting system by arranging for sales reports to be automatically delivered to the management team, including the CFO's office, on a weekly or monthly basis

[12]   **CW4** worked as a NextGen Sales Executive from 2008 to December 2011.  CW4's duties included handling large, enterprise level sales of NextGen's PM, EHR, RCM, and health information exchange ("HIE") software systems to hospitals and larger physician groups.   CW4 handled sales in multiple regions covering Virginia, Pennsylvania and West Virginia.  CW4's job responsibilities included attending conference calls with other sales personnel in CW4's region.  CW4's duties also included analyzing data and inputting data into Salesforce, and creating and submitting Saleforce forecasting reports to CW4's boss (who, at times, included Chris Button, Mike Demuth and Jim Thompson), who reported to Shultz (Vice President of Sales) and/or Gary Voydanoff.  Shultz and Gary Voydanoff reported to Pat Cline ("Cline").  CW4 also discussed deals with CW4's boss, with Shultz, and occasionally with Cline.

930247_1

Company-wide and was required to be kept up to date so that it could be accurately reported up the chain of command.

132.  According to CW4, QSI executives became increasing involved with prospective deals as the quarter-end approached, and requested updated forecasts more frequently.  For example, towards the end of the quarter, CW4 discussed deals with CW4's boss, Shultz, and even occasionally with Cline.  CW4 explained it was the general practice that CW4's boss would not get Holt involved with deals worth less than $1 million, however, CW4's boss occasionally reached out to Holt in connection with deals worth less than $1 million.

# VIII.  ADDITIONAL SCIENTER ALLEGATIONS

133.  As alleged herein, Defendants acted with scienter in that Defendants knew and recklessly disregarded that their public documents and statements issued or disseminated in the name of the Company were materially false and misleading and that such statements or documents would be issued or disseminated to the investing public; and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding QSI, their control over, and/or receipt and/or modification of QSI's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning QSI, participated in the fraudulent scheme alleged herein.

## A.  Defendant Plochocki Sold 87% of His QSI Stock While in Possession of Material Non-Public Information

134.  Defendant Plochocki profited enormously from the scheme to misrepresent the truth about QSI's business.  While in possession of material, non-public information regarding the pronounced slowdown in QSI's business, Defendant Plochocki sold substantial amounts of QSI common stock from his holdings at

- 53 -

artificially inflated prices.  The price at which Defendant Plochocki sold his stock far exceeded the closing price of QSI stock after the Company announced that its EPS had significantly declined (*i.e.*, $15.95 on July 26, 2012).

135.   On February 24, 2012, Defendant Plochocki sold 88,500 QSI shares at $43.99 per share, reaping proceeds of $3,893,115, over seven times his fiscal 2012 salary.  This stock sale was suspicious in timing and amount because: (i) Defendant Plochocki made this sale when he was aware that he was misrepresenting QSI's growth prospects (he cashed-out just weeks before QSI closed the FY2012 fourth quarter); (ii) prior to making this massive stock sale, he had made no stock sales for approximately three and a half years (since September 2008); (iii) through this sale, he liquidated nearly all, *i.e.*, 87%, of his holdings of QSI stock; and (iv) he made this sale at a time when QSI's stock price was near its all-time high.

136.   The suspiciousness of Plochocki's stock sales and their proximity to the market learning of the Company's true financial condition raises a strong inference that he knew about the Company's true financial condition when he liquidated his shares and used that information in connection with the sales.  The QSI stock chart below illustrates the price of QSI stock when Defendant Plochocki dumped his QSI holdings compared to the price when the Company's true financial condition was disclosed.

- 54 -



137.   Not coincidentally, just two weeks before cashing in, Plochocki urged investors to buy QSI stock and hyped the Company's stock price performance stating that, QSI's "share price and market cap . . . have both tripled in the last three and a half years."

138.   Defendant Plochocki's significant insider stock sales while in possession of material non-public information regarding QSI's true financial performance and growth prospects further support a strong inference of his scienter.

**B.   The SEC Challenged the Adequacy of Defendants' Disclosures Regarding QSI's Projections Calling Them "Generic" and "Confusing"**

139.   Defendants knew that QSI's FY2013 revenue and earnings projections issued during the Class Period were materially false and misleading.  As detailed below, when the SEC asked QSI (in comment letters dated July 3 and July 9, 2012) to provide investors with the support and assumptions underlying QSI's projections,

- 55 -

Defendants instead included in QSI's proxy materials "generic support and discussion," which the SEC explained was "confusing" to shareholders. Defendants' provision of "generic" and "confusing" support for QSI's projections despite the warnings in the SEC's comment letters further demonstrates Defendants knew and recklessly disregarded the projections were materially false and misleading and without factual basis.

140.   On June 25, 2012, QSI filed a preliminary proxy statement that stated QSI would "grow revenues by 20-24% and earnings by 20-25% in fiscal 2013."  On June 26, 2012, QSI filed an "Open Letter" to QSI's shareholders, signed by Razin and Plochocki, stating that Defendants were "confident about [QSI's] growth prospects," and "[f]or fiscal 2013, we expect that revenues will increase in the 20-24% range and we expect earnings per share to grow by 20-25%."  In making these statements, QSI omitted any support for these projections (which they knew were without factual basis) and any description of the assumptions underlying the projections.  Further, QSI failed to list the limitations or other factors that could cause QSI to fail to realize the assumptions underlying the projections.

141.   In a July 3, 2012 letter to QSI, the SEC flagged QSI's FY2013 projections and warned that QSI should "provide support for these very specific projected figures by describing the assumptions underlying them, including any limitations on those assumptions or other factors that may cause them not to be realized."  The July 3 SEC letter reminded QSI that "the company and its management are in possession of all facts relating to [the] company's disclosure, [and] they are responsible for the accuracy and adequacy of the disclosures they have made."

142.   Knowing the projections were without factual basis, and rather than excise the projections from QSI's proxy materials altogether, on July 9, 2012, QSI filed revised proxy materials that repeated the statement that QSI would "grow revenues by 20-24% and earnings by 20-25% in fiscal 2013," and several pages later, represented that QSI "has an annual planning and budgeting process and a continuous

- 56 -

reforecasting process, which incorporates inputs from all operating entities to determine short term and long term expectations," and provided a laundry-list of "input variables" purportedly considered in forming QSI's projections.

143.   On July 9, 2012, following its review of QSI's July 9, 2012 proxy materials, the SEC issued another letter to QSI regarding its misleading statements. The SEC's July 9, 2012 letter referred QSI to the concerns the SEC had expressed in its previous letter dated July 3, 2012, and explained that the SEC had "asked [QSI] to provide support and describe the assumptions underlying the very specific projected figures . . . included in [QSI's] proxy," that the revised materials provided only "generic support and discussion" for the projections, and that the "revised disclosure" in QSI's July 9, 2012 proxy materials was "confusing."

144.   On July 10, 2012, QSI filed another proxy statement that repeated QSI's revenue and earnings projections and the "generic support" it had previously include in its July 9, 2012 materials.  QSI repeated its projections and "generic support" in further proxy materials filed on July 13 and July 23, 2012.  On July 26, 2012, QSI retracted its revenue and earnings projections.  Defendants' actions in refusing to provide any meaningful support for QSI's projections, which Defendants knew were without factual basis, further demonstrates a strong inference of scienter.

### C.     Defendants' False Statements and Omissions Concerned QSI's Core Operations Which Defendants Closely Monitored

145.   Each of the Individual Defendants was a top executive involved in QSI's daily operations and with access to all material information regarding the Company's core operations.  Therefore, each of the Individual Defendants is presumed to have had knowledge of all material facts regarding QSI's core operations.

146.   Each of the false statements alleged herein involved a core operation of QSI.  Defendants repeatedly hyped QSI's historical and projected revenue and EPS growth.  Indeed, Defendants made statements about QSI's historical and projected revenue and EPS growth during each conference call during the Class Period.

- 57 -

147. In addition, in the Company's SEC filings, it repeatedly assured investors that its guidance was highly reliable because the Company continually updated it based on real-time data from all its operating divisions, stating that QSI engaged in "a continuous reforecasting process, which incorporates inputs from all operating entities to determine short term and long term expectations." According to former independent director Hussein, and other former employees, QSI's guidance was continuously updated based on real-time data.

148. Furthermore, according to Hussein, Razin was intimately involved in the day-to-day operations of QSI. Plochocki even told Hussein that it was Razin who came up with the FY2013 guidance.

### D. Defendants Affirm QSI's FY2013 Guidance but Withdraw It Just Three Days Later

149. The temporal proximity of a misleading statement and the subsequent disclosure bolsters the inference that Defendants knew the statement was false when made. QSI's FY2013 first quarter closed on June 30, 2012, and the Company's results were dismal. Far from achieving at least 20% growth in earnings, the exact opposite had occurred: QSI's net income and EPS had declined by almost 20%. Significantly, while in possession of this material non-public information, QSI continued to falsely affirm its FY2013 guidance for weeks *after* the first quarter closed in proxy materials dated July 9, 10, 13 and 23, 2012.

150. On July 26, 2012 – *just three days after QSI affirmed its guidance* – QSI suddenly announced that its EPS had precipitously declined and, as a result, it was retracting its guidance. QSI disclosed that, compared to the year-ago quarter, its net income had declined 18% and its EPS had declined 19%, and thus, it was "not affirming [its] previous guidance nor providing revised guidance."

### E. Defendant Razin's Control Over QSI's Operations and Board

151. Defendants also misled the market in order to help maintain Razin's control over the Company. According to Hussein, Razin and QSI's management

- 58 -

"sought to perpetuate the market perception that the company was positioned to continue to grow and thrive, when in fact the opposite was happening." QSI's management misled investors in order to "reassure the market and QSI's shareholders regarding the financial condition and prospects for the company following Cline's departure and the company's announcement in May 2012 of disappointing earnings numbers for the fourth quarter of 2012."

152. On June 15, 2012, Hussein informed QSI's Board that he was nominating a rival slate of directors for the Company's Board, and would be sponsoring a proxy contest in support of the election of those directors at the August 2012 annual shareholder meeting. "By reassuring the market regarding QSI's financial condition and growth prospects," Hussein explained, "Razin and QSI management sought to increase the prospects for the re-election of the incumbent directors and thereby to further consolidate Razin's control over the company," while "dissuad[ing] QSI investors from supporting [Hussein's] proposed slate of directors."

153. Defendants Plochocki and Holt were well aware of Razin's significant influence over the Board and the Company's operations at the time they participated in the scheme to mislead the market. Hussein described Razin as the "*de facto* CEO of the company," and stated that "[w]ithout board authorization, Razin maintains an office at QSI, controls and directs the use of QSI facilities and resources, and manages the company on a day-to-day basis." According to Hussein, "[a]ll significant decisions regarding the direction of the company are made by Razin, and the company's executive officers do not make public statements regarding the company, its operations, or its financial performance or future prospects without Razin's approval." Hussein also explained that "Razin's management team made the false statements in May, June and July 2012 regarding QSI's fiscal 2013 earnings projections *after consulting with Razin and obtaining his approval*, as they did on all important matters pertaining to the management of QSI."

154.   Plochocki and Holt also knew Razin carried great influence over the firing of QSI management.  For example, according to Hussein, on May 26, 2010, Razin caused the creation of a Board committee entitled "Independent Directors Compensation and Executive Personnel Committee," which met only once (on May 26, 2010) and "was created for the sole purpose of facilitating Razin's decision to terminate [COO Philip] Kaplan's employment, for reasons that were never explained to Hussein, [director] Brennan, or the full board of directors."

155.   On another occasion, in May 2010, independent QSI director Joseph Davis "alerted the QSI board of directors that Razin had, for the past seven years, falsely certified that he was a full-time employee of the company in order to obtain health insurance coverage for himself and his wife under the company's benefit plan." According to Hussein, "Davis introduced a resolution seeking an independent investigation of Razin . . . which . . . was voted down by Razin and the directors aligned with him."  According to Hussein, Razin successfully struck any mention of the resolution from the meeting minutes (despite the resolution having been listed on the agenda and having been supported by three of the seven independent directors) and Davis was subsequently not nominated for re-election to the Board.

156.   In furtherance of Defendants' attempt to deceive investors regarding the Company's instability, Defendants withheld material information from the market regarding the departures of Decker and Cline from QSI.  According to Hussein, shortly after the Class Period ended, NextGen President Decker "informed Razin and QSI management" in "early August 2012," before the "contested board election" had taken place, of his resignation.  According to Hussein, Decker had "object[ed] to Razin claiming the status of an independent director while maintaining an office in the company and functioning as its CEO."  However, rather than announce Decker's resignation prior to the August 16, 2012 shareholder meeting, Hussein stated that Defendants Razin and Plochocki instead engaged in "subterfuge" in that they "did not inform the full QSI board of [Decker's resignation] and delayed announcing Decker's

- 60 -

930247_1

1   resignation until after the contested board election at the annual shareholders meeting

2   held" on August 16, 2012.

3       157.   On January 17, 2013, QSI announced Cline had "notified the Chairman

4   of the Board of his immediate resignation from the Board."  However, in announcing

5   Cline's resignation from the Board of Directors, QSI did not disclose the actual

6   resignation letter, the fact that the letter had been addressed to the entire Board (not

7   just the Chairman), and the fact that Cline stated in the letter he was leaving because

8   of "the current board environment and company issues."  It was not until May 17,

9   2013, almost a year after the Class Period, that QSI disclosed in a Form 8-K the

10   contents of Cline's resignation letter.  QSI's Executive Vice President and General

11   Counsel, James Sullivan (who had signed the May 17, 2013 Form 8-K referenced

12   above), resigned shortly thereafter in May 2013.  According to Hussein, "QSI made

13   no disclosure of the fact of Sullivan's resignation or the reasons for his resignation."

14   **IX.   LOSS CAUSATION**

15       158.   During the Class Period, Defendants engaged in a scheme to deceive the

16   market and a course of conduct that artificially inflated the price of QSI common

17   stock.  By misrepresenting the Company's business and sales prospects, and failing to

18   disclose QSI's declining sales and sales pipeline, among other adverse facts,

19   Defendants presented a misleading picture of QSI's business condition that operated

20   as a fraud or deceit on Class Period purchasers of QSI common stock.

21       159.   These false and misleading statements, individually and collectively,

22   concealed QSI's true financial circumstances and future business prospects, resulting

23   in the market price for the Company's common stock being artificially inflated until,

24   as indicated herein, the relevant truth was revealed.  While each of these

25   misrepresentations was independently fraudulent, they were all motivated by

26   Defendants' desire to artificially inflate QSI's stock price and the image of its future

27   business prospects to give the market the false impression that QSI's sales and sales

28   prospects were better than they really were.  These false and misleading statements

- 61 -

1  and omissions, among others, had the intended effect of preventing the market from

2  learning the full truth and maintaining the artificial inflation in QSI's stock price.  As

3  a result of Defendants' false and misleading statements and material omissions, QSI's

4  common stock traded at artificially inflated levels throughout the Class Period,

5  reaching a Class Period high of $50.04 on September 27, 2001.

6      160.   At all relevant times, the material misrepresentations and omissions

7  particularized in this amended complaint directly or proximately caused or were a

8  substantial contributing cause of the damages sustained by Lead Plaintiffs and other

9  members of the Class.

10     161.   As Defendants' prior misrepresentations and omissions gradually became

11  apparent to the market, the price of QSI common stock declined significantly as the

12  artificial inflation dissipated or was removed.  As a result of their purchases of QSI

13  common stock during the Class Period, Lead Plaintiffs and other members of the

14  Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

15     162.   Investors began to learn the truth about QSI's true sales conditions on

16  May 7, 2012, when QSI disclosed that sales deals were taking longer to get done – a

17  trend that the Company was "seeing more of."  As a result of this partial disclosure,

18  QSI's stock price dropped from a close of $36.99 per share on Friday, May 4, 2012,

19  the prior trading day, to a close of $33.98 per share on May 7, 2012, a decline of

20  nearly 8%, on unusually high volume.  The following day, May 8, 2012, analysts cut

21  their forecasts for QSI's performance.  J.P. Morgan, for example, issued a report on

22  May 8, 2012, titled "Trimming Estimates After Mgmt Commentary," in which it

23  noted that it had spoken with QSI management that morning and received "downbeat

24  management commentary."   In response to this development, QSI stock declined

25  another 9% on May 8, 2012 falling from $33.98 to $30.99, again on extraordinarily

26  high volume.

27     163.   Defendants, however, continued to conceal the Company's true sales and

28  business conditions.

930247_1

164.   On May 10, 2012, given the investor concern regarding the disclosures earlier in the week, QSI was forced to pre-announce its FY2012 results, thus partially revealing the Company's true financial condition.   In the May 10, 2012 disclosure, QSI revealed that it expected to report FY2012 EPS of between $1.27 and $1.30 – growth rates that were 28% below the bottom of QSI's conservative guidance and 36% below the top of QSI's conservative guidance.   QSI also disclosed that the longer sales cycle was a cause of the reported EPS figures.   Analysts widely reported that these results were "disappointing" and much worse than expected, even considering Plochocki's "downbeat" remarks on May 7, 2012.   For example, Piper Jaffray reported that QSI's "big miss" on its guidance "grossly fall[s] short of our estimates and consensus."   Credit Suisse reported that, "[c]oming on the heels of . . . QSII's management presentations at competitor conferences, we would suggest weaker results had begun to be discounted in [the] shares, however these preannounced results were below even revised expectations."   These partial revelations regarding the truth about QSI's financial condition caused QSI's stock to drop another 6% on May 10, 2012, from $32.09 per share to $30.12 per share, again on extremely high volume. *See also* §V.F.

165.   But Defendants continued to conceal the Company's true sales and business conditions.   And, in an effort to off-set the disclosures detailed above, issued bullish guidance for FY2013, claiming that "[r]evenues are expected to increase between 20 and 24 percent and earnings per share are expected to grow between 20 and 25 percent versus the 2012 fiscal year."

166.   Then, on July 26, 2012, Defendants disclosed figures reflecting the Company's true financial condition, revealing that net income for the FY2013 first quarter was $15.5 million, down 18% and that EPS for the FY2013 first quarter was $0.26, a 19% decrease.   And, Plochocki disclosed that the main driver of the material decline in QSI's profitability was the loss of revenue "from large, higher margin software system sales."   Plochocki also retracted the FY2013 guidance – which the

- 63 -

1  Company had repeatedly confirmed (as recently as three days earlier) – citing

2  "evolving conditions affecting our industry."   Defendants also revealed that

3  NextGen's pipeline had dropped materially and admitted that there is a "pause" in

4  sales activity.   As a direct result of Defendants' revelations regarding previously

5  concealed risks and the truth about QSI's previous representations regarding demand

6  and QSI's prospects for growth, QSI's stock price plummeted from $23.63 per share

7  to $15.95 per share, or 33%, on extremely heavy trading volume of over 6.5 million

8  shares.  *See also* §§I., VI.  Individually and collectively, these drops removed the

9  inflation from QSI's stock price, causing real economic loss to investors who had

10  purchased the stock during the Class Period.

11        167.   In sum, the significant declines in QSI's stock price were a direct result

12  of the nature and extent of Defendants' fraud finally being revealed to investors and

13  the market.   The timing and magnitude of QSI's stock price declines negate any

14  inference that the loss suffered by Lead Plaintiffs and other Class members was

15  caused by changed market conditions, macroeconomic or industry factors, or

16  Company-specific facts unrelated to the Defendants' fraudulent conduct.   The

17  economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and other Class members

18  was a direct result of Defendants' fraudulent scheme to artificially inflate QSI's stock

19  price and the subsequent significant decline in the value of QSI's stock when

20  Defendants' prior misrepresentations and other fraudulent conduct was revealed.

21  **X.     PRESUMPTION OF RELIANCE**

22        168.   Lead Plaintiffs are entitled to a presumption of reliance on Defendants'

23  material misrepresentations and omissions pursuant to the fraud-on-the-market

24  doctrine because, *inter alia*:

25              (a)    The Defendants made public misrepresentations and failed to

26  disclose material facts during the Class Period;

27              (b)    Defendants' misrepresentations and omissions were material;

28

- 64 -

(c)     Defendants' misrepresentations and omissions would induce a reasonable investor to misjudge the value of QSI common stock; and

(d)     Lead Plaintiffs and other members of the Class purchased QSI common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

169.   At all relevant times, the market for QSI's publicly traded common stock was open, efficient, and well-developed for the following reasons:

(a)     QSI stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient market for securities.

(b)     QSI's securities volume was substantial.

(c)     Institutional investors held a substantial amount of QSI common stock.

(d)     QSI was eligible to file registration statements with the SEC on Form S-3.  To be S-3 eligible, a company had to have $75 million in stock held by non-affiliates, and had to have filed financial reports with the SEC for at least one year.  The value of the shares held by nonaffiliates of QSI greatly exceeded the $75 million threshold.

(e)     As a public company, QSI regularly filed annual, periodic and interim public reports with the SEC.

(f)     QSI regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and the Internet, as well as through presentations to investors and analysts, and conference calls with analysts.

(g)     QSI was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' salesforces and certain customers.

- 65 -

930247_1

(h)     The price of QSI stock promptly reacted to the dissemination of new information regarding the Company.

(i)     The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of QSI common stock.

(j)     Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class purchased or otherwise acquired QSI common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

170.   As a result of the foregoing, the market for QSI common stock promptly digested current information regarding QSI from all publicly available sources and reflected such information in the trading price for QSI common stock.  Under these circumstances, all purchasers of QSI common stock during the Class Period suffered similar injury through their purchase of QSI common stock at artificially inflated prices, and a presumption of reliance applies.

171.   Accordingly, Lead Plaintiffs and the other members of the Class did rely and are entitled to have relied on the integrity of the market price for QSI stock, and a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period applies.

172.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972), because the fraud claims asserted herein are grounded in Defendants' material omissions.  As this action involves Defendants' failure to disclose material adverse information regarding QSI's true business and sales conditions – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions.

- 66 -

# XI.   NO SAFE HARBOR

173.   The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements and omissions pleaded in this amended complaint.  Many of the alleged false statements herein are not forward-looking, but concern then-existing facts about QSI's financial performance.  In addition, any forward-looking statements alleged to be false herein were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Furthermore, to the extent that the statutory safe harbor would otherwise apply to any statement found by the Court to be forward-looking. Defendants are liable for those false or misleading forward-looking statements because at the time each of those statements was made, the speaker knew that the statement was false or misleading, or the statement was authorized and/or approved by an executive officer of QSI who knew that the statement was false or misleading when made.

174.   Moreover, as detailed above, the SEC has specifically stated that QSI's purported cautionary language was inadequate.  *See* §VIII.B.  Indeed, on July 3, 2012, the SEC sent QSI a comment letter, stating that the Company's disclosures concerning its guidance were inadequate.  In particular, the SEC comment letter noted that the proxy materials "contain[ed] specific projections about the . . . future performance of [QSI]" without providing any support, and instructed QSI to "***provide support for these very specific projected figures by describing the assumptions underlying them, including any limitations on those assumptions or other factors that may cause them not to be realized***."  The SEC warned QSI's management that, "[s]ince the company and its management are in possession of all facts relating to a company's disclosure, they are responsible for the accuracy and adequacy of the disclosures they have made."  In a subsequent letter dated July 9, 2012, the SEC stated that QSI's

- 67 -

930247_1

1  proposed revised disclosure offered merely "generic support and discussion" and was
2  "confusing."

3  **XII.   CLASS ACTION ALLEGATIONS**

4      175.   Lead Plaintiffs bring this action as a class action pursuant to Rules 23(a)
5  and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of
6  all persons or entities who purchased or otherwise acquired the common stock of QSI
7  during the period from May 26, 2011 through July 25, 2012, inclusive, and were
8  damaged thereby.  Excluded from the Class are Defendants and their immediate
9  family members (as defined herein), present or former executive officers of QSI, and
10 their immediate family members (as defined in 17 C.F.R. §229.404 Instructions
11 (1)(a)(iii) and (1)(b)(ii)).

12     176.   The members of the Class are so numerous that joinder of all members is
13 impracticable.  Throughout the Class Period, QSI common shares were actively traded
14 on the NASDAQ.  Although the exact number of Class members is unknown to Lead
15 Plaintiffs at this time, Lead Plaintiffs believe that there are at least thousands of
16 members of the proposed Class.  Members of the Class can be identified from records
17 maintained by QSI or its transfer agent(s), and may be notified of the pendency of this
18 action by publication using a form of notice similar to that customarily used in
19 securities class actions.

20     177.   Lead Plaintiffs' claims are typical of the claims of the members of the
21 Class, as all members of the Class were similarly damaged by Defendants' conduct as
22 complained of herein.

23     178.   Common questions of law and fact exist as to all members of the Class
24 and predominate over any questions solely affecting individual members of the Class.
25 Among the questions of fact and law common to the Class are:

26         (a)    whether Defendants' misrepresentations and omissions as alleged
27 herein violated the federal securities laws;

28

- 68 -

1    (b)    whether statements made by Defendants to the investing public

2    during the Class Period misrepresented material facts about the business, operations

3    and management of QSI;

4    (c)    whether Defendants Plochocki, Holt and Razin are personally

5    liable for the alleged misrepresentations and omissions described herein;

6    (d)    whether Defendants' misrepresentations and omissions as alleged

7    herein caused the Class members to suffer a compensable loss; and

8    (e)    whether the members of the Class have sustained damages, and the

9    proper measure of damages.

10    179.   Lead Plaintiffs will fairly and adequately protect the interests of the

11    members of the Class and have retained counsel competent and experienced in class

12    actions and securities litigation.  Lead Plaintiffs have no interests that conflict with the

13    interests of the Class.

14    180.   A class action is superior to all other available methods for the fair and

15    efficient adjudication of this action.  Joinder of all Class members is impracticable.

16    Additionally, the damage suffered by some individual Class members may be small

17    relative to the burden and expense of individual litigation, making it practically

18    impossible for such members to redress individually the wrongs done to them.  There

19    will be no difficulty in the management of this action as a class action.

20    **XIII.  CLAIMS FOR RELIEF**

21    **COUNT I**

22    **Violations of Section 10(b) of the Exchange Act and
      Rule 10b-5 Promulgated Thereunder**
23    **(Against All Defendants)**

24    181.   Lead Plaintiffs repeat and reallege each and every allegation set forth

25    above as if fully set forth herein.

26    182.   During the Class Period, Defendants carried out a plan, scheme and

27    course of conduct which was intended to, and throughout the Class Period, did: (i)

28    deceive the investing public regarding QSI's business, operations, growth prospects

- 69 -

and the intrinsic value of QSI stock; (ii) enable Defendants to artificially inflate the price of QSI stock; (iii) enable Defendant Plochocki to sell almost $4 million of his privately held QSI shares during the Class Period while in possession of material adverse non-public information about the Company; and (iv) cause Lead Plaintiffs and other members of the Class to purchase QSI common stock at artificially inflated prices.    In furtherance of this unlawful scheme, plan and course of conduct, Defendants jointly and individually (and each of them) took the actions set forth herein.

183.   Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the purchasers of the Company's common stock during the Class Period in an effort to maintain artificially high market prices for QSI common stock in violation of §10(b) of the Exchange Act and Rule 10b-5.    Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.    Defendants Plochocki, Holt and Razin are also sued as controlling persons as alleged below.

184.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of QSI as specified herein.

185.   Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of QSI's value and performance and continued substantial growth, which included the making of, and the participation in the making of, untrue statements of material fact and

- 70 -

1  omitting to state material facts necessary in order to make the statements made about

2  QSI and its business operations and future prospects in light of the circumstances in

3  which they were made, not misleading, as set forth more particularly herein, and

4  engaged in transactions, practices and a course of business that operated as a fraud and

5  deceit upon the purchasers of QSI common stock during the Class Period.

6      186.   Defendant QSI is liable for all materially false and misleading statements

7  made during the Class Period, as alleged above at ¶¶44-109.

8      187.   Defendant QSI is liable for the false and misleading statements made by

9  QSI officers during conference calls with investors and analysts as the maker of such

10  statements and under the principle of respondent superior.

11      188.   Defendants Plochocki and Holt, as the most senior officers of the

12  Company, and Defendant Razin, as the Company's Chairman, are liable as direct

13  participants in the wrongs complained of herein.  Through their high-ranking positions

14  of control and authority as the most senior executive officers and Chairman of the

15  Company, each of the Individual Defendants was able to control, and did directly

16  control, the content of the public statements disseminated by QSI.  The Individual

17  Defendants had direct involvement in the daily business of the Company and

18  participated in the preparation and dissemination of QSI's materially false and

19  misleading statements set forth above.

20      189.   In addition, the Individual Defendants are liable for, among other

21  material omissions and false and misleading statements, the false and misleading

22  statements and omissions they made as follows:

23  **Defendant Plochocki:**

24          (a)    Defendant Plochocki authorized the May 10, 2012 press release.

25          (b)    Defendant Plochocki signed the June 26, 2012 Letter to

26  Shareholders, and the July 2012 Proxy Materials.

27          (c)    Defendant Plochocki made statements during numerous conference

28  calls and other public conferences as alleged herein, including calls and conferences

- 71 -

1   on May 26, 2011, July 28, 2011, October 27, 2011, December 14, 2011, January 9,

2   2012, January 26, 2012, February 7, 2012, and May 17, 2012.

3           (d)     Defendant Plochocki made statements during an interview with

4   *Investor's Business Daily* that were publicly disseminated and attributed to Defendant

5   Plochocki on November 7, 2011.

6   **Defendant Holt:**

7           (a)     Defendant Holt signed the May 10, 2012 Form 8-K.

8           (b)     Defendant Holt made statements during conference calls and other

9   public conferences as alleged herein, including calls and conferences on June 9, 2011,

10  May 14, 2012, and May 17, 2012.

11  **Defendant Razin:**

12          (a)     Defendant Razin signed the June 26, 2012 Letter to Shareholders,

13  and the July 2012 Proxy Materials.

14          190.   The allegations in this amended complaint establish a strong inference

15  that Defendants acted with scienter throughout the Class Period in that they had actual

16  knowledge of the misrepresentations and omissions of material facts set forth herein,

17  or acted with reckless disregard for the truth in that they failed to ascertain and

18  disclose such facts.   Defendants' misrepresentations and omissions were done

19  knowingly or with recklessness for the purpose and effect of concealing QSI's

20  operating condition and future business prospects from the investing public and

21  supporting the artificially inflated price of QSI's common stock.  As demonstrated by

22  Defendants' material misstatements and omissions throughout the Class Period, if

23  Defendants did not have actual knowledge of the misrepresentations and omissions

24  alleged herein, they were reckless in failing to obtain such knowledge by recklessly

25  refraining from taking those steps necessary to discover whether their statements were

26  false or misleading, even though such facts were available to them.   Specifically,

27  Defendants knew or recklessly disregarded that QSI's business was materially slowing

28  during the Class Period, as described more fully above.

930247_1

191.   Lead Plaintiffs and the other members of the Class have suffered damages in that, in direct reliance on the integrity of the market in which the stock trades and/or the materially false and misleading statements and omissions made by Defendants, they paid artificially inflated prices for QSI common stock, which inflation was removed from the stock when the true facts became known.   Lead Plaintiffs and the other members of the Class would not have purchased QSI common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

192.   By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

193.   As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of QSI common stock during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### (Against All Defendants)

194.   Lead Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

195.   The Individual Defendants acted as controlling persons of QSI within the meaning of §20(a) of the Exchange Act, as alleged herein.   By reason of their high-level positions of control and authority as the Company's most senior officers and, in the case of Razin, as QSI's Chairman, the Individual Defendants had the power and authority to influence and control, and did influence and control, the decision-making and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.   QSI controlled the Individual Defendants and all of its employees.   The Individual Defendants were able to and did influence and control, directly and indirectly, the content and dissemination of the public statements made by QSI during the Class Period, thereby causing the

- 73 -

930247_1

1  dissemination of the false and misleading statements and omissions of material fact as

2  alleged herein.  Defendants were provided with or had unlimited access to copies of

3  the Company's press releases, public filings and other statements alleged by Lead

4  Plaintiffs to be misleading prior to and/or shortly after these statements were issued

5  and had the ability to prevent the issuance of the statements or cause the statements to

6  be corrected.

7  196.  In their capacities as QSI's most senior corporate officers and Chairman,

8  and as more fully described above.  The Individual Defendants had direct and

9  supervisory involvement in the day-to-day operations of the Company and, therefore,

10  are presumed to have had the power to control or influence the particular transactions

11  giving rise to the securities law violations as alleged herein.  The Individual

12  Defendants signed QSI's SEC filings, and were directly involved in providing false

13  information and certifying and/or approving the false statements disseminated by QSI

14  during the Class Period.

15  197.  By virtue of their positions as controlling persons of QSI and as a result

16  of their own aforementioned conduct, Defendants together and individually, are liable

17  pursuant to §20(a) of the Exchange Act, jointly and severally with, and to the same

18  extent as the Company is liable under §10(b) of the Exchange Act and Rule 10b-5

19  promulgated thereunder.  Moreover, as detailed above, during the time that

20  Defendants exercised control over QSI, each of these Defendants was culpable for the

21  material misstatements and omissions made by QSI, including such misstatements as

22  to QSI's growth prospects, as set forth above.

23  198.  As a direct and proximate result of Defendants' misconduct, Lead

24  Plaintiffs and the other members of the Class suffered damages in connection with

25  their purchases or acquisitions of QSI common stock during the Class Period.

26

27

28

930247_1

# COUNT III

## For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Against Defendant Plochocki)

199.   Lead Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

200.   As detailed above, during the Class Period, Defendant Plochocki occupied a position with QSI that allowed access to confidential information concerning the Company, its operations, finances, financial condition and future business prospects.  Defendant Plochocki's public representations on these subjects set forth herein were materially false or misleading.

201.   Notwithstanding his duty to refrain from trading in QSI common stock unless he disclosed the material adverse facts alleged herein, and in violation of his fiduciary duties to Lead Plaintiffs and other members of the Class, Defendant Plochocki sold millions of dollars' worth of QSI common stock during the Class Period.

202.   Defendant Plochocki sold his shares of QSI common stock, as alleged above, at market prices artificially inflated by the nondisclosure and misrepresentations of material adverse facts in the public statements released during the Class Period.

203.   Defendant Plochocki knew that he was in possession of material adverse information which was not known to the investing public, including Lead Plaintiffs and other members of the Class.  Before selling his stock to the public, he was obligated to disclose that information to Lead Plaintiffs and other members of the Class.

204.   By reason of the foregoing, Defendant Plochocki directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails, and the facilities of the national securities exchanges, employed devices, schemes, and artifices to defraud, and engaged in acts and transactions and a course of business

- 75 -

1   which operated as a fraud or deceit upon members of the investing public who

2   purchased QSI common stock.

3        205.   Lead Plaintiffs and other members of the Class who purchased shares of

4   QSI common stock: (1) have suffered substantial damages because they relied upon

5   the integrity of the market and paid artificially inflated prices for QSI common stock

6   as a result of the violations of §10(b) and Rule 10b-5 alleged herein; and (2) would not

7   have purchased QSI common stock at the prices they paid, or at all, if they had been

8   aware that the market prices had been artificially and falsely inflated by Defendants'

9   misleading statements and concealment.   At the time of the purchases by Lead

10  Plaintiffs and members of the Class, the fair and true value of QSI common stock was

11  substantially less than the prices paid by them.

12       206.   As a direct and proximate result of Defendant Plochocki's wrongful

13  conduct, Lead Plaintiffs and the other members of the Class suffered damages in

14  connection with their purchases of QSI common stock during the Class Period.

15  **XIV.  PRAYER FOR RELIEF**

16       WHEREFORE, Lead Plaintiffs, on their own behalf and on behalf of the Class,

17  pray for relief and judgment as follows:

18       A.   Declaring this action to be a class action and certifying Lead Plaintiffs as

19  class representatives under Rule 23 of the Federal Rules of Civil Procedure;

20       B.   Awarding compensatory damages in favor of Lead Plaintiffs and the

21  Class against all Defendants, jointly and severally, in an amount to be proven at trial,

22  including interest thereon;

23       C.   Awarding Lead Plaintiffs and the Class their reasonable costs and

24  expenses incurred in this action, including attorneys' fees and expert fees; and

25       D.   Awarding such other and further relief as the Court may deem just and

26  proper.

27

28

930247_1

1   **XV.   JURY DEMAND**

2         Lead Plaintiffs hereby demand a trial by jury.

3   DATED:  April 7, 2014                    ROBBINS GELLER RUDMAN
                                                & DOWD LLP
4                                            DARREN J. ROBBINS
                                             ROBERT R. HENSSLER JR.
5                                            CHRISTOPHER D. STEWART

6

7                                            s/ ROBERT R. HENSSLER JR.
                                             ROBERT R. HENSSLER JR.
8
                                             655 West Broadway, Suite 1900
9                                            San Diego, CA  92101
                                             Telephone:  619/231-1058
10                                           619/231-7423 (fax)

11                                           BERNSTEIN LITOWITZ BERGER &
                                                GROSSMANN LLP
12                                           BLAIR A. NICHOLAS
                                             BENJAMIN GALDSTON
13

14
                                             s/ BENJAMIN GALDSTON
15                                           BENJAMIN GALDSTON

16                                           12481 High Bluff Drive, Suite 300
                                             San Diego, CA  92130
17                                           Telephone:  858/793-0070
                                             858/793-0323 (fax)
18
                                             BERNSTEIN LITOWITZ BERGER &
19                                              GROSSMANN LLP
                                             GERALD SILK
20                                           AVI JOSEFSON
                                             1285 Avenue of the Americas, 38th Floor
21                                           New York, NY  10019
                                             Telephone:  212/554-1400
22                                           212/554-1444 (fax)

23                                           Lead Counsel for Plaintiff

24                                           CYPEN & CYPEN
                                             STEPHEN H. CYPEN
25                                           777 Arthur Godfrey Road, Suite 320
                                             Miami Beach, FL  33140
26                                           Telephone 305/532-3200
                                             305/535-0050 (fax)
27
                                             Additional Counsel for Plaintiff
28

                                             - 77 -

1

**Certificate Pursuant to Local Rule 5-4.3.4.**

2
       I, Robert R. Henssler Jr., am the ECF User whose identification and password

3
are being used to file an Amended Complaint for Violations of the Federal Securities

4
Laws.  In Compliance with Local Rule 5-4.3.4(a)(2), I hereby attest that Benjamin

5
Galdston has concurred in this filing.

6

7
                                           s/ ROBERT R. HENSSLER JR.
                                              ROBERT R. HENSSLER JR.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>CERTIFICATE OF SERVICE</u>

2        I hereby certify that on April 7, 2014, I authorized the electronic filing of the

3 foregoing with the Clerk of the Court using the CM/ECF system which will send

4 notification of such filing to the e-mail addresses denoted on the attached Electronic

5 Mail Notice List, and I hereby certify that I caused to be mailed the foregoing

6 document or paper via the United States Postal Service to the non-CM/ECF

7 participants indicated on the attached Manual Notice List.

8        I certify under penalty of perjury under the laws of the United States of America

9 that the foregoing is true and correct.  Executed on April 7, 2014.

10                      s/ ROBERT R. HENSSLER JR.
ROBERT R. HENSSLER JR.

11

12                  ROBBINS GELLER RUDMAN
  & DOWD LLP

13                  655 West Broadway, Suite 1900
San Diego, CA  92101-8498

14                  Telephone:  619/231-1058
619/231-7423 (fax)

15                  E-mail: bhenssler@rgrdlaw.com

16

17

18

19

20

21

22

23

24

25

26

27

28

930247_1

**Mailing Information for a Case  8:13-cv-01818-CJC-JPR In re Quality Systems, Inc. Securities Litigation**

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Benjamin Galdston**
  beng@blbglaw.com

- **Robert Russell Henssler , Jr**
  bhenssler@rgrdlaw.com,e_file_sd@rgrdlaw.com,tjohnson@rgrdlaw.com

- **Blair A Nicholas**
  blairn@blbglaw.com,denab@blbglaw.com,matthew.mahady@blbglaw.com,amyn@blbglaw.com,errol.hall@blbglaw.com,kayem@blbglaw.com,nikim@blbglaw.com,J

- **Brian Oliver O'Mara**
  bomara@rgrdlaw.com,e_file_sd@rgrdlaw.com,tjohnson@rgrdlaw.com

- **Gerald H Silk**
  jerry@blbglaw.com

- **Christopher Dennis Stewart**
  CStewart@rgrdlaw.com,e_file_sd@rgrdlaw.com,nhorstman@rgrdlaw.com,tjohnson@rgrdlaw.com,ldeem@rgrdlaw.com

- **Jordanna G Thigpen**
  jthigpen@jswlegal.com

- **Peter Allen Wald**
  peter.wald@lw.com,katherine.rykken@lw.com,#ocecf@lw.com,andrew.gray@lw.com,#sfdocket@lw.com,michael.kang@lw.com

- **Jeff S Westerman**
  jwesterman@jswlegal.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Stephen              H Cypen
Cypen and Cypen
777 Arthur Godfrey Road   Suite 320
Miami Beach, FL 33140

Avi                  Josefson
Bernstein Litowitz Berger & Grossman LLP
1285 Avenue of the Americas
New York, NY 10019
```