# JS-5

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

|  |  |
|---|---|
| **In re QUALITY SYSTEMS, INC. SECURITIES LITIGATION** | **Case No.: SACV 13-01818-CJC(JPRx)** <br><br> **ORDER GRANTING PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND LIFTING STAY** |

## I.  INTRODUCTION

This is a securities class action brought on behalf of all persons who purchased or otherwise acquired Quality Systems, Inc. ("QSI") securities between May 26, 2011, and July 25, 2012, (collectively, "Plaintiffs") against Defendant QSI and QSI officers Steven T. Plochocki, Paul A. Holt, and Sheldon Razin.  The operative Amended Complaint alleges violations of § 10(b) and § 20(a) of the 1934 Securities Exchange Act and Rule 10b-5 based on purportedly false and misleading statements related to QSI's current and projected sales and financial performance.  (Dkt. 26 [Amended Complaint, hereinafter "AC"].)  It also alleges insider trading violations under § 10(b) of the Exchange Act and

Rule 10b-5 against Defendant Plochocki.  The parties have reached a settlement, and Lead Plaintiffs Arkansas Teacher Retirement System ("ATRS") and City of Miami Fire Fighters' and Police Officers' Retirement Trust ("Miami") (together "Lead Plaintiffs") move for an order (1) conditionally certifying the class for settlement purposes pursuant to Federal Rule of Civil Procedure 23(b)(3); (2) preliminarily approving the settlement; (3) appointing A.B. Data, Ltd. ("A.B. Data") as claims administrator; (4) approving the proposed class notice procedures; and (5) setting a final fairness hearing date.  (Dkt. 95 [Motion, hereinafter "Mot."].)  Defendants have not opposed.  For the following reason, Lead Plaintiffs' motion is GRANTED.[1]

## II.  BACKGROUND

According to the AC, between 2011 and 2012, a period when QSI was experiencing a slowdown in its greenfield sales and a decline in its sales pipeline, Defendants misrepresented the strength of QSI's sales figures, sales prospects, greenfield sales, and pipeline figures, and issued highly favorable earnings per share (EPS) guidance for fiscal years 2012 ("FY2012") and 2013 ("FY2013").  (AC ¶¶ 44–108.)  Plaintiffs generally alleged that QSI's statements were fraudulent because they were issued contemporaneously while QSI's new bookings and sales pipeline were declining.  (*Id*. ¶¶ 46, 48–56.)  Each of the fraudulent statements allegedly was material to investors, and the Individual Defendants possessed the requisite scienter because they were aware of QSI's flagging financial performance as of late 2011.  (*Id*. ¶¶ 62, 78, 99, 102.)  Plaintiffs further alleged that Defendant Plochocki's sale of 87% of his QSI stock during the Class Period and letters from the SEC seeking clarification of QSI's EPS projections were indicators of scienter.  (*Id*. ¶¶ 134–144.)  On July 26, 2012, QSI issued a press release

---

[1]  Having read and considered the papers presented by the parties, the Court finds this matter appropriate for disposition without a hearing.  *See* Fed. R. Civ. P. 78; Local Rule 7-15.  Accordingly, the hearing set for August 13, 2018, at 1:30 p.m. is hereby vacated and off calendar.

declining to affirm the FY2013 guidance, given that record revenues for the first quarter had come in at just 18% and there was a decline in EPS and net income from the previous year's quarter.  (*Id*. ¶ 110.)  As a result of QSI's press release and "revelations" regarding its financial condition, QSI's stock price plummeted from $23.63 per share to $15.95 per share, a 33% price drop.  (*Id*. ¶ 166.)

This action was originally filed in November 19, 2013.  (Dkt. 1.)  ATRS and Miami were appointed Lead Plaintiffs on February 4, 2014, (Dkt. 22), and by stipulation, the AC was filed on April 7, 2014.  On June 20, 2014, Defendants moved to dismiss the AC, (Dkt. 29), and after full briefing and hearing on the motion, the Court granted Defendants' motion to dismiss with prejudice, (Dkt. 39).  Thereafter, Lead Plaintiffs filed a motion for reconsideration of the Court's order granting Defendants' motion to dismiss, (Dkt. 40), which the Court denied, (Dkt. 46).  Plaintiff's appealed the Court's decision to the Ninth Circuit, and on July 28, 2017, the Ninth Circuit issued its opinion, reversing and remanding the case back to this Court.  *In re Quality Sys., Inc. Sec. Litig*., 865 F.3d 1130 (9th Cir. 2017).  On November 16, 2017, the Court issued a Scheduling Order and an Order Regarding Settlement Procedures, Pre-trial Conference and Trial.  (Dkts. 64, 65.)

Following remand, the parties participated in discovery, including initial disclosures pursuant to Federal Rule of Civil Procedure 26(f), and served requests for production of documents, interrogatories, requests for admissions, subpoenas *duces tecum* on various non-parties, and a notice of deposition of Defendant QSI.  (Mot. at 5.) On May 9, 2018, the parties participated in a full-day, in-person mediation before Gregory P. Lindstrom, Esq., of Phillips ADR.  (*Id*. at 5–6.)  By the time of settlement, document discovery was ongoing, and Lead Plaintiffs had obtained more than 350,000 pages of documents produced by Defendants and non-parties.  Although the parties were unable to resolve the matter during the formal mediation session, following the mediation

the parties continued negotiations under Mr. Lindstrom's direction and supervision.  The parties ultimately accepted the mediator's "double-blind" recommendation.[2]  The parties reached a settlement in principle to settle all claims asserted in the action for $19 million.  On May 18, 2018, pursuant to the parties' joint stipulation, the Court stayed all proceedings pending submission of this motion for preliminary approval of the settlement.  (Dkt. 91.)  When the settlement was reached, Defendants' petition for a writ of certiorari to the Supreme Court was pending, and on June 8, 2018, the parties requested the Supreme Court defer action on the pending petition until its next scheduled conference on September 24, 2018, in light of the parties' settlement.  (Mot. at 6.)

## III.  ANALYSIS

### A.      Class Certification Requirements

Pursuant to Federal Rule of Civil Procedure 23, Lead Plaintiffs seek provisional certification of a class for settlement purposes only.  The proposed class is defined as

> All persons or entities who purchased or otherwise acquired QSI common stock during the period from May 26, 2011 through July 25, 2012, inclusive ("Class Period"), and were damaged thereby.  Excluded from the Class are: (a) Defendants; (b) immediate family members of the individual Defendants (as defined in 17 C.F.R. §229.404 Instructions (1)(a)(iii) and (1)(b)(ii)); (c) present or former executive officers or directors of QSI and their immediate family members (as defined in 17 C.F.R. §229.404 Instructions (1)(a)(iii) and (1)(b)(ii)); (d) any firm or entity in which any Defendant has or had a controlling interest during the Class Period; (e) any affiliates, parents, or subsidiaries of QSI; (f) all QSI plans that are covered by ERISA; and (g) the

---

[2]  The double-blind bid system compares the range of settlement amounts of each litigant in a series of rounds, and is a neutral third party to the process.  If the settlement offers between the parties coincide, neutral third party advises each party that a settlement has been reached.  Here, the mediator recommended a settlement amount of $19 million and both parties accepted.  (Mot. at 9–10.)

legal representatives, agents, affiliates, heirs, beneficiaries, successors-in-interest, or assigns of any excluded Person, in their respective capacity as such.  Also excluded from the Class are those Persons who exclude themselves by submitting a request for exclusion that is accepted by the Court.

(the "Class").  (Dkt. 95-2 ["Settlement Agreement"] at 6.)  When a plaintiff seeks conditional class certification for purposes of settlement, the Court must ensure that the requirements of Rule 23 are met as if the case were going to be fully litigated.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *Staton v. Boeing Co.*, 327 F.3d 938, 952–53 (9th Cir. 2003).  Rule 23 contains two sets of requirements for certification of a class.  First, under Rule 23(a), all proposed classes must have sufficient numerosity, commonality, typicality, and adequacy.  Second, the party seeking certification must show that the action falls within one of the three "types" of classes described in the subsections of Rule 23(b).  In this case, Lead Plaintiffs seek certification pursuant to Rule 23(b)(3).  The Court concludes that Lead Plaintiffs have presented sufficient evidence to show that the proposed class satisfies the requirements of Rule 23(a) and Rule 23(b)(3).

## 1.  Rule 23(a) Requirements

### i.  Numerosity

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable."  "No exact numerical cut-off is required; rather, the specific facts of each case must be considered."  *In re Cooper Cos. Inc. Sec. Litig.*, 254 F.R.D. 628, 634 (C.D. Cal. 2009) (citing *General Tel. Co. of Northwest, Inc. v. E.E. O. C.,* 446 U.S. 318, 330 (1980)).  "As a general matter, courts have found that numerosity is satisfied when class size exceeds 40 members."  *Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 311 F.R.D. 590, 602–03 (C.D. Cal. 2015); *see Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 473–74 (C.D. Cal. 2012).  Here, QSI had between 57 million and 59 million

shares outstanding that were trading on the NASDAQ Stock Exchange during the Class Period.  (Mot. at 16–17.)  More than 375 institutional investors reported holdings in QSI stock during that time, and it is essentially certain that thousands of individuals purchased and traded the stock.  The numerosity requirement is therefore easily satisfied.  *See In re Cooper*, 254 F.R.D. at 634 (finding the numerosity requirement met in a securities class action when 36 million shares were outstanding during the relevant time period).

### ii.   Commonality

Rule 23(a)(2) requires that "there are questions of law or fact common to the class."  "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury,' [which] does not mean merely that they have all suffered a violation of the same provision of law."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  The claims must depend upon a common contention that "is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id*.  Even a single common question satisfies the commonality requirement.  *Id.* at 2556.  The Court finds that Lead Plaintiffs have alleged a number of common questions of law and fact, including (1) whether Defendants' alleged misrepresentations and omissions violated the securities laws; (2) whether those misrepresentations and omissions were materially false and misleading; (3) whether Defendants acted with the requisite mental state when making those statements; (4) whether the individual Defendants controlled QSI and its violations of the securities laws; (5) whether the price of QSI's stock was artificially inflated during the Class Period as a result of Defendants' alleged misrepresentations and omissions; (6) whether Defendants' misrepresentations and omissions caused the Class Members to suffer a compensable loss; and (7) whether the Class members have sustained damages, and the proper measure of damages.  The answers to these common

questions necessarily resolve all Class Members' claims in one stroke, so the commonality requirement is met.

### iii.   Typicality

Rule 23(a)(3) requires that the "claims or defenses of the representative parties are typical of the claims or defenses of the class."  Representative claims are "typical" if they are "reasonably coextensive with those of the absent class members; they need not be substantially identical."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). Here, Lead Plaintiffs' claims are identical to those of other Class Members, who all suffered from the same course of conduct—QSI's allegedly misleading statements and omissions, and the subsequent inflation of the price of its stock.  The typicality requirement is therefore satisfied.

### iv.   Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  This factor requires (1) a lack of conflicts of interest between the proposed class and the proposed representative plaintiff, and (2) representation by qualified and competent counsel that will prosecute the action vigorously on behalf of the class.  *Staton*, 327 F.3d at 957.  The concern in the context of a class action settlement is to ensure that there is no collusion between the defendant, class counsel, and class representatives to pursue their own interests at the expense of the interests of the rest of the members of the class.  *Id.* at 958 n.12.

Counsel for Lead Plaintiffs, Bernstein Litowitz and RGRD, are experienced in litigating securities class actions and is familiar with the facts underlying this case.  *See Chung v. Tyson Foods, Inc.*, No. 5:16-CV-5340, 2017 WL 368506, at *5 (W.D. Ark. Jan.

25, 2017) (approving Bernstein Litowitz as lead counsel based on past recoveries of hundreds of millions of dollars in securities class actions); *Richman v. Goldman Sachs Grp., Inc.*, 274 F.R.D. 473, 479 (S.D.N.Y. 2011) (approving RGRD as lead counsel based on its substantial experience litigating complex securities actions).  Counsel have vigorously prosecuted this action, and have managed almost five years of motion practice and discovery, leading to the current settlement.  Every indication is that they have done so capably and adequately.

Additionally, there is no evidence that Lead Plaintiffs have any conflicts of interest with other Class Members or that Lead Plaintiffs have colluded with Defendants to produce a settlement.  Lead Plaintiffs are pension funds and institutional investors who have monitored this litigation and become familiar with the facts and theories underlying the class claims.  Moreover, the Court already made a preliminary finding of adequacy when it appointed ATRS and Miami to be Lead Plaintiffs.  (*See* Dkt. 22.)  The adequacy requirement is therefore met.

## 2.    Rule 23(b) Requirements

In addition to the requirements of Rule 23(a), a proposed class must satisfy one of the three requirements under Rule 23(b).  Here, Lead Plaintiffs seek certification pursuant to 23(b)(3), which allows certification if:

> (3) the court finds that the questions of law or fact common to the class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include:
>
>   (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

The predominance requirement overlaps with Rule 23(a)(2)'s commonality requirement, but is a more demanding inquiry. *Hanlon*, 150 F.3d at 1019. The "main concern in the predominance inquiry . . . [is] the balance between individual and common issues." *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 959 (9th Cir. 2009). Here, the common issues predominate over any individual questions. Lead Plaintiffs have allegedly been harmed in precisely the same way every Class Member was harmed: by purchasing QSI shares that were overvalued on account of certain misrepresentations and omissions made by QSI. Indeed, the Supreme Court has observed that "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud," such as this one. *Amchem*, 521 U.S. at 625.

The Court also finds that proceeding as a class is superior to other methods of resolving the issues presented by this case. A class action may be superior "[w]here classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). It is also superior when "no realistic alternative" to a class action exists. *Id.* at 1234–35. "District courts have consistently recognized that the common liability issues involved in securities fraud cases are ideally suited for resolution by way of a class action." *Cooper*, 254 F.R.D. at 641; *see also Freedman v. Louisiana-Pacific Corp.*, 922 F. Supp. 377, 400 (D. Or. 1996) ("[C]ourts have consistently embraced the class action device as a superior method of adjudicating federal securities fraud claims."). Given the common issues

presented by all Class Members, adjudicating these claims on an individual basis for many thousands of potential Class Members is unrealistic.  Additionally, although the Court foresees no management problems from litigating this dispute as a class action, the Supreme Court has held that a district court "need not inquire whether the case, if tried, would present intractable management problems" in a "settlement-only class certification." *Amchem*, 521 U.S. at 620.  As a result, the superiority requirement is met.

## B.       Fairness of the Proposed Settlement

Plaintiff also seeks preliminary approval of the Settlement Agreement.  Rule 23(e) "'requires the district court to determine whether a proposed settlement is fundamentally fair, reasonable, and accurate.'" *Staton*, 327 F.3d at 959 (quoting *Hanlon*, 150 F.3d at 1026).  To determine whether this standard is met, a district court must consider a number of factors, including "'the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; . . . and the reaction of the class members to the proposed settlement.'" *Id.* (quoting *Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003)).  At the preliminary approval stage, a full "fairness hearing" is not required; rather, the inquiry is whether the settlement "appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007).

Having reviewed the arms-length negotiation process and substantive terms of the Settlement Agreement, the Court finds no obvious deficiencies or grounds to doubt its fairness.  The parties did not settle until after almost five years of litigation, substantial

discovery, and a private mediation session before a neutral mediator.  *See In re Heritage Bond Litig.*, No. 02-ML-1475 DT, 2005 WL 1594403, at *9 (C.D. Cal. June 10, 2005) ("A presumption of correctness is said to attach to a class settlement reached in arm's-length negotiations between experienced capable counsel after meaningful discovery.") (internal quotation and citations omitted).  There is no evidence of collusion during the parties' settlement negotiations, particularly given that the parties accepted the mediator's "double-blind" proposal.  Indeed, "[t]he assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive." *Satchell v. Fed. Express Corp.*, No. C03-2659 SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007).

Moreover, the Court finds that the benefits provided to the proposed settlement class appropriately balance the risks of continued litigation.  Lead Plaintiffs and the Class Members' path to recovery was not without significant obstacles.  Defendants vigorously argued that the representations made by QSI were not false or did not otherwise violate the securities laws, and continued to challenge the sufficiency of the Amended Complaint.  And Defendants' petition for a writ for certiorari remains pending before the Supreme Court, adding to the risk of delay and termination of the litigation altogether.  Additionally, Lead Plaintiffs and the Class faced a difficult task of proving up causation and damages given the uncertain effect on stock price of corrective disclosures made by Defendants during the Class Period.  Trial no doubt would have included a great deal of expert testimony on these complex and difficult questions.  And an appeal would have been virtually certain, whatever the result at trial.  Further litigation entails significant risks for all involved parties, including the risk that Class Members would recover nothing at all.  *See In re Portal Software, Inc. Sec. Litig.*, No. C-03-5138 VRW, 2007 WL 4171201, at *3 (N.D. Cal. Nov. 26, 2007) ("Additional consideration of increased expenses of fact and expert discovery and the inherent risks of proceeding to summary judgment, trial and appeal also support the settlement.").  Accordingly, the relative strength of the Class Members' claims, combined with the risk of obtaining and

maintaining class status and the likely duration of further litigation, all weigh in favor of granting preliminary approval of the Settlement Agreement.

In light of such risks, the substantive terms of the Settlement Agreement are reasonable.  The parties' agreement provides for a Settlement Amount of $19 million.  (Settlement Agreement ¶ 1.36.)  The Settlement Agreement defines the Net Settlement Fund ("NSF") as the Settlement Amount less any attorneys' fees (up to 25% of the Settlement Amount, or $4,750,000), attorneys' expenses and an incentive award to each Lead Plaintiff (together, not to exceed $300,000), notice and administration expenses, (up to $500,000), taxes and tax expenses.  (*Id.* ¶¶ 1.28, 2.8; Dkt. 95-2 Ex. A-1 at 2–3.)  The parties have not provided the Court with a full estimate of what the NSF will be if their requests for deductions are granted, but the proposed notice documents indicate that the per-share award will drop $0.17 if the Court approves Lead Counsel's fee and expense application, (*Id.* Ex. A-1 at 3), and from this the Court deduces that the NSF will be approximately $13,373,000.  That fund will be distributed on a *pro rata* basis to Class Members who submit valid claims, based on the relative size of their recognized claims.  (*Id.* Ex. A-1 at 15.)  If any claimant's authorized distribution calculates to less than $10, it will not be included in the calculation and no distribution will be made to that authorized claimant.  The parties estimate that the average distribution, pre-deductions, will be $0.63 per share.  (*Id.* Ex. A-1 at 3.)  If there is a balance remaining in the NSF after an initial distribution, and if Lead Counsel and the Claims Administrator determine that it is cost-effective to do so, the Claims Administrator shall conduct a re-distribution, to authorized claimants who have cashed their initial distributions and who would receive at least $10 from such redistribution.  (*Id.* Ex. A-1 at 16.)  These redistributions shall be repeated until the balance remaining in the NSF is *de minimis*, and thereafter that remaining balance shall be distributed to non-sectarian, not-for-profit organizations.  The formula for distributing the NSF is fair, as it will compensate Class Members according to the

relative size of their claims, how many shares they owned and for how long—or, in other words, according to how much they were harmed by Defendants' alleged activities.

Lead Counsel apparently intends to seek a 25% fee.  The Ninth Circuit has set 25% as the benchmark for common fund cases.  *Torrisi v. Tucson Electric Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993).  It is unclear what incentive award will be sought for Lead Plaintiffs, given that the Settlement caps the incentive award and the attorneys' expenses together at $300,000.  The Court notes that Lead Plaintiffs' incentive award may be excessive as compare to the per-share recovery, which is likely to be small.  *See In re Toys R Us-Delaware, Inc.—Fair & Accurate Credit Transactions Act Litig.*, 295 F.R.D. 438, 470 (C.D. Cal. 2014) (explaining that California district courts typically approve incentive awards between $3,000 and $5,000).  Furthermore, the actual amount awarded by the Court to Lead Counsel and Lead Plaintiffs will affect the amount of relief afforded to the settlement class, as they directly detract from the NSF.  (*See* Settlement Agreement ¶ 1.28.)  The Court will expect Class Counsel to explain and provide detailed evidence as to why a 25% attorneys' fees award, reimbursement for attorneys' expenses, Lead Plaintiffs' incentive award, and administration costs are fair and just.  Although the Court has concerns regarding the proposed incentive awards and expenses, it nonetheless finds that the Settlement Agreement is appropriate for preliminary approval, pending a full fairness hearing.  As discussed above, the settlement eliminates the significant risk of non-recovery in continuing litigation.  Moreover, none of the signs of caution flagged by the Ninth Circuit—such as where the class receives no monetary distribution or where the fees not awarded revert to defendants—are present here.  The Court will make its final decision on the fairness and adequacy of the settlement after the parties have addressed the Court's concerns identified herein and after Class Members have had an opportunity to object.

//

The Court's fairness analysis includes evaluating the scope of any release of claims. *See, e.g.*, *Collins v. Cargill Meat Solutions Corp.*, 274 F.R.D. 294, 303 (E.D. Cal. 2011) (analyzing scope of release to determine whether preliminary approval of a settlement was warranted). A settlement agreement may only release claims that are "based on the identical factual predicate as that underlying the claims in the settled class action." *Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) (quoting *Williams v. Boeing Co.*, 517 F.3d 1120, 1133 (9th Cir. 2008)). Put another way, a release of claims that "go beyond the scope of the allegations of the operative complaint" is impermissible. *Willner v. Manpower Inc.*, No. 11-CV-02846-JST, 2014 WL 4370694, at *7 (N.D. Cal. Sept. 3, 2014). The release in this case is appropriately limited. (Agreement ¶ 1.32.)

## C.  Claims Administrator

Lead Plaintiffs request appointment of A.B. Data as the Claims Administrator. Both parties have agreed to designate A.B. Data as the Claims Administrator. (Mot. at 25.) There is no further information in the record that might aid the Court in determining whether A.B. Data is an adequate settlement claims administrator. But the Court takes judicial notice that a number of other federal courts in California have approved A.B. Data as a claims administrator in class action settlements. *See, e.g.*, *Munday v. Navy Fed. Credit Union*, No. SACV151629JLSKESX, 2016 WL 7655807, at *9 (C.D. Cal. Sept. 15, 2016) (appointing A.B. Data as claims administrator); *Lofton v. Verizon Wireless (Vaw) LLC*, No. C 13-05665 YGR, 2016 WL 7985255, at *2 (N.D. Cal. Jan. 28, 2016) (same). Accordingly, A.B. Data is appointed claims administrator in this case.

## D.  Notice of the Proposed Settlement

Finally, Lead Plaintiffs seek approval of the proposed form and manner of notice of the settlement to be sent to Class Members. Rule 23(c)(2)(B) provides that for Rule

23(b)(3) classes, as here, the Court "must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  The notification procedure outlined in the Settlement Agreement satisfies that standard.  (*See* Settlement Agreement § 5.)  No later than fifteen calendar days after the entry of this Order, QSI will provide the Claims Administrator with identifying information of Class Members.  (*Id*. ¶ 5.2.)  The Claims Administrator will then provide each Class Member with notice within ten calendar days by mail.  (*Id*.)  Additionally, the Lead Counsel will publish the Class Notice in *The Wall Street Journal* and once over a national newswire service.  (Mot. at 24.)

Notice to Class Members must "clearly and concisely state, in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues or defenses; (iv) that the class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion, and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)."  Fed. R. Civ. P. 23(c)(2)(B).  The proposed Class Notice form provides clear information about the definition of the class and nature of the action, a summary of the terms of the proposed settlement, the terms of the released claims, the process of objecting to the settlement, and the consequences of inaction.  (*See* Settlement Agreement Ex. A-1.)  The Claim Form that is to be provided along with the Class Notice is similarly acceptable.  (*Id.* Ex. A-2.)  Class Members will have 120 days after the notice is mailed to either submit the Claim Form or request exclusion.  Finally, the notice materials comply with the special requirements found in the Private Securities Litigation Reform Act, which requires that, among other things, the notice materials inform class members of the amount of the settlement in the aggregate and per-share basis, whether the parties disagree on the amount, the amount of desired attorneys' fees, contact information for counsel, and an explanation for the settlement.  15 U.S.C. §78u-4(a)(7)(A)–(F).

As the notice procedure comports with Rule 23(c)(2)(B), the Court directs that notice be distributed to Class Members according to the terms and timeline provided in the Settlement Agreement and attendant exhibits.

**IV. CONCLUSION**

In light of the parties' settlement agreement, the Court LIFTS the stay. For the foregoing reasons, the Court GRANTS provisional certification of the class for settlement purposes only; GRANTS preliminary approval of the settlement; APPROVES the appointment of Lead Counsel as Class Counsel; APPROVES Lead Plaintiff to be the class representative; APPROVES A.B. Data to be the Claim Administrator; and APPROVES of the proposed distribution of notice to the class. Notice shall be distributed to class members by **August 14, 2018**. The final approval hearing shall be held on **Monday, November 19, 2018, at 1:30 p.m.**

DATED:    July 30, 2018

_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE